**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KBC ASSET MANAGEMENT NV, derivatively on behalf of CHEMED CORPORATION, <br><br>       Plaintiff, <br><br>   v. <br><br> KEVIN J. MCNAMARA, JOEL F. GEMUNDER, PATRICK P. GRACE, THOMAS C. HUTTON, WALTER L. KREBS, ANDREA R. LINDELL, THOMAS P. RICE, DONALD E. SAUNDERS, ARTHUR V. TUCKER, JR., GEORGE J. WALSH III, FRANK E. WOOD, TIMOTHY S. O'TOOLE, DAVID P. WILLIAMS, and ERNEST J. MROZEK, <br><br>       Defendants, <br><br>    -and- <br><br> CHEMED CORPORATION, a Delaware corporation, <br><br>       Nominal Defendant. | Civil Action No. _____ <br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II.   JURISDICTION AND VENUE .....................................................................................4

III.  PARTIES ..................................................................................................................5

IV.  THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES ...........................................10

      A.    The Fiduciary Duties of the Members of the Board ...............................10

      B.    Chemed's Corporate Governance Principals Describe Additional
           Responsibilities of the Board ..................................................................11

      C.    Additional Fiduciary Duties of the Audit Committee Members ............12

V.   FACTUAL ALLEGATIONS ........................................................................................13

      A.    The Medicare Hospice Program .............................................................13

            1.      Eligibility for Hospice Care Services .........................................14

            2.      Eligibility for Crisis Care Services ............................................14

            3.      Obligations of the Hospice Care Provider under Medicare .......15

            4.      The Medicare Hospice Payment Process ...................................17

            5.      Medicare Reimburses More Intensive Inpatient and Crisis Care at a
                    Rate Higher than That for Routine Hospice Care ......................19

      B.    The False Claims Act and Related Federal and State Healthcare Fraud
           Statutes ...................................................................................................19

      C.    The Government Has Recently Asserted Numerous FCA Claims Against
           Hospice Providers ..................................................................................21

      D.    Background on Chemed and Vitas .........................................................23

      E.    Vitas Systematically Charges Medicare for a Greater Proportion of More
           Expensive Forms of Care than the Rest of the Hospice Industry .........25

      F.    Vitas Systematically Charges Medicare for Longer Stays than the Rest of
           the Hospice Industry ..............................................................................28

      G.    Since 2007, Four *Qui Tam* Actions Have Been Filed Against Chemed ...............29

            1.      The *Spottiswood* Action .............................................................29

            2.      The *Urick* Action .....................................................................32

             3.      The *Rehfeldt* Action ..................................................................38

             4.      The *Gonzales* Action..................................................................39

      H.    The Government Investigates and Intervenes in the *Qui Tam* Actions and
           Files Suit against Chemed for Submitting False Claims for Hospice Care ..........43

            1.      Chemed's and Vitas' Business Practices Led to the Submission of
                    False or Fraudulent Claims for Crisis Care and Ineligible Patients..........44

2.      The Government Alleges Substantial Evidence of False Claims for Hospice Services ........................................................................................46

3.      The Government Alleges Substantial Evidence that Chemed and Vitas Intentionally Failed to Train Employees and Pressured Nurses to Increase Hospice Profits ...........................................................48

4.      There is Substantial Evidence that Chemed's Management Closely Monitored the Company's ADC Numbers ...............................................49

I.      Plaintiff's Confidential Sources Have Corroborated the Wrongdoing Alleged by the Government and *Qui Tam* Relators ..................................53

J.      Chemed's Board of Directors and Executives Knew or Should Have Known About Improper Medicare Hospice Billing................................57

K.      Chemed Shareholders Have Expressed Disapproval of the Board's Executive Compensation Decisions........................................................61

VI.     DERIVATIVE ALLEGATIONS ................................................................................63

VII.    DEMAND ON THE BOARD OF DIRECTORS IS EXCUSED AS FUTILE ......................63

A.      Demand Is Excused Because the Individual Defendants' Conduct Is Not a Valid Exercise of Business Judgment.....................................................64

B.      Demand Is Excused Because a Majority of the Current Board Members Are Either Not Independent or Are Conflicted Because They Face a Substantial Likelihood of Liability Arising From Their Misconduct..................65

C.      The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith .........................68

VIII.   COUNT I - DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY (AGAINST THE INDIVIDUAL DEFENDANTS) ...............................................................................69

IX.     PRAYER FOR RELIEF ........................................................................................70

X.      DEMAND FOR JURY TRIAL ................................................................................71

Plaintiff KBC Asset Management NV ("Plaintiff") brings this action derivatively for the benefit of nominal defendant Chemed Corporation ("Chemed" or the "Company"). Plaintiff bases its allegations on personal knowledge as to itself, and upon information and belief as to all other matters. Plaintiff's information and belief are based upon, among other things, the investigation of its counsel, which included: review of public filings with the United States Securities and Exchange Commission ("SEC"); review of public filings in federal courts, including lawsuits filed by (1) the United States Department of Justice ("DOJ"), (2) certain *qui tam* relators, and (3) court-appointed lead plaintiffs in federal securities fraud litigation; interviews with former employees of Chemed and/or its subsidiaries; and review of press releases, news reports, analyst reports, hospice industry reports, investor conference-call transcripts, federal and state government websites, and other information available in the public domain. Based on the allegations set forth in this complaint, Plaintiff asserts shareholder derivative claims for breach of fiduciary duty against members of Chemed's board of directors (the "Board") and certain Chemed executives (collectively, the "Individual Defendants").

## I.    INTRODUCTION

1.    This shareholder derivative action arises from the Chemed Board's consciously causing and permitting the Company to engage in nearly a decade of systematic illegal billing of the Company's hospice patients in disregard for Medicare guidelines and patients' medical needs. Specifically, since at least 2004, Chemed, through its affiliated subsidiaries, which provide hospice care and services under the brand Vitas Innovative Hospice® (collectively referred to herein as "Vitas"), has submitted or caused the submission of false claims to the federally funded Medicare program by (1) enrolling and billing Medicare for certain patients who were not eligible to receive hospice services because the patients did not have a life expectancy of six months or less if their illnesses ran their normal course; and (2) enrolling

certain patients in, and billing Medicare for, more expensive continuous care (commonly referred to as "crisis care") services when those patients did not need crisis care services or when Vitas, in fact, did not provide such services or provided inappropriate medical care.  As a result, Chemed and Vitas caused certain patients to forgo appropriate curative care in lieu of inappropriate hospice care for which they did not qualify or which they did not receive.

2.      The illegal, and potentially criminal, conduct in which Chemed has engaged is not the work of a rogue employee or even one or two of Vitas' fifty-two hospice programs operating outside the purview of the Board or senior management.  Rather, the conduct in question was at the core of Chemed's business strategy and was deeply embedded in the Company's regular practices.

3.      Since 2007, Chemed has been the subject of investigations by the Office of the Inspector General ("OIG"), the DOJ, the Florida Attorney General, and the Texas Attorney General.  During the same timeframe, Chemed was named as a defendant in a securities fraud class action and at least three *qui tam* actions filed by former Chemed employees in federal courts in California, Florida, Texas, and Illinois.  These actions make detailed and corroborating allegations, based on firsthand accounts from current and former Vitas employees, regarding Chemed's institutionalized practice of fraudulently billing Medicare by improperly enrolling scores of ineligible patients in hospice and crisis care programs.

4.      On May 2, 2013, following an eight-year investigation, the United States government intervened in three of the previously-filed *qui tam* actions and filed a False Claims Act action (the "DOJ Action") against Chemed and Vitas for fraudulently billing Medicare.  Like the *qui tam* actions, the government's lawsuit relies on accounts from Vitas managers, doctors, and nurses regarding widespread misconduct.  For example, the government describes the results

of a medical review by Vitas' Medicare claims processor that led to the discharge of 75-80 patients who were determined to be ineligible for hospice services.

5.      The allegations and evidence gathered by the government, the multiple *qui tam* relators, and the federal securities-fraud plaintiffs are corroborated by the first-hand knowledge of five confidential witnesses ("CWs") identified by Plaintiff herein – all former employees of Vitas whose positions provided them with access to relevant information.  These witnesses, including a physician with direct contact with patients, a Senior Director, and a Director of Market Development, have described their experiences at Vitas during their tenure.  For example, the Vitas physician confirmed that at Vitas "there was a lot of pressure to bring in patients who didn't qualify and didn't qualify to stay based on Medicare criteria."  This physician concluded that Vitas "was not an ethical place to work."

6.      These corroborating first-hand accounts of Chemed's systematic Medicare fraud are further confirmed by a comparison of Vitas patient data in Chemed's own annual reports with statistics provided the National Hospice and Palliative Care Organization ("NHPCO"), the largest nonprofit membership organization representing hospice and palliative care programs and professionals in the United States.[1]  These statistics confirm that Vitas' patients receive more expensive crisis and inpatient care much more often than the national industry average, and remain in hospice much longer than the national average.  In particular, the percent of Vitas' patients receiving crisis care was approximately: thirteen times the national average in 2006; five times the national average in 2007; four times the national average in 2008, 4.5 times the national average in 2009, four times the national average in 2010, eleven times the national

---

[1] This organization is chaired by an Executive Vice President ("EVP") of Vitas.

average in 2011, and nine times the national average in 2012.  Similarly, from 2007 to 2012, Vitas patients remained in hospice approximately ten days longer than the national average.

7.     Chemed's illegal practices have caused significant harm and expense to the Company and damaged Chemed's reputation with patients and its largest and most important customer, the United States government.  At present, Chemed and members of the Board remain exposed to significant civil and/or criminal liability.

8.     Absent the relief sought herein, the Individual Defendants will continue to cause injury to Chemed by, *inter alia*, consciously and/or recklessly violating federal and state law, exceeding their powers as directors of a Delaware corporation by engaging in unlawful activities, violating their fiduciary duties, and otherwise wasting assets to the detriment of the Company and its shareholders.

9.     As current officers and/or directors of Chemed, each of the Individual Defendants owed and/or owes the Company and its shareholders the fiduciary duties of good faith, loyalty, and due care in the management and administration of the Company.  The Individual Defendants have breached these obligations, however, by, *inter alia*, approving, authorizing, acquiescing in and/or willfully turning a blind eye to Chemed's substantial and systematic violation of federal and state law and the Company's submission of thousands of fraudulent claims to Medicare and Medicaid.  Each such violation threatens Chemed's ability to operate as a health care provider under federal and state health care programs and subjects the Company to civil liability.

## II.     JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C § 1332 in that the matter in controversy exceeds $75,000 and is between citizens of different States.

11.     Venue is proper in this jurisdiction pursuant to 28 U.S.C § 1391(b) because the named defendant, Chemed, is incorporated in, and therefore is a resident of, the State of Delaware.

12.     Additionally, Section 8.07 of Chemed's By-Laws states that "[u]nless the corporation consents in writing to the selection of an alternative forum, a state or federal court located within the State of Delaware *shall be the sole and exclusive forum* for (i) any derivative action or proceeding brought on behalf of the corporation, (ii) any action asserting a claim for breach of a fiduciary duty owed by any director, officer or other employee of the corporation to the corporation or the corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law, the certificate of incorporation or the by-laws of the corporation, or (iv) any action asserting a claim governed by the internal affairs doctrine, in each such case subject to such court having personal jurisdiction over the indispensable parties named as defendants therein."  (Emphasis added.)

### III.   PARTIES

13.     Plaintiff is a current owner of Chemed common stock and has continuously owned such shares since February 9, 2009.  Plaintiff brings this action derivatively in the right of and for the benefit of Chemed.  Plaintiff will fairly and adequately represent the interests of Chemed and its shareholders in enforcing the rights of the Company.  Plaintiff is an asset management company headquartered in Brussels, Belgium.  Plaintiff is a corporation duly organized and existing under the laws of Belgium.  Plaintiff is a citizen of Belgium.

14.     Nominal Defendant Chemed is a corporation duly organized and existing under the laws of the State of Delaware.  Chemed maintains its principal place of business and executive offices at 2600 Chemed Center, 255 East Fifth Street, Cincinnati, Ohio 45202. Chemed's largest subsidiary, Vitas, is the nation's largest for-profit provider of end-of-life

hospice care services.  Vitas serves patients through 52 hospice programs in 18 states and the District of Columbia.  Chemed is also a leading provider of repair and maintenance services to the residential and commercial markets through its other subsidiary, Roto-Rooter.  Chemed's stock trades on the New York Stock Exchange under the ticker symbol "CHE."  Chemed's Board maintains three standing committees on which the Company's directors serve: the Audit Committee, the Compensation/Incentive Committee, and the Nominating Committee.  Chemed is a citizen of both Delaware and Ohio.

15.     Defendant Kevin J. McNamara ("McNamara") has been the President and Chief Executive Officer ("CEO") of Chemed since August 1994 and May 2001, respectively.  Previously, McNamara was Chemed's EVP, Secretary, and General Counsel from November 1993, August 1986, and August 1986, respectively, to August 1994.  McNamara has been a member of the Board since 1987 and has been the Chairman of Vitas since 2004.  Since 2004, McNamara has received more than $44 million for his service as a director and officer of the Company.  McNamara is a citizen of Ohio.

16.     Defendant Timothy S. O'Toole ("O'Toole") has been the CEO of Vitas and EVP of Chemed since 2004 and 1992, respectively.  O'Toole was a member of the Board from 1991 to 2008.  From 1989 to 1997, O'Toole was a director of Omnicare, Inc. ("Omnicare"), a public company that was spun off from Chemed in 1981.  O'Toole has two current or former brothers-in-law (Thad Jacarz and Robert Meyrose) who were employed by Vitas.  Since 2004, O'Toole has received more than $19 million for his service as a director and officer of the Company.  O'Toole is a citizen of Florida.

17.     Defendant David P. Williams ("Williams") has been EVP and Chief Financial Officer ("CFO") of Chemed since 2007 and 2004, respectively.  Since 2004, Williams has

received more than $17 million for his service as an officer of the Company.  Williams is a citizen of Ohio.

18.      Defendant Joel F. Gemunder ("Gemunder") has been a member of the Board since 1977.  Gemunder was a member of the Nominating Committee from May 2004 to May 2007 and has been on that committee since May 2008.  From May 1981 to August 2010, Gemunder was the President and a member of the board of directors of Omnicare.  Previously, Gemunder was a Group Executive and EVP of Chemed, and a Vice President ("VP") of W.R. Grace.  Since 2004, Gemunder has received more than $890,000 for his service as a director of the Company.  Gemunder is a citizen of Florida.

19.      Defendant Patrick P. Grace ("Grace") has served on the Board since 1996 and has been a member of the Audit Committee since May 1998.  Grace has been a member of the Nominating Committee since May 2000, serving as Chairman of that committee since May 2009.  Grace additionally served as a member of the Compensation/Incentive Committee from May 1997 to May 2002.  Grace is the son of Joseph P. Grace, who was the president of W.R. Grace & Co. ("W.R. Grace") from 1945 to 1992 and the chairman of Chemed until 1993.  Since 2004, Grace has received more than $1 million for his service as a director of the Company.  Grace is a citizen of New York.

20.      Defendant Thomas C. Hutton ("Hutton") has served on the Board since 1985.  He is a VP and attorney for Chemed and has held this position since 1988.  Hutton served as director of Omnicare from 1983 to 2001.  Hutton is the son of Edward L. Hutton, who served as CEO of Chemed from 1970 to 2001, as Chairman of Chemed from 2004 to 2009, and as VP of W.R.

Grace prior to 1971.  Since 2004, Hutton has received more than $93,000 for his service as a director of the Company.[2]  Hutton is a citizen of New York.

21.     Defendant Walter L. Krebs ("Krebs") has served on the Board from May 1989 to April 1991, May 1995 to May 2003, and since May 2005.  Krebs served as a member of the Audit Committee from May 1996 to May 1997 and again from May 2005 to May 2008.  Krebs was a member of the Incentive Committee from May 1996 to May 1997 and since May 2009 has continued to serve on the Compensation/Incentive Committee.  Krebs was formerly SVP, CFO, and Treasurer of Service America Systems, Inc., a wholly owned subsidiary of Chemed (formerly Roto-Rooter) from October 1997 to July 1999.  From January 1990 to April 1991, Krebs was the CFO of Chemed subsidiary DuBois Chemicals.  Since 2005, Krebs has received more than $895,000 for his service as a director of the Company.  Krebs is a citizen of Kentucky.

22.     Defendant Andrea R. Lindell ("Lindell") has served on the Board since May 2008.  Lindell served as a member of the Compensation Committee since May 2008.  Lindell has served as a director of Omnicare since 1992.  From 1990 to 2010, Lindell served as Dean of the College of Nursing of the University of Cincinnati, to which the Chemed Foundation donated at least $66,700 between 2001 and 2007.  Since May 2008, Lindell has received more than $500,000 for her service as a director of the Company.  Lindell is a citizen of North Carolina.

23.     Defendant Thomas P. Rice ("Rice") has served on the Board and as a member of the Audit Committee since May 2009.  Since May 2009, Rice has received more than $510,000 for his service as a director of the Company.  Rice is a citizen of Maryland.

24.     Defendant Donald E. Saunders ("Saunders") has been a member of the Board since 1998.  Saunders also was a member of the Board from May 1981 to May 1982, and from

---

[2] Chemed has not disclosed Hutton's executive compensation.

May 1983 to May 1987.  Saunders has been a member of the Audit Committee since May 1998 and has been its Chairman since May 2002.  Saunders held various executive roles at DuBois Chemicals, a subsidiary of Chemed, from 1970 to 1991.  Since 2004, Saunders has received more than $1.1 million for his service as a director of the Company.  Saunders is a citizen of Ohio.

25.     Defendant Arthur V. Tucker, Jr. has been VP and Controller of Chemed since February 1989.  From May 1983 to February 1989, Tucker was Assistant Controller of Chemed. Tucker joined the former DuBois Chemicals subsidiary of Chemed in 1977 as Director of the Internal Audit Department.  Tucker transferred to Chemed in 1979 as an Assistant to the Controller and was promoted to Assistant Controller in 1983.  Since 2004, Tucker has received more than $7.9 million for his service as an officer of the Company.

26.     Defendant George J. Walsh III ("Walsh") has served on the Board since 1995. Walsh has been a member of the Compensation and Incentive Committee from May 1998 to May 2004 and again in May 2007, and served as Chairman of that Committee since May 2008. Walsh was a member of the Nomination Committee from May 2000 to May 2004, and has been a member of that Committee since May 2007, and served as Chairman of that Committee from May 2007 to May 2009.  Walsh was also a member of the Audit Committee from May 1997 to May 1998.  Walsh is a partner with the law firm of Thompson Hine LLP ("Thompson Hine"), which for fiscal years 2004 to 2007, received fees for legal services provided to Chemed totaling $113,699.  Thompson Hine has also represented Omnicare.  Since 2004, Walsh has received more than $1.4 million for his service as a director of the Company.  Walsh is a citizen of New York.

27.     Defendant Frank E. Wood ("Wood") has served on the Board since May 2002. Wood had served as a member of the Compensation and Incentive Committee since May 2002. Since 2004, Wood has received more than $880,000 for his service as a director of the Company. Wood is a citizen of Ohio.

28.     Defendant Ernest J. Mrozek ("Mrozek") served on the Board from May 2009 to May 2010 and as a member of the Audit Committee in May 2009 to May 2010.  From May 2009 to May 2010, Mrozek has received more than $85,000 for his service as a director of the Company.  Mrozek is a citizen of Illinois.

29.     The Defendants identified in paragraphs 15 through 28 are collectively referred to herein as the "Individual Defendants."

30.     Chemed and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.     THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A.     The Fiduciary Duties of the Members of the Board

31.     By reason of their positions as present or past officers and/or directors of Chemed and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed and owe the Company and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.  Each Individual Defendant owed and owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

32.     To discharge their duties, the Individual Defendants were and are required to exercise reasonable and prudent oversight and supervision over the management, policies,

practices, and controls of Chemed and its most significant subsidiaries.  By virtue of such duties,

the Individual Defendants were and are required to, among other things:

a.  manage, conduct, supervise, and direct the business affairs of Chemed (and those subsidiaries) in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and By-Laws);

b.  neither violate nor knowingly permit any officer, director, or employee of Chemed (or those subsidiaries) to violate any applicable laws, rules or regulations;

c.  remain informed as to the status of Chemed's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto, and to take steps to correct such conditions or practices;

d.  establish and maintain systematic and accurate records and reports of the business and affairs of Chemed and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records; and

e.  maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Chemed (and those subsidiaries) are conducted in accordance with all applicable laws, rules, and regulations.

**B.    Chemed's Corporate Governance Principals Describe Additional Responsibilities of the Board**

33.    Chemed's Corporate Governance Principles "have been approved by the Board of

Directors and, along with the charters of board committees, provide the framework for the

governance of the Corporation."   The Corporate Governance Principles provide that "[i]n

addition to its general oversight of management, ***the board also performs a number of specific***

***functions, including . . . ensuring processes are in place for maintaining . . . the integrity of***

***compliance with law and ethics*** . . . ."  (Emphasis added.)  The Corporate Governance Principles

also state that it is Board's responsibility to "assure that the long-term interests of the shareholders are being served."[3]

### C.    Additional Fiduciary Duties of the Audit Committee Members

34.    In addition to the fiduciary duties discussed above, the Board's Audit Committee is responsible for assisting the Board in ensuring "compliance of the Company with legal and regulatory requirements," including "oversight of . . . legal matters . . . and inquiries received from regulators or governmental agencies."   Since 2004, Defendants Grace, Krebs, Rice, Saunders, and Mrozek have served on the Audit Committee at various times.   The Audit Committee is currently composed of Defendants Grace, Rice, and Saunders.

35.    The Audit Committee Charter provides that the "Audit Committee is appointed by the Board to assist the Board in monitoring . . . the compliance of the Company with legal and regulatory requirements . . . ."   The Charter further provides that the "Audit Committee shall," among other things:

- "Review with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures."

- "Assist Board oversight of, and review with the Company's counsel, legal matters that may have a material impact on the financial statements and any material reports or inquiries received from regulators or governmental agencies."

- "Meet with management, the internal auditor, and the independent auditor in separate executive sessions to discuss any matters that the Audit Committee or those persons believe should be discussed."

- "Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and for the

---

[3]   Chemed's Corporate Governance Principles are available at http://ir.chemed.com/phoenix.zhtml?c= 72704&p=IROL-govhighlights.

confidential, anonymous submission by employees of such concerns."

The Audit Committee Charter further provides that the "foregoing shall be the common recurring activities of the Audit Committee in carrying out its functions."[4]

## V.   FACTUAL ALLEGATIONS

### A.   The Medicare Hospice Program

36.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., establishes the Health Insurance for the Aged and Disabled Program, commonly known as the Medicare Program ("Medicare").

37.    Medicare is comprised of four parts.  Medicare Part A is a 100-percent federally funded health insurance program for qualified individuals aged 65 and older, younger persons with qualifying disabilities, and persons with end-stage kidney disease (permanent kidney failure requiring dialysis or transplant).  The majority of Medicare Part A's costs are paid by United States citizens through payroll taxes.  The benefits covered by Medicare Part A include hospice care under 42 U.S.C. § 1395x(dd).

38.    Hospice care is designed to provide patients with palliative care (i.e., care designed to relieve pain and other symptoms of terminal illness, but not to cure an illness or condition) instead of curative care (i.e., care designed to cure an illness or condition).  Hospice palliative care includes a comprehensive set of medical, social, psychological, emotional, and spiritual services for terminally ill individuals.  To be covered by Medicare, hospice services must be reasonable and necessary for the palliation and management of a patient's terminal illness as well as related conditions.  Medicare outlines the admission criteria for hospice care of various illnesses.

---

[4]    Chemed's Audit Committee Charter is available at http://media.corporate-ir.net/media_files/irol/72/72704/governance/AuditCharter_111306.pdf.

### 1.      Eligibility for Hospice Care Services

39.      Hospice is available to terminally ill individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, as long as certain conditions are met.  *See* Medicare Benefit Policy Manual, Chapter 9, §§ 10, 20.1.[5]

40.      To receive hospice care under Medicare, an individual must be (1) entitled to Part A of Medicare; and (2) certified as "terminally ill" in accordance with 42 C.F.R. § 418.22.  *See* 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.20.  According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

41.      Participation in hospice care is voluntary; Medicare beneficiaries must choose hospice care.  In choosing hospice care, Medicare beneficiaries forego curative treatment of their terminal illnesses.  Thus, ***patients who receive the Medicare hospice benefit no longer receive care that seeks to cure their illnesses***.  For this reason, electing hospice care is a critical medical decision for a patient.

### 2.      Eligibility for Crisis Care Services

42.      Continuous care, or "crisis care," is used for a patient who elects to receive hospice care at home, or in a long-term care facility (such as a nursing home).  Crisis care is provided when the (at-home or nursing home) hospice patient is experiencing a "brief period[] of crisis," and only as necessary to allow the patient to remain at their residence.  42 C.F.R. § 418.302(b)(2).  Medicare defines a brief "period of crisis" as "a period in which the individual requires continuous care to achieve palliation and management of acute medical symptoms."  *Id*.

---

[5] *Available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c09.pdf.

at § 418.204(a).  *See also* Medicare Benefit Policy Manual, § 20.1 ("Continuous home care may be provided only during a period of crisis.").[6]

43.     According to a May 3, 2013 Memorandum Report, published by the OIG, titled *Medicare Hospice: Use of General Inpatient Care*, "Continuous home care is allowed only during brief periods of crisis in which a beneficiary requires continuous care to achieve palliation or management of acute medical symptoms."

44.     To bill Medicare for crisis care, a hospice provider must provide care that is: (1) designed to palliate the patient's acute medical symptoms; (2) provided to the patient for at least eight hours in a 24-hour period, counted from midnight to midnight; and (3) predominantly nursing care, meaning care that is provided by a registered nurse (RN), licensed practical nurse (LPN), or nurse practitioner (NP).  *See* 42 C.F.R. §§ 418.302, 418.204.  If the care lasts less than eight hours in a 24-hour period, the hospice may only bill Medicare for routine home care for that day of hospice services.  Similarly, if the care provided does not consist of predominantly nursing care, the hospice may not bill Medicare for crisis care and must instead bill for routine home care.  *See id.*

### 3.      Obligations of the Hospice Care Provider under Medicare

45.     Healthcare providers like Vitas are obligated to comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare under what is known as "Part A."  When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services, and, in the case of hospice care, to know that Medicare only reimburses for services that are reasonable and necessary for the palliation or management of terminal illness.  42 U.S.C. § 1395y(a)(1)(C).

---

[6] *See also* http://www.nhpco.org/sites/default/files/public/regulatory/CHC_Tip_sheet.pdf ("Continuous home care may be provided only during a period of crisis.")

46.     To bill Medicare for hospice care, the hospice provider must ensure that a patient is terminally ill.  In that regard, the hospice provider must have a written certification of terminal illness that, among other things, includes: (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation that support a determination that the patient has a life expectancy of six months or less; and (3) the signature(s) of the physician(s) attesting to these medical conclusions.  42 C.F.R. § 418.22.

47.     In addition to the Medicare regulations, these important requirements also are contained in the Medicare Benefit Policy Manual, Chapter 9, § 20.1.  That manual also contains additional descriptions and guidance for hospice providers.

48.     Recognizing the gravity of a patient's decision to forgo curative care for a terminal illness, Medicare instructs that "a hospice needs to be certain that the physicians' clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of six months or less if the illness runs its normal course.  *A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare*."   170 Fed. Reg. 70534-35.  (Emphasis added.)

49.     The clinical record for each hospice patient must contain "correct clinical information."  42 C.F.R. § 418.104.  All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated. . . ."  42 C.F.R. § 418.104(b).

50.     For the initial 90-day period, the hospice provider must obtain a certification of terminal illness for the patient from both (1) the medical director of the hospice or a physician member of the hospice interdisciplinary group, and (2) the individual's attending physician, if

the individual has an attending physician.  For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who is a member of the hospice's interdisciplinary group for the patient.  42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.22.

51.     As specified by 42 C.F.R. § 418.56, an interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor. The interdisciplinary group is responsible for coordination of each patient's care, to ensure continuous assessment of each patient's and family's needs, and for the implementation of the interdisciplinary plan of care.

### 4.     The Medicare Hospice Payment Process

52.     The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through the Centers for Medicare & Medicaid Services ("CMS"), as supported by American taxpayers. CMS, in turn, contracts with Medicare Administrative Contractors ("Medicare claims processors," also known as "MACs"), to review, approve, and pay Medicare bills, called "claims," received from health care providers like Vitas. In this capacity, the Medicare claims processors act on behalf of CMS.

53.     Payments typically are made by Medicare directly to health care providers such as Vitas rather than to the patient.  The Medicare beneficiary usually assigns his or her right to Medicare payment to the provider.

54.     The Medicare provider either submits its bill directly to Medicare for payment, or it contracts with an independent billing company to submit a bill to the Medicare claims processor, on the provider's behalf.

55.     Since 2002, Palmetto GBA ("Palmetto") has been the Medicare claims processor that is responsible for processing the claims that Vitas submitted to obtain Medicare payments for hospice services.

56.     Palmetto provides guidance to hospice providers on the medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less, and such guidance is publicly available.

57.     Palmetto also provides publicly available guidance to help hospice providers determine when crisis care is appropriate.

58.     In addition, Palmetto offers training and assistance to hospice providers on the Medicare requirements.

59.     Because it is not feasible for the Medicare program, or its contractors, to review the patient files for the millions of claims for payments that are received from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements, and trusts the providers to submit truthful and accurate claims.  Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form called a "CMS-1450 form."

60.     When a Medicare beneficiary elects hospice services, hospices must complete Form CMS-1450.[7]  *See generally* Medicare Claims Processing Manual, Chap. 11, Processing Hospice Claims, and Medicare Program Integrity Manual, Chap. 3, *Verifying Potential Errors and Taking Corrective Actions*.  Additionally, all Medicare providers must have, in each of their patients' files, the medical documentation needed to establish that the Medicare items or services for which Medicare reimbursement is being sought are reasonable and medically necessary.

---

[7] *Available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c11.pdf.

### 5. Medicare Reimburses More Intensive Inpatient and Crisis Care at a Rate Higher than That for Routine Hospice Care

61.     Medicare reimburses Hospice care providers at a higher rate for more intensive levels of hospice care.   For example, Medicare's daily payment rates for routine, general inpatient, and crisis care during 2013 (unadjusted for the geographic location of the patient) were as follows:

**FY 2013 UNADJUSTED PAYMENT RATES BY LEVEL OF HOSPICE CARE**

| Description | Rate |
|------------|------|
| Routine Care | $153.45 |
| Inpatient Care | $682.59 |
| Crisis Care | $895.56 |

Source: Dept. of Health and Human Services, CMS, Hospice Payment System (July 2012).[8]

### B. The False Claims Act and Related Federal and State Healthcare Fraud Statutes

62.     Business obtained by submitting ineligible claims for reimbursement under the federal and state Medicare and Medicaid programs exposes a company and its executives to liability under the False Claims Act ("FCA").

63.     The FCA provides:

(a) Liability for certain acts. – Any person who – (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; . . . , or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to payor transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

---

[8]     *Available       at*       http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/hospice_pay_sys_fs.pdf.

. . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

(c) Claim defined. – For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(a), (b), (c).

64.     The civil penalties for violations of the FCA occurring on or after September 29, 1999 were increased to a minimum of $5,500 and a maximum of $11,000 per violation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999).

65.     Further, by submitting false claims to Medicare, a party becomes subject to criminal liability under several federal statutes including, but not limited to, the following:

- 18 U.S.C. § 287 ("False, fictitious or fraudulent claims") provides that "Whoever makes or presents . . . any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title."

- 18 U.S.C.A. § 286 ("Conspiracy to defraud the Government with respect to claims") provides that "[w]hoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined under this title or imprisoned not more than ten years, or both."

- 42 U.S.C. § 1320a-7b(a) ("Criminal penalties for acts involving Federal health care programs") provides that "[w]hoever . . . knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program [or] at any time knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment . . . shall . . . be guilty of a misdemeanor and upon conviction thereof fined not more than $10,000 or imprisoned for not more than one year, or both."

- 18 U.S.C. §§ 1341 and 1343 make it a separate federal crime to utilize either the mails or private or commercial interstate carriers, or wire communications to accomplish an illegal act, such as presenting a false claim to Medicare or a state health plan. In addition, 18 U.S.C. §1345 (a)(1)(C) specifically provides that the federal government may enjoin persons that are "committing or about to commit a Federal health care offense."

66.     In addition to the federal FCA, each of the 18 states in which Vitas operates have enacted either health care fraud statutes, false claims statutes, or both.  *See* Exhibit A (Health-Care Fraud and False-Claims-Act Statutes in States in Which Vitas Operates).  These state statutes provide significant civil and criminal penalties for violators.  *Id.*

**C.     The Government Has Recently Asserted Numerous FCA Claims Against Hospice Providers**

67.     Since 2009, federal prosecutors have asserted FCA claims against numerous hospice providers for, *inter alia*, enrolling ineligible patients into hospice care.  Settlements with the government related to this conduct include the following:

- Golden Gate Ancillary LLC, dba AseraCare Hospice, Odyssey HealthCare, a subsidiary of Gentiva Healthcare ($25 million);

- Kaiser Foundation Hospitals - Kaiser Sunnyside Medical Center, Kaiser Foundation Health Plan of the Northwest and Northwest Permanente P.C., Physicians & Surgeons (collectively, Kaiser NW) ($1,830,322);

- Hospice of Arizona L.C., along with a related entity, American Hospice Management LLC, and their parent corporation, American Hospice Management Holdings LLC, ($12 million);

- Altus Healthcare & Hospice Inc. n/k/a AHH Historic Inc., of Atlanta, Georgia (Halcyon Healthcare) ($555,572);

- Hospice Home Care, Inc. ($2.7 million);

- SouthernCare Inc. ($24.7 million);

- Diakon Lutheran Social Ministries d/b/a Diakon Hospice Saint John (Diakon) ($10.56 million);

- Hospice Family Care, Inc. ($3.7 million);

- S-Hospice Group, Inc. d/b/a Home Hospice of North Texas (Home Hospice) ($500,000);

- Hospice Care of Kansas LLC and its parent company, Ft. Worth, Texas-based Voyager HospiceCare Inc. ($6.1 million);

- San Diego Hospice (bankruptcy);

- Harmony Care Hospice and its CEO Daniel J. Burton ($1.3 million);

- Hospice Care of Kansas LLC and Fort Worth-based Voyager HospiceCare Inc. ($6.1 million); and

- Good Samaritan Hospice USA Inc. (criminal charges based on a loss to the Medicare program of over $3 million).[9]

68.     As U.S. Attorney for the Northern District of Alabama, Joyce White Vance, explained regarding hospice-care related settlements, "Medicare benefits, including the hospice benefits, are intended only for those individuals who are appropriately qualified. . . .  [w]e must protect the public welfare and tax-funded benefits programs."[10]

69.     Additionally, as Stuart F. Delery, Acting U.S. Assistant Attorney General for the Civil Division, noted, "[t]oo often, however, we hear reports of companies that abuse this critical service by using aggressive marketing tactics to push patients into services they don't need in

---

[9] Latour Lafferty, "Justice Department Increases Fraud Prosecution of Hospice Providers," martindale.com (May 15, 2013) (available at http://www.martindale.com/health-care-law/article_Fowler-White-Boggs-PA_1793442.htm).

[10] *Id.*

order to get higher reimbursements from the government.  The Department of Justice will take swift action to protect taxpayer dollars and make sure that Medicare benefits are available to those who truly need them."[11]

### D.   Background on Chemed and Vitas

70.   Chemed was founded in 1970 as a subsidiary of W.R. Grace.  In 1971, the Company was spun off from W.R. Grace and began trading publicly.  Edward L. Hutton, a former VP of W.R. Grace, served as Chemed's CEO from 1971 to 2001 and as Chairman of the Board from 2004 to 2009.  The Company was known as Roto-Rooter, Inc. from May 19, 2003, until May 17, 2004, reflecting the name of its then-largest operation.  On February 4, 2004, Chemed completed its acquisition of Vitas, a for-profit provider of hospice services.

71.   According to a January 18, 2004 article in *The Tampa Tribune*,[12] "Vitas came under criticism in the mid-1990s during a federal investigation that revealed representatives of the company were paid higher commissions if they recruited for hospice care patients who were expected to live longer, ultimately boosting the bottom line."  Mark Cohen, a "Vitas spokesman," said that while such higher commissions were no longer Company policy, "[e]mployees still are paid commissions for successful recruiting" because "[i]t is appropriate to compensate people for taking on that task."  However, Mr. Cohen said "he under[stood] while people might find that unseemly."

72.   Since acquiring Vitas in 2004, the Company has operated through two primary subsidiaries, Vitas and Roto-Rooter.  Roto-Rooter provides plumbing repair and cleaning services, including sewer, drain, and pipe cleaning (as well as plumbing repair) to residential and commercial customers through its network of Company-owned branches, independent

---

[11] *Id.*

[12] Donna Koehn, "The Business of Hospice Gets Corporate Attention," *The Tampa Tribune* (Jan. 18, 2004).

contractors, and franchisees.  Vitas (the larger of the two segments) operates 52 for-profit hospice programs in eighteen states and the District of Columbia,[13] including routine home care, general inpatient care, crisis care, and respite care.

73.    Since 2004, Vitas has accounted for an increasing proportion of Chemed's revenues.  In 2012, Vitas accounted for approximately 75% of the Company's revenues:



74.    Similarly, since 2004, Vitas has accounted for an increasing proportion of Chemed's net earnings.  In 2012, Vitas accounted for over 73% of the Company's net earnings:



---

[13] Vitas operates hospice programs in Alabama, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, Ohio, Pennsylvania, Texas, Virginia, Wisconsin, and the District of Columbia.

75.     Vitas is headquartered in Miami, Florida and is the nation's largest for-profit hospice care provider.  The majority of Vitas patients are treated in their homes, but Vitas also provides hospice services to patients in hospitals, nursing homes, and inpatient facilities.  According to Chemed's February 27, 2013 annual report, filed with the SEC on Form 10-K, "[a]pproximately 90% of [Vitas'] revenue is from the United States government through the Medicare program."

76.     The more patients Vitas treat and the longer those patients are enrolled in a hospice program, the higher the revenues that the Vitas segment generates for Chemed.  For example, a May 25, 2009 *Barron's* article noted that Vitas' "[a]dmissions fell 6.9% in the latest quarter, but longer patient stays helped nudge revenue up 5%."[14]

**E.     Vitas Systematically Charges Medicare for a Greater Proportion of More Expensive Forms of Care than the Rest of the Hospice Industry**

77.     A comparison of Vitas' patient statistics, as provided in Chemed's annual reports filed on Form 10-K, with industry data reported by NHPCO, demonstrates that Vitas has consistently diverted its patients away from routine home care and toward more expensive forms of care such as inpatient and crisis care.  *See* ¶ 61, *supra*.  As a result, Vitas' average daily census ("ADC") (i.e., average number of patients per day) for routine home care has been consistently *below* the national average, while its ADC for more expensive inpatient and crisis care has been consistently *above* the national average.

---

[14] Kopin Tan, "Chemed: Strange Bedfellows, Attractive Price," *Barron's* (May 25, 2009).



78.     According to Vitas' ADC numbers reported in Chemed's Forms 10-K, since 2006, Vitas has consistently charged Medicare for keeping a higher proportion of its patients in more expensive inpatient care:



79.     Chemed's Forms 10-K also reveal that, for at least the past seven years, Vitas has charged Medicare for a much greater proportion of patients in the most expensive form of hospice care, namely, crisis care, when compared to the national average.  In fact, the percent of Vitas' patients receiving crisis care was approximately: thirteen times the national average in

2006; five times the national average in 2007; four times the national average in 2008, 4.5 times the national average in 2009, 4 times the national average in 2010, 11 times the national average in 2011, and nine times the national average in 2012:



80.     In an October 29, 2013 investor conference call discussing Chemed's Q3 2013 results, Defendant McNamara acknowledged that "*the area where we seem to be a statistical outlier is in the [crisis] care* . . . ."  (Emphasis added.)  McNamara noted that "the government in the [2013 DOJ] lawsuit has indicated well at least at one level *just the fact that we provide more [crisis] care than the average, that's going to draw a lot of scrutiny*."   (Emphasis added.) During the call, Defendants also acknowledged the pressure the government's scrutiny has placed on Chemed's business model of disproportionately billing for inpatient and crisis care. According to Defendant Williams, "[d]uring the quarter, *our revenue growth was significantly constrained by a mix shift from [crisis] and inpatient care which we refer to as high acuity care, into routine homecare . . . [t]his mix shift negatively impacted revenue by approximately $6 million*."  (Emphasis added.)  Williams further noted that "VITAS estimates revenue will

continue to be constrained in the fourth quarter of 2013 as a result of mix shift from high acuity care to routine home care."

**F.    Vitas Systematically Charges Medicare for Longer Stays than the Rest of the Hospice Industry**

81.    From 2007 to 2012, while the average hospice patient in the United States received care for 69.03 days, the average Vitas patient received care for 77.26 days, or 9.88 days longer than the national average.  This results in the government being billed thousands more for patients enrolled in a Vitas hospice care program compared to the national average.  The following chart compares Vitas' patients' average length of stay as reported in Chemed's annual reports on Form 10-K with the national average as reported by NHPCO:[15]



---

[15] Vitas and the NHPCO have close ties.  In fact, the Chairman of the NHPCO is Ron Fried ("Fried"), the EVP of Development and Public Affairs for Vitas.  Fried reports to Defendant O'Toole.  *See* http://www.vitas.com/Aboutus/ Leadership/ExecutiveTeam/RonFried.aspx.  Fried is also an ex officio member of NHPCO's Regulatory Committee.

### G.   Since 2007, Four *Qui Tam* Actions Have Been Filed Against Chemed

#### 1.   The *Spottiswood* Action

82.   On August 14, 2007, Laura Spottiswood ("Spottiswood") filed a *qui tam* action (the "*Spottiswood* Action")[16] against Vitas.  Spottiswood worked for Vitas as a Registered Nurse in Cook County, Illinois between 2001 and 2002.  On November 12, 2012, Spottiswood filed an amended complaint in which she alleged numerous examples of her "firsthand experience with Vitas' fraudulent continuous home care practices," including the following:

> a.   "As a part of her on-duty training, [Spottiswood] went with Ms. Pegg on a patient visit at a nursing home.  Upon arrival, based upon her health condition it was clear that the patient, Esther K., did not require continuous care to achieve palliation.  Nor did she have any acute medical symptoms that required special care or pain management.  Instead, [Spottiswood] and Ms. Pegg merely assisted a nurse's aide with the patient's personal care and taking her vitals, which did not qualify as being continuous home care services.  After they left, Ms. Pegg called the Vitas office to report that the patient needed to be taken off continuous home care.  When [Spottiswood] returned to the nursing home approximately one week later, she noticed that there was no change in Esther K.'s condition (or recorded in the progress notes).  Nonetheless, Esther K. remained on continuous home care."  Spottiswood ¶ 59.

> b.   "As a registered nurse, [Spottiswood] was assigned to visit Vitas patients and their families.  For each visit, [Spottiswood] would review the patient file and perform a physical assessment, identify physical, psychological, social and spiritual needs, and teach pain management and dietary issues.  When serving as an "on call" nurse, [Spottiswood] would be dispatched if there was a crisis or, far more often, simply to cover a patient when a crisis care worker had failed to show up at work.  ***During the next six months, [Spottiswood] visited approximately 30 patients, almost half of whom were on [crisis] care.  From the beginning, based on her review of the patient files, her own observations, and her conversation with nursing home staff and family members, it was clear to [Spottiswood] that none of her continuous home care patients were in need of, or in fact provided with, continuous home care***."   Spottiswood ¶¶ 62-63 (emphasis added).

---

[16]   *See Spottiswood ex rel. United States v. Chemed Corp.*, No. 1:07-cv-04566 (N.D. Ill.).   References to "Spottiswood ¶ ___" are to paragraphs of the First Amended Complaint, ECF No. 36, which is incorporated herein by reference.

c.      "Eleanor B. was admitted to hospice care on 8/27/01 and she had been placed on [crisis] on at least five separate occasions (2/14/02, 3/19/02, 3/21/02, 4/01/02, and 4/18/02).  On the last occasion, she was placed on [crisis] [or crisis care] when a nurse from the nursing home called a physician and got an order for [crisis care] due to a need for oral antibiotic and a leg wound.  The continuous care order called for "oral care as needed, head of bed elevated, keep resident clean and dry, turn and reposition, vitals every shift."  No new orders were entered on patient's chart.  Based on the progress notes in the file, the continuous care worker did nothing for the leg wound which was covered by a small dressing.  When [Spottiswood] visited on 4/21/02, there was no need for crisis care nursing and no Vitas crisis care staff was present.  [Spottiswood] called Vitas to report that no [crisis care] worker was present and she was told that the agency staff had called off and that there was no one to send.  No medications were given and no dressings were changed since patient was most recently placed on [crisis care].  It appeared to [Spottiswood] that all care being provided was already paid for by Medicaid, yet Medicare was also listed on Case Sheet as a payor."  Spottiswood ¶ 65(b).

d.      "Barbara K. was admitted to hospice on 8/30/01 and placed on [crisis care] on 2/19/02 because of a need for "dressing change" that was in fact performed by the nursing home staff.  [Spottiswood] visited on 2/24/02, and was told by CNA (from Classic Care) that no one was at bedside when she arrived at 8:00 a.m., and nursing home staff advised that there was no one in room when they arrived at 6:30 a.m.  (According to the sign in sheet, the LPN on duty the night before had left before the end of her shift, and it appears that before she left she made entries on the progress notes for 6:30 a.m. and 8:00 a.m.).  [Spottiswood] was advised that this had been the case on the preceding Saturday and Sunday.  [Spottiswood] called Vitas and notified a supervisor, Sandy Norton, of fact that LPN was leaving early and she sent the sign-in sheet (which confirmed that no one was with the patient).  Neither Vitas nor Ms. Norton returned her call.  According to the progress notes, the care provided was limited to vitals taken and repositioned, Foley catheter emptied.  Nursing home staff provided all medications."  Spottiswood ¶ 65(g).

e.      "Dorothy L. was admitted to hospice on 4/05/02 and [crisis care] was to start on 4/06/02 for cerebral vascular accident (stroke) and dementia.  However, Vitas was unable to staff with an RN or LPN so [Spottiswood] was sent to visit the patient on 4/07/02 to "please" the nursing home and to tell them that as soon as they could find someone to send, they would.  According to progress notes, [crisis care] worker was to provide turning and repositioning and take vitals.  Medicaid paid for stay.  Medicare paid for [crisis care]."  Spottiswood ¶ 65(h).

f.      "Jean P. was admitted to hospice on 2/12/02; [crisis care] started on 2/15/02 with Stage II decubiti (a pressure ulcer), and visited by

[Spottiswood] on 2/24/02.  There was no need for crisis nursing care.
According to progress notes, care given patient was to reposition, change
diaper, take vitals, and monitor oxygen therapy.  All medications were
given by nursing home staff and the dressing was changed once or twice a
day, usually by nursing home staff."  Spottiswood ¶ 65(i).

g.     "Margaret R. was admitted to hospice on 2/21/02 with end-stage colon
cancer, was immediately started on [crisis care], and when she was visited
by [Spottiswood] on 3/17/02, she was on still on [crisis care].  At the time
of [Spottiswood]'s visit, patient was living at home with her husband and
two daughters.  [Spottiswood] did not observe patient experiencing any
acute medical symptoms, nor did she observe patient to be in a period of
"crisis" which would reasonably have required continuous care to achieve
palliation.  According to the progress notes, the crisis care worker changed
Margaret's diaper, took her vitals, emptied her Foley bag, and sat at her
bedside.  All medicine was administered by her daughters, and not the
crisis care worker.  [Spottiswood] personally observed the [crisis care]
workers' sign- in sheets, which indicated that crisis care workers had been
present but that no crisis nursing care was provided."  Spottiswood ¶ 65(j).

h.     "Leo S. was admitted to hospice on 3/19/02.  Patient had been placed on
[crisis care] on a number of occasions, most recently on 4/19/02 with
diagnosis of "failure to thrive" and need for dressing changes.
[Spottiswood] visited on 4/21/02 and found the patient awake and alert
and in need of minor coaching to increase his caloric intake.  Patient was
able to feed himself.  The dressing change was for a very small wound on
his right foot, the size of a pinhead.  He had a bunion removed a few
weeks earlier.  The dressing was changed once a day.  Progress notes
indicated that worker took vitals, changed diaper as needed, and assisted
with meals.  [Spottiswood] made second visit on 5/12/02 and learned that
patient was taken off [crisis care] for two weeks, but placed back on [crisis
care] on 5/07/02 for Stage II, pressure ulcer.  Patient was still on [crisis
care].  The dressing was changed one time daily.  According to the
progress notes, [crisis care] worker took vitals, diaper change as needed,
and assisted with meals."  Spottiswood ¶ 65(k).

i.     "Edith W. was admitted to hospice on 2/08/01 and was visited by
[Spottiswood] around 1/23/02.  When [Spottiswood] returned to nursing
home on 1/25/02 to see another patient she was asked if she was the [crisis
care] worker sent by Vitas for Edith W. for "low pulse."  Edith W. was not
in need of continuous home care to achieve palliation.  Nor did she have
any acute medical symptoms that required continuous pain management."
Spottiswood ¶ 65(*l*).

j.     "Marie Z. was admitted to hospice 10/30/01 and visited by [Spottiswood]
at home on 2/24/02.  At the time, patient had been on [crisis care] for more
than a week due to respiratory distress.  However, [Spottiswood] found no

need for [crisis care].  The care was provided by agency staff (not Vitas employees), and included repositioning, bed baths, taking vitals, and monitoring vitals.  Patient's family gave all medications."  Spottiswood ¶ 65(m).

k.     "Catherine U. was placed on continuous home care due to decreased/loss of consciousness and respiratory distress.  The chart indicated that she received no skilled services and the nursing home staff administered medications."  Spottiswood ¶ 65(n).

83.     In all, Spottiswood provided 15 detailed, first-hand accounts of instances in which Vitas submitted false claims to Medicare for unnecessary hospice services.  While these accounts pre-dated Chemed's acquisition of Vitas in 2004, at a minimum, they should have placed Defendants on notice (at least as of 2007 when the case was filed) that Vitas employees were enrolling ineligible patients into the Company's hospice care programs.

### 2.     The *Urick* Action

84.     On August 8, 2008, Barbara Urick ("Urick") filed a *qui tam* action (the "*Urick* Action")[17] against Vitas.  Urick, a registered nurse, worked for Vitas in San Antonio between January 2006 and 2008 as a triage field nurse.  "[B]ased on her direct, independent and personal knowledge," Urick¶ 9, Urick alleged that Vitas had violated the FCA and Texas Medicaid Fraud Prevention Act by submitting false claims involving hospice services to ineligible patients, unnecessary medical supplies, failure to perform mandated medical assessments, and backdating of the termination of hospice status to avoid costs.  Urick ¶ 2.

85.     In her complaint, Urick alleged that "[p]hysicians for [Vitas] rarely, if ever, see the patients in person."  Urick ¶ 53.  Urick alleged that she had "documented numerous cases where patients have received [continuous home care] services that were not medically necessary."  Urick ¶ 56.  Moreover, "[Urick] and other RNs of Defendant Hospice have arrived

---

[17] *See United States and Texas ex rel. Urick v. Vitas HME, et al.*, No. 5:08-cv-00663-OLG (W.D. Tex.).  References to "Urick ¶ ___" are to the Complaint, ECF No. 1, which is incorporated herein by reference.

at homes of patients placed on [crisis care] and been unable to provide services because the patients are at church, playing Bingo, or at the beauty parlor."  Urick ¶ 74.  Urick provided the following examples, among others:

    a.    "On or about March 16, 2008, Patient Number 00843850, an eighty-six (86) year old female, was placed on [crisis care] because of a change in level of consciousness.  When [Urick] visited the patient, [Urick] found her to be awake and alert, able to answer questions and follow commands.  The patient lived in an assisted living facility where facility nurses gave all medications, and the patient notes reflect that during the [crisis care] election periods in question [Vitas'] RNs provided custodial care only.  In this case, the Hospice RN merely sat next to the patient, day in and day out, without providing any skilled care.  The patient received twenty-four (24) hour [crisis care] services, including LVNs [Licensed Vocational Nurses] for twelve (12) hours.  The patient remained on [crisis care] for at least forty-five (45) days.  Although [Urick] informed [Vitas] via her written documentation and her verbal report that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, [Vitas] continued to provide [crisis care] services to this patient.  [Vitas] fraudulently submitted claims to Medicare for these services."  Urick ¶ 64.

    b.    "[Vitas] placed Patient Number 007466821, an eighty-nine (89) year old male, on [crisis care] because of agitation.  However, the patient refused all anti- anxiety medications, and the patient notes reflect that during the [crisis care] election periods only custodial care was given.  The notes reflect that the principal services for the patient included assistance with bathing and reading the Bible to the patient.  The patient remained on [crisis care] for forty-five (45) days.  Patient notes showed that the patient's wife was also a patient of [Vitas] and had herself remained on [crisis care] for sixty (60) days, even though only custodial care services were necessary.  At one point when both the patient and his wife were on [crisis care], [Vitas] was sending two RNs/LPNs/LVNs to the patient's house, even though neither the patient nor his wife actually required skilled nursing care.  After [Urick] discovered this abuse, she called the team manager on call and reported that the patient and his wife did not require [crisis care] services.  Despite the fact that [Urick] informed [Vitas] of the lack of need for these services, [Vitas] continued to provide [crisis care] services to the patient for approximately three (3) more weeks.  [Vitas] fraudulently submitted claims to Medicare for the [crisis care] services provided to this patient and his wife."  Urick ¶ 65.

    c.    "On or about February 28, 2008, Patient Number 00788556, an eighty-six (86) year old male, was placed on [crisis care] because of increased confusion and shortness of breath.  [Urick] visited the patient on March 2,

2008.  The patient admitted to having suffered from shortness of breath "for a long time because of my lung disease."  The patient had twenty-four (24) respirations per minute, was able to feed himself and transfer himself out of bed without assistance.  Patient notes reflect that only custodial care was given.  Both [Urick] and RN Amy Cooley, a former employee of [Vitas], tried repeatedly to remove the patient from [crisis care] by informing [a Vitas physician] that the patient did not require [crisis care] care.  However, [the Vitas physician] refused to remove the patient from [crisis care].  Approximately the middle of May 2008, RN Cooley finally succeeded in removing the patient from [crisis care] by contacting the patient's attending physician, who agreed that the patient did not require [crisis care].  However, [Vitas] returned the patient to [crisis care] on or about May 20, 2008 for approximately one week.  The patient remains on service, and was recently returned again to [crisis care] in early July 2008.  Despite the fact that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, [Vitas] fraudulently submitted claims to Medicare for the [crisis care] services provided to this patient."  Urick ¶ 66.

d.  "On or about July 12, 2007, Patient Number 00806746, an eighty-two (82) year old male, was placed on [crisis care] for having a decreased level of consciousness and increased shortness of breath.  [Urick] visited the patient on July 17, 2007.  The patient admitted to suffering from shortness of breath "for years", denied any pain, was fully mobile with the assistance of a walker, and was able to perform standard activities of daily living, such as bathing himself.  [Urick] called and spoke with the team manager on call and informed the team manger that [crisis care] was not necessary for this patient.  However, [Vitas] kept the patient on [crisis care] for thirty (30) days until the patient's family moved him out of San Antonio.  Despite the fact that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, [Vitas] fraudulently submitted claims to Medicare for the [crisis care] services provided to this patient."  Urick ¶ 67.

86.  Urick alleged that she "repeatedly cared for patients on whom [Vitas], upon information and belief, 'forced' [crisis care] care."  Urick provided multiple examples, including the following:

a.  "Approximately December 2006, Patient Number 00765807, an eighty-nine year (89) old male, was placed on RHC.  The patient began receiving [crisis care] services on or about November 17, 2007 for a decreased level of consciousness.  [Urick] visited the patient on November 18, 2007.  During her visit with the patient, the family of the patient complained to [Urick] that [Vitas] had "forced crisis care" on the patient.  The family told [Urick] that they felt that the extra staff with [crisis care] had

increased the patient's restlessness and stress, and the family informed [Urick] that they had actually sent RNs of [Vitas] away.  [Vitas] removed the patient from [crisis care] services on or about November 18, 2007 per the family's request.  However, [Vitas] returned the patient to [crisis care] services again on or about February 17, 2008 through March 23, 2008, only to be removed again per the request of the patient and his family.  Despite the fact that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, [Vitas] fraudulently submitted claims to Medicare for the [crisis care] services provided to this patient."  Urick ¶ 68.

b.     "On or about May 26, 2008, Patient Number 00875958, a sixty-one (61) year old female, was placed on [crisis care].  The patient's family would not allow employees of [Vitas] to see the patient unless the family had to leave the house to run an errand.  Even when this occurred, the patient only required custodial care.  Nurses spent entire shifts relegated to the kitchen of the house, unable to enter the room in which the patient rested.  In fact, there were only a few occasions in which [Vitas] personnel even saw the patient.  [Urick] was sent to the patient's house approximately nineteen (19) days after the patient was placed on [crisis care].  [Urick] reported the circumstances to team manager Sheri Knecht, and they both agreed that the patient should be taken off of [crisis care].  However, despite their assessment, the patient remained on [crisis care] until the patient passed away on June 30, 2008.  [Vitas] fraudulently submitted claims to Medicaid for the [crisis care] services provided to this patient."  Urick ¶ 69.

c.     "On or about January 7, 2007, [Urick] cared for Patient Number 00623547, an eighty-one (81) year old female, who was placed on [crisis care] because of increased respiratory distress, increased weakness, and change in level of consciousness.  [Urick] visited the patient on January 21, 2007.  [Urick] took the patient's vitals, which showed she had twenty-two (22) respirations per minute, which is normal, with even and unlabored breathing.  The patient was able to get up to her bedside commode and move to her recliner without assistance.  Patient notes reflect that only custodial care was given.  [Urick] informed [a Vitas Team Manager] that the patient no longer satisfied the criteria for [crisis care].  [The Vitas Team Manager] advised [Urick] to leave the patient on [crisis care] "over the weekend until the primary nurse for the patient could reevaluate" the patient.  It was not until almost one (1) week later, on January 23, 2007, that the patient was discharged from [crisis care].  Despite the fact that skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, [Vitas] fraudulently submitted claims to Medicare for the [crisis care] services provided to this patient."  Urick ¶ 70.

d.      "On or about March 9, 2008, [Urick] visited Patient Number 00855681, an eighty-seven (87) year old female that lived in an assisted living facility and had private caregivers. The patient required purely custodial care, and personnel of [Vitas] could do nothing for the patient that was not already provided by the patient's private caregivers. Even though skilled nursing services were not medically necessary and the patient was not experiencing a period of crisis, [Vitas] fraudulently submitted claims to Medicare for the [crisis care] services provided to this patient." Urick ¶ 71.

e.      "Patient Number 00659485 was placed on RHC approximately June 14, 2005. [Urick] first saw this patient in July 2006. [Urick]'s documentation on the patient stated that the patient was placed on [crisis care] for "being incontinent of the bowel and bladder." When [Urick] saw the patient, the patient was completely ambulatory and continent, had a Karnofsky score of 60, complained of no pain, and did not require assistance with any activities of daily living. [Urick] called and informed the team manager on call that hospice services were not necessary. Nevertheless, [Vitas] continued to provide hospice services and fraudulently submitted claims to Medicare for these services." Urick ¶ 82.

87.     Urick further alleged that "[Vitas] uses full-time [crisis care] services to entice hospice patients and their families to enroll with [Vitas], rather than those of [Vitas'] competitors." Urick ¶ 75. For example, Urick described her "experience when she first began employment with [Vitas] and accompanied Senior Admissions Nurse Barbara Fuqua to a hospice admissions assessment and enrollment meeting. [Urick] observed RN Fuqua 'selling' [Vitas] services by specifically discussing [crisis care] care. RN Fuqua explained to the family that [crisis care] provided twenty-four (24) hour nursing care 'at no charge' to the family. Upon questioning by [Urick], Fuqua told [Urick] that all the admissions nurses discuss the [crisis care] services because it 'is something unique that we ([Vitas]) offer,' referencing the fact that [Vitas] is the only hospice service in San Antonio that provides [crisis care] services. The 'pitch' is clearly designed to appeal to families who have been responsible for providing custodial care to their relative, thereby relieving them from this task." *Id.*

88.     Urick also alleged that "[w]hen [Vitas] learns of a new hospice patient, it quickly sends a RN to the new patient to set forth a plan of care, but [Vitas] does not require its RNs to perform the assessment on the patient at this time.  Often, a new patient is placed on [crisis care], and a RN is not sent to perform an assessment until twenty-four (24) to forty-eight (48) hours after a plan of care has been developed.  Therefore, [Vitas] begins providing services before completing a legally sufficient IPOC, bills for such services, and systematically enrolls patients in hospice services where an assessment has not yet established that such services are medically necessary."  Urick ¶ 89.  Urick provided several specific examples of this practice.  *See* Urick ¶¶ 91-92, 94-95.

89.     Urick also alleged that Vitas "causes its RNs systematically to backdate the termination of hospice status in [Vitas'] records so that the hospice services appear to end prior to the incursion of costly medical services that [Vitas] has an obligation to cover."  Urick ¶ 96. Urick stated that she "has been instructed at least four (4) times during her employment with [Vitas] to retroactively date hospice services she had provided so that it appeared that hospice services ended prior to the actual time of termination of services."  Urick ¶ 98.  "Each of these requests occurred when a patient required ambulance services or trips to the emergency room, which should have been paid from the per diem hospice care rate."  *Id*.  Urick provided an example of such an incident, which occurred on June 7, 2008 with "Patient Number 00779957." Urick ¶ 99.

90.     In all, Urick provided 19 detailed, first-hand accounts of instances in which Vitas submitted false claims to Medicare for unnecessary hospice services.  These accounts are significant because they confirm that the misconduct referenced in the earlier *Spottiswood* Action continued even after Chemed acquired Vitas in 2004.

### 3.    The *Rehfeldt* Action

91.    On January 30, 2009, Michael A. Rehfeldt ("Rehfeldt") filed a *qui tam* action (the

"*Rehfeldt* Action")[18] against Vitas.  Rehfeldt was hired by Vitas in 2008 and became general

manager of Vitas' San Antonio, Texas operation.

92.    Rehfeldt alleged that "[t]hrough in-depth evaluation of patient records and

statistics, as well as though conversations and interviews with VITAS' employees and officers,

[Rehfeldt] has discovered an interwoven network of schemes designed to fraudulently bill

Medicare for non-qualifying patients and to fraudulently shift costs from [Vitas] to the United

States."  Rehfeldt ¶ 8.  Rehfeldt stated that he "has discussed his suspicions with Ian Viente,

VPO and Peggy Pettit, EVP/COO, and other VITAS executives, and has concluded that VITAS'

false certifications, fraudulent billing, and cost shifting to the United States constitute a

widespread, systematic practice endemic to VITAS."  *Id.*  According to Rehfeldt, ***"[i]t is the goal***

***of VITAS' corporate governance to hide the evidence of the scheme through both active***

***concealment and assumed willful ignorance."***  *Id.*  (Emphasis added.)  Rehfeldt provided the

following "typical" example of Vitas' "fraudulent practices," which he alleged is supported by

documentary evidence:

> A December 12, 2008 email documents the representative case of a patient
> fraudulently admitted and re-certified under Defendants' scheme.  Lisa Corona,
> manager of a VITAS in-patient unit, reported to [Rehfeldt] that a man had entered
> her facility that day on his own power, walking with a cane.  His chart showed
> that he had been receiving hospice benefits on VITAS' rolls for over two years,
> having been admitted under a terminal diagnosis of "End Stage Stroke."  The
> guidelines for that diagnosis essentially require that the patient be non-
> ambulatory and non-verbal, which was completely at odds with the observations
> of VITAS' staff and medical personnel.  [Corona] reported that the team
> physician had never believed that the patient was eligible for the hospice benefit

---

[18] *See Rehfeldt ex rel. United States and Texas v. Vitas Healthcare Corp., et al.*, No. 3:09-cv-00203-B (N.D. Tex.).
References to "Rehfeldt ¶ ___" are to the *Qui Tam* Complaint, which is incorporated herein by reference.

and had recommended that he be discharged.  The patient had instead been repeatedly recertified.

Rehfeldt ¶ 18.

93.    Rehfeldt alleged that "VITAS keeps track of nearly every conceivable patient statistic via its proprietary software "VX."  Rehfeldt ¶ 21.  As a result, "VITAS management had the ability at any time to examine, for example, the number of patients in San Antonio whose length of stay exceeded 500 days (21.6%, as of 2008)."  *Id.*   "Nevertheless," according to Rehfeldt, "these patients were not discharged, even upon review and despite the recommendation of staff."  *Id.*  "In 2007, the San Antonio office began undergoing a Focused Medical Review by eMS.  VX reveals the number of living patients discharged from the San Antonio office rolls from 2003 to 2008:"

| 2003 | 20 |
|------|-----|
| 2004 | 24 |
| 2005 | 28 |
| 2006 | 36 |
| 2007 | 147 |
| 2008 | 148 |

*Id.*

94.    According to Rehfeldt, "[t]he data bears almost no construction other than that hundreds of ineligible patients on the San Antonio rolls, for which VITAS was content to fraudulently bill Medicare, were purged once the fraud threatened to be discovered."  *Id.*

### 4.    The *Gonzales* Action

95.     On January 27, 2012, Dr. Charles Gonzales ("Dr. Gonzales"), who was employed by the Los Angeles operations of Vitas ("Vitas Los Angeles") from 2004 to 2011, filed a *qui tam*

action (the "*Gonzales* Action")[19] to recover losses sustained by the Medicare Program as a result of Vitas Los Angeles's "pattern and practice of false certification and recertification" of hospice care.  Dr. Gonzales's complaint was unsealed on April 4, 2013, and provides a further window into the pervasive Medicare fraud that Chemed's upper management not only permitted, but actively encouraged.  According to Dr. Gonzales, "[o]ver the past decade, Vitas Los Angeles knowingly submitted or caused the submission of false claims to Medicare, and created false records and statements to receive reimbursement from Medicare for hospice care."  Gonzales ¶ 31.  Dr. Gonzales alleged that "[t]his pattern and practice of false certification and recertification was engaged in at the direction and control of upper management for the Los Angeles region."  According to Dr. Gonzales, "the Vitas Los Angeles management personnel who asserted this direction and control included:"

- Belinda Hodges, Patient Care Administrator for Los Angeles

- Susan Fishenfold, General Manager for Los Angeles

- Kevin Klein, Medical Director for Los Angeles

- Sharon Wens, Team Manager

Gonzales ¶ 35.

96.    Dr. Gonzales provided detailed allegations of how "[t]his direction and control was asserted in various settings."  Dr. Gonzales described this "direction and control" in detail:

> For example, each week, the Team Managers would meet with each regional team within Los Angeles (there are 10 to 12 regional teams covering Vitas Los Angeles' operations).  During those meetings, if a suggestion was made that a patient no longer qualifies for hospice, ***the Team Managers (such as Sharon Wens) would fabricate a rationale for keeping the patient on hospice or instruct the Team Doctors to do so.***  If there was continued disagreement, the case was referred to Belinda Hodges.  Hodges then applied further pressure on the

---

[19] *See United States ex rel. Gonzales v. Vitas Healthcare Corp.*, No. 12-cv-0761 (C.D. Cal.).  References to "Gonzales ¶ __" are to the Complaint for Money Damages and Civil Penalties for Violations of the False Claims Act, ECF No. 19-2, which is incorporated herein by reference.

dissenting team member, and instructed the Team Doctors what to state in the physician notes in order to ensure that the patient continues to qualify for hospice, no matter how untrue.  Notably, neither Wens nor Hodges are doctors.

As to patients for which Wens or Hodges could not easily fabricate a justification for recertification, those patients were sent to the Medical Director Review Committee.  Inevitably, that Committee, headed by Medical Director Kevin Klein, falsely determined that the patient qualified for hospice care, and instructed the Team Doctor to recertify the patient for hospice. On information and belief, these practices continue.

Gonzales ¶ 36 (emphasis added).

97.     Dr. Gonzales stated that he "is aware of many patients that Vitas Los Angeles has improperly certified and/or re-certified" and provided numerous "examples of how Defendant Vitas systematically and intentionally falsely certifies large numbers of its patients as eligible for hospice care, when they are not."  Gonzales ¶ 39.  The following are a selection of the instances of Medicare fraud identified by Dr. Gonzales at Vitas Los Angeles:

     a.    "Patient J.W. was admitted by Vitas to hospice on March 27, 2008, with a diagnosis of dementia.  Vitas Los Angeles improperly certified, and repeatedly recertified, this patient as qualifying for Medicare hospice benefits, when she did not in fact qualify.  As a result, the patient was still in hospice when [Dr. Gonzales] left Vitas in May of 2011, three years later.  Vitas Los Angeles frequently uses the amorphous diagnosis of "dementia" to falsely certify and re-certify patients who do not have any diagnosis that meets the appropriate criteria.  Patient D.G. was admitted by Vitas to hospice on March 13, 2009, with a diagnosis of dementia.  The patient had been discharged for an extended prognosis from another hospice right before she was admitted to Vitas.  Vitas Los Angeles improperly certified, and repeatedly recertified, this patient as qualifying for Medicare hospice benefits, when she did not in fact qualify.  As a result, the patient was still in hospice when [Dr. Gonzales] left Vitas in May of 2011."  Gonzales ¶ 40.

     b.    "Patient J.P. was admitted by Vitas to hospice on August 29, 2008, with a diagnosis of chronic obstructive pulmonary disease.  Vitas Los Angeles improperly certified, and repeatedly recertified, this patient as qualifying for Medicare hospice benefits, when she did not in fact qualify.  As a result, the patient was still in hospice when [Dr. Gonzales] left Vitas in May of 2011."  Gonzales ¶ 42.

c.      "Patient E.R. was admitted by Vitas to hospice on October 3, 2009, with a diagnosis of dementia.  Vitas Los Angeles improperly certified, and repeatedly recertified, this patient as qualifying for Medicare hospice benefits, when she did not in fact qualify.  As a result, the patient was still in hospice when [Dr. Gonzales] left Vitas in May of 2011."  Gonzales ¶ 43.

d.      "Patient S.S. was admitted by Vitas to hospice on October February 13, 2009, with a diagnosis of Friedreichs Ataxia.  Vitas Los Angeles improperly certified, and repeatedly recertified, this patient as qualifying for Medicare hospice benefits, when he did not in fact qualify.  As a result, the patient was still in hospice when [Dr. Gonzales] left Vitas in May of 2011."  Gonzales ¶ 44.

e.      "Patient Z.G. was admitted by Vitas to hospice on July 30, 2007, with a diagnosis of dementia.  Vitas Los Angeles improperly certified, and repeatedly recertified, this patient as qualifying for Medicare hospice benefits, when she did not in fact qualify.  As a result, the patient was still in hospice when [Dr. Gonzales] left Vitas in May 2011."  Gonzales ¶ 45.

f.      "Patient M.G. was admitted by Vitas to hospice on September 1, 2006.  Vitas Los Angeles improperly certified, and repeatedly recertified, this patient as qualifying for Medicare hospice benefits, when she did not in fact qualify.  The patient died on hospice in 2010, after having received hospice care for over three years."  Gonzales ¶ 46.

g.      "Patient M.W. was admitted by Vitas to hospice on January 15, 2009, with a diagnosis of dementia.  Vitas Los Angeles improperly and repeatedly recertified this patient as qualifying for Medicare hospice benefits, when she did not in fact qualify.  As a result, the patient remained on hospice for over two years prior to dying in the spring of 2011."  Gonzales ¶ 47.

h.      "Patient B.M. was admitted by Vitas to hospice on August 2, 2010, with a diagnosis of 'debility.'  The patient was still in hospice when [Dr. Gonzales] left Vitas in May of 2011.  Vitas Los Angeles frequently uses the amorphous diagnosis of 'debility' to falsely certify and recertify patients who do not have any 6 diagnosis that meets the appropriate criteria.  This is one such patient."  Gonzales ¶ 48.

i.      "Patient A.M. was admitted by Vitas to hospice on March 3, 2008, with a diagnosis of debility.  Vitas Los Angeles improperly certified, and repeatedly recertified, this patient as qualifying for Medicare hospice benefits, when she did not in fact qualify.  As a result, the patient was still in hospice when [Dr. Gonzales] left Vitas in May of 2011."  Gonzales ¶ 49.

98.     In all, Dr. Gonzales provided details regarding 34 individual patients for which

Vitas Los Angeles falsely certified or recertified as qualifying for Medicare hospice benefits.  Dr.

Gonzales then concluded:

> "The hospice stay of the above patients averages approximately two years and
> seven months.  Each patient thus had to be certified and recertified by Vitas Los
> Angeles an average of at least fourteen (14) times.  Thus for just these thirty-four
> examples, Vitas Los Angeles submitted approximately 476 false certifications or
> recertifications.  ***Each of those false certifications or recertifications cost
> Medicare – and therefore taxpayers – at least ten thousand dollars.***"

Gonzales ¶ 74 (emphasis added).

### H.     The Government Investigates and Intervenes in the *Qui Tam* Actions and Files Suit against Chemed for Submitting False Claims for Hospice Care

99.     On May 2, 2013, the government filed the DOJ Action,[20] alleging that Chemed

and Vitas had filed numerous false claims to Medicare for hospice services.  On the same day,

the government intervened in the *Gonzales* Action, the *Urick* Action, and the *Spottiswood*

Action.  As Defendants admitted in their subsequent motion to dismiss the government's FCA

claims, the government's case against Chemed is based on the review of "***millions of pages of***

***documents***, including policies, training manuals, and patient files in relation to hospice programs

in Florida, Texas, California, Missouri, and other locations."[21]  In its dismissal briefing, Chemed

also noted that "[l]ast year, the government took the depositions of six current and former Vitas

employees and interviewed numerous others."[22]  According to Chemed, the government has

---

[20] *See United States of America v. Vitas et al.*, No. 4:13-cv-00449-BCW (W.D. Mo. May 2, 2013).  References to "DOJ ¶ __" are to the United States' First Amended Complaint and Complaint in Intervention, ECF No. 56, which is incorporated herein by reference.

[21] *See* ECF No. 63, No. 4:13-0449-CV-W-BCW (W.D. Mo.) (emphasis added).

[22] *Id.*

investigated Chemed for "eight years" and obtained "truckloads of documents and other information."[23]

100.    In its complaint, the government alleged that Chemed and Vitas knowingly submitted or caused the submission of false claims to Medicare for crisis care services that were not necessary or not actually provided.  According to the government, Vitas' management set goals for the number of crisis care days that were to be billed to Medicare and pressured staff to increase the numbers of crisis care claims submitted to Medicare, without regard to whether the services were appropriate or were actually being provided.  In addition, the government alleged that Chemed and Vitas knowingly submitted or caused the submission of false claims for patients who were not terminally ill.  The government further alleged that Chemed and Vitas violated the FCA and misspent tens of millions of taxpayer dollars from the Medicare program.

### 1.    Chemed's and Vitas' Business Practices Led to the Submission of False or Fraudulent Claims for Crisis Care and Ineligible Patients

101.    As set forth in the DOJ Action, Chemed and Vitas used aggressive tactics and pressured their employees to enroll patients for hospice care when this level of care was not necessary.  In addition, Chemed and Vitas advised their employees to increase the number of crisis claims submitted to Medicare, without regard to whether the crisis care services were appropriate for patients, or whether Vitas was actually providing the crisis care services to patients, when it billed Medicare for those services.

102.    Vitas marketed crisis care services to patients and their families as "intensive comfort care services," without mentioning that in order to bill Medicare for these services at the higher rates, a patient had to be experiencing a short-term crisis and have acute medical symptoms.  DOJ ¶ 58.  One of Vitas' marketing brochures stated that "intensive comfort care"

---

[23] *Id.*

was available for "symptoms causing distress to the patient or family." *Id.* Chemed and Vitas knowingly used this marketing ploy to mislead patients and their families and for the purpose of inflating the Company's census and profits.

103. For example, on January 18, 2007, Vitas' VP of Operations sent an email to a marketing employee and general Manager in one of Vitas' Texas location, stating "your program's [crisis care] margin dropped to [0.3 percentage] in December. Would you give me your thoughts on what caused this drop and what you will be doing to correct this in January? I will need this analysis by the end of the day today." DOJ ¶ 60.

104. In addition, Vitas did not properly train its employees regarding Medicare compliance, nor did Vitas promote a business culture that was in accord with Medicare regulations. For example, Vitas circulated a document called "Procedure for Starting Crisis Care" that outlined a procedure that was inconsistent with Medicare regulations (because it instructed Vitas employees that crisis care may commence without a physician's order). *Id.* at ¶ 62. Moreover, according to the DOJ Complaint, a medical director at Vitas incorrectly believed that Vitas could bill Medicare for crisis care if the patient was "actively dying," when, in fact, Medicare rules require that all patients receiving hospice care must have a life expectancy of six months or less if their illnesses runs its normal course. *Id.*

105. A nurse employed by Vitas alleged that on multiple occasions when the Company sent her to the homes of patients who required crisis care (as she was told), she discovered that the patients were at church, the beauty parlor, or playing bingo. *Id.* at ¶ 64. Nevertheless, Vitas ignored the patients' health and fraudulently billed Medicare for crisis care when it was clear that these patients were not in need of this type of hospice care. *Id.*

106.    According to the DOJ Complaint, since at least 2007 and until at least May 2013 when the DOJ Complaint was filed, Chemed and Vitas conducted regular internal audits that included reviews of Vitas' hospice services.  *Id.* at ¶ 69.  The DOJ asserted that Vitas was aware of (a) patients who were receiving crisis care but were not eligible, (b) patients who were billed to Medicare for crisis care, but the services were not consistent with Medicare requirements, and (c) patients who were in hospice care who were not in crisis.  *Id.*  A document written in September 2010 for the San Fernando, California Vitas hospice program ("Patient Care Documentation and Compliance Internal Review") showed that Vitas actually reviewed medical records for their hospice programs.  Based on this review, the document concludes that ***only 50 percent*** of the records showed that Vitas was acting consistently with Medicare's criteria for crisis care.  *Id.*  Likewise, this review showed that only ten percent of the crisis care reimbursement claims complied with the patients' plans of care set forth by Vitas' medical staff.  *Id.*

107.    The government also compared Vitas' patient statistics with those from the NHPCO, and concluded that Vitas was obtaining Medicare reimbursement for crisis care that was ***six times the national average of the hospice industry***.  *Id.* at ¶¶ 72, 76.  ***This report from NHPCO indicated that Vitas bills Medicare for twice as many crisis care days as all other hospice providers combined***.  *Id.* at ¶ 72.  Further, the NHPCO stated that from 2004 to 2011, Vitas' percentage of days of service for crisis care ranged from 4.42 percent to 5.25 percent, while the national average ranged from 0.4 percent to 1.2 percent.  *Id.* at ¶ 73.

## 2.    The Government Alleges Substantial Evidence of False Claims for Hospice Services

108.    Chemed and Vitas created an environment that encouraged and pressured Vitas' clinical staff to admit as many patients as possible, regardless of whether they were eligible for

hospice care.  This was done in order to artificially inflate the Company's profits.  According to the DOJ Complaint, *"top-level managers at Vitas's corporate headquarters set aggressive hospice admissions goals for regional and mid-level corporate managers at local Vitas programs, resulting in the admission of ineligible patients."*  DOJ ¶ 160 (emphasis added). *"Chemed management regularly corresponded with Vitas management about the average daily census and growth in admissions, making focused frequent inquiries if they believed the numbers reported were too low."*  *Id.* at ¶ 161 (emphasis added).

109.    The DOJ Complaint alleges Chemed and Vitas knowingly made or caused to be made or used, a false record or statement in order to get a false or fraudulent claim paid by the government.  Indeed, the government uncovered the following specific examples, among others, of false claims that apparently were submitted to Medicare:

a.    Vitas submitted a false claim to Medicare for seven days of crisis care for a patient labeled as "EF" who was diagnosed with dementia and received hospice care.  However, Vitas' records stated that patient EF was not in crisis and administered what would have been standard hospice services, but billed Medicare at the higher crisis care rate.  DOJ ¶ 79.  Moreover, on the same day that Vitas submitted patient EF for crisis care for "pain and dyspnea," the Company's own records stated that patient EF's pain level was at zero and the nurse noted in the medical file that the care plan was "effective."  *Id.* at ¶ 82.

b.    Vitas knowingly submitted a crisis care claim for patient "MJ" because of "shortness of breath" when all of MJ's vital signs were normal and the patient exhibited no signs of shortness of breath.  *Id.* at ¶¶ 88-89.  Medical records stated that MJ was "agitated and screaming loudly," which directly contradicts shortness of breath.  *Id.* at ¶ 97.

c.    Vitas submitted a crisis care claim to Medicare for patient "TS" for weakness, anxiety and pain which are not acute symptoms that require crisis care or this type of billing to Medicare.  *Id.* at ¶ 106.  In addition, Vitas submitted another crisis care claim to Medicare for back pain when only a heating pad was required to relieve the pain.  *Id.* at ¶ 107.  Further, Vitas billed Medicare for crisis care based on TS having a "decreased level of consciousness after TS suffered a fall," however, Vitas' medical records stated that patient TS was walking.  *Id.* at ¶ 116.

   d.     Vitas improperly billed Medicare for patient DT based on patient's health
          being in "crisis" while Vitas' medical records stated DT was only
          experiencing weakness, mental status changes, confusion and agitation.
          *Id.* at ¶¶ 123-24.

   e.     Vitas improperly billed Medicare for patient RB for crisis care because of
          shortness of breath for an additional 11 days even though the Vitas
          medical record indicated that RB was comfortable and no longer having
          labored respirations.  *Id.* at ¶ 130.

   f.     Vitas improperly billed Medicare for patient MG for crisis care allegedly
          due to pain, complicated wound care, and caregiver breakdown, even
          through these symptoms are not an appropriate basis for billing Medicare
          at the crisis rate.   *Id.* at ¶¶ 140-46.

   g.     Vitas improperly billed Medicare for patient FA for crisis care because of
          "decreased level of consciousness and tachypnea" when Vitas' records
          showed that Vitas actually offered crisis care to FA and his family because
          FA's family was considering aggressive curative therapy instead of
          continuing hospice care.  Thus, Vitas used crisis care as a way to keep FA
          on crisis care so Vitas could continue to bill Medicare on behalf of FA.
          *Id.* at ¶ 155-56.

   110.   In all, the government provided detailed descriptions of false claims submitted by

Vitas for 14 patients in seven states.

   **3.     The Government Alleges Substantial Evidence that Chemed and Vitas
            Intentionally Failed to Train Employees and Pressured Nurses to
            Increase Hospice Profits**

   111.   Vitas also intentionally failed to properly train employees on the applicable rules

and requirements that are in place for hospice eligibility under Medicare.  In addition, Vitas

pressured admission nurses to admit as many patients as possible to hospice, regardless of their

eligibility, in order to artificially boost Chemed's profits.

   112.   As detailed in the DOJ Complaint, Vitas distributed written materials to its own

staff that incorrectly trained them on how and when to initiate crisis care.   DOJ ¶ 62.

Specifically, the government found that Vitas had circulated a document called "Procedure for

Starting Crisis Care" that outlined a procedure that was wholly inconsistent with Medicare

regulations.  That document instructed Vitas employees (contrary to applicable law) that crisis care may commence without a physician's order.  *Id.*

113.    In addition, the government detailed the testimony of a Vitas nurse who stated that on several occasions when she arrived at particular homes ready to administer intensive nursing care, she found the patients were, for example, at church, the beauty parlor, or playing bingo.  Notwithstanding that such patients obviously did not need crisis care; Vitas nonetheless fraudulently billed Medicare for services for these patients.

114.    Further, the government detailed that some Vitas medical directors did not receive any training regarding Medicare eligibility requirements for hospice.  *Id.* ¶ 169.  Vitas' failure to properly train its staff is especially egregious because Vitas medical directors are responsible for certifying patient eligibility for hospice care.  *Id.*

### 4.    There is Substantial Evidence that Chemed's Management Closely Monitored the Company's ADC Numbers

115.    Chemed and Vitas executives closely monitored the Company's ADC and set aggressive hospice admissions goals for their direct reports.  According to the DOJ Complaint:

> Vitas's business practices led to the submission of false claims for patients who did not need end of life care.  **[T]op-level managers at Vitas's corporate headquarters set aggressive hospice admissions goals for regional and mid-level corporate managers at local Vitas programs, resulting in the admission of ineligible patients.**
>
> **Chemed management regularly corresponded with Vitas management about the average daily census and growth in admissions, making focused frequent inquiries if they believed the numbers reported were too low**.
>
> Vitas senior managers regularly corresponded with personnel in the field offices when their average daily census and admissions growth were lagging.
>
> Chemed and Vitas falsely certified on electronic claim forms that they submitted (or caused to be submitted) to Medicare that Vitas's claims were "correct and complete" and that Vitas maintained patient medical records in compliance with the certification requirements of 42 C.F.R. § 418.22.

Vitas's corporate culture encouraged its marketing and clinical staff to admit as many patients as possible, regardless of whether they were eligible for hospice.

***The general manager of each Vitas program was directly evaluated on the profitability and the number of patients admitted at the program's facility.***

General managers, who were typically not nurses or doctors, expected their marketing departments and sales representatives to find referral sources and patients, and evaluated and promoted their employees based on meeting hospice admissions goals. This often meant that the Vitas program managers disregarded concerns of nurses and doctors who expressed that they did not believe that certain Vitas hospice patients were terminally ill.

***Vitas paid bonuses to its non-clinical staff based on the number of patients enrolled into the program.***

***Vitas took adverse employment actions against marketing representatives who did not meet monthly admissions goals.***

***One former general manager stated that Vitas paid him bonuses based on the number of patient admissions and the length of time he could get a patient to stay on hospice services.***

Vitas did not properly train its staff on hospice eligibility criteria. One former Vitas medical director stated that he received no training at all from Vitas on Medicare eligibility requirements for hospice, and that Vitas expected him to certify patients as eligible for hospice without making actual determinations that the patient had a prognosis of six months or less if their illness ran its normal course. In contrast, numerous Vitas marketing employees said that Vitas spent significant resources training its marketing employees on how to "sell hospice" to patients, patients' families, and referral sources for potential hospice patients.

Vitas also employed field nurses to provide care to its hospice patients residing in skilled nursing facilities, assisted living facilities, and hospitals, but did not provide them adequate training on the eligibility requirements for the Medicare hospice benefit.

Vitas directed these untrained field nurses, as part of their job duties, to identify elderly people who were eligible for Medicare hospice benefit, and to encourage the referral of elderly people to Vitas for end of life care.

***According to one former hospice manager for Vitas, the company philosophy was to "sign everybody up" for Medicare hospice services.*** A former Vitas nurse in Florida said that Vitas "wanted everyone enrolled in hospice care." This philosophy is inconsistent with Medicare requirements, because, for example, a patient who elects hospice care under the Medicare program also chooses to stop receiving curative care for his or her illness.

***Medical staff reported that they felt pressured by Vitas to admit or readmit patients who were inappropriate for hospice services.***  One former admissions nurse said that if he did not admit a patient he believed to be ineligible, he would be pressured to reconsider his decision until he finally determined the patient was eligible for the Medicare hospice benefit.  The same nurse stated that he was pressured by Vitas to bend the Medicare rules to get patients onto hospice service.

Another Vitas nurse stated that when she attended the weekly meetings to discuss discharging patients, the goal was to discharge as few patients as possible without regard to hospice appropriateness.  Discharging more than four patients per meeting was frowned upon by the Vitas business managers, and Vitas medical staff were told to stop discharging patients even if patients were not eligible.

***The same Vitas nurse stated that she was instructed by Vitas to falsely write that a patient experienced symptoms that the patient did not experience in order to support a determination of hospice eligibility.***  For example, she was once told to write that a patient had an unnatural color, or pallor, when the patient did not, and was instructed not to write that the patient's health was improving in the medical record.

One Vitas team doctor stated that on several occasions, when he did not believe patients were eligible for hospice, and therefore did not certify the patients as eligible, the Vitas medical director overruled him and signed the certification even in the absence of justification.

***A former Vitas physician stated that he was under pressure from Vitas management to increase the number of patients admitted to hospice, and he was often overruled when he determined that a patient should be discharged because the patient was not dying.  The physician informed Vitas managers that he was concerned that his medical decisions were being ignored, but Vitas did not address his concerns.***

*See* DOJ ¶¶ 160-77 (emphases added).

116.    In a Q4 2010 Earnings Call, O'Toole responded to a question from an analyst at RBC Capital regarding ongoing Medicare billing audits or claims reviews.  In response, O'Toole stated, in pertinent part, that, "[Audits and claims reviews are] always continuing, whether they be at the federal level, or various state level reviews, and we're doing very well in that regard and have improved, as Dave [David Williams] just mentioned, our internal processes.  ***So we make sure we have all of the key documents in the file for those reviews and upgrading every aspect of our compliance program***."  (Emphasis added.)

117.    The Company's 2009 and 2010 Annual Reports (which were signed by Defendants McNamara, Williams, and Tucker) state that Chemed "actively monitor[s] each of [their] hospice programs, by provider number, as to their specific admissions, discharge rate and median length of stay data in an attempt to determine whether they are likely to exceed the Medicare cap."

118.    Moreover, not only did Chemed and Vitas executives "actively monitor" each of the hospice programs, the Board also was provided and reviewed this data as part of the Company's compliance process.  For example, Vitas posted on its website an article written by O'Toole entitled "Our Commitment to Compliance."[24]  In that article, O'Toole states that as part of Chemed's "Internal Audit function," "regular reports" are "collated at the corporate level" to monitor "any compliance related disciplinary action" and ***provided directly to the Chemed Board***:

> ***Compliance with standards is monitored by internal compliance advocates who review a representative sample of billing documents each month***.  Feedback on any identified issues is given to the responsible individual in the program, and trends are monitored on a monthly basis to assure that any issues requiring attention are promptly addressed.  ***In addition to these reviews, Vitas' parent company, Chemed, maintains an Internal Audit function to independently review these documents as well.   Regular reports from these reviews are provided to the Vitas Compliance Committee and the Chemed Board of Directors for yet another level of oversight***.

(Emphases added.)

119.    O'Toole further noted that both Vitas and Chemed have hotlines through which compliance allegation and fraud can be reported to senior management:

> ***To ensure our strong culture of compliance throughout the organization, VITAS maintains not just the VITAS Compliance Hotline at 1-800-63-VITAS (638-4827) as mentioned above, but a robust network of compliance hotlines as described in this section.***  The compliance hotlines assure that employees have

---

[24] http://www.Vitas.com/CultureofCompliance/Articles/ComplianceCommitment.aspx

ready access to a way of reporting any compliance issues that need attention. Also, for any employee who feels at all uncomfortable discussing issues in the program or with their immediate supervisor, these hotlines provide the ability to report situations anonymously. ***Any compliance allegations reported are investigated under the supervision of the Compliance Officer and involve the Chief Operating Officer, Vice President of Operations for the affected program, the National Medical Director and legal counsel when appropriate.***

. . . .

***Additionally, VITAS' parent company maintains the Chemed Theft and Fraud Hotline to give those with concerns yet another avenue to report potential concerns. . . .***

(Emphases added.)

120.    The internal auditing processes referenced above establish that Chemed's officers and directors knew or should have known that Vitas was submitting false claims for hospice services.  Notwithstanding that fact, the malfeasance described herein has continued unabated for about a decade.

I.    **Plaintiff's Confidential Sources Have Corroborated the Wrongdoing Alleged by the Government and *Qui Tam* Relators**

121.    In addition to the DOJ Complaint, several confidential witnesses ("CWs") interviewed by Plaintiff's investigator fully support the allegations herein.  The CWs are former employees of Vitas and/or Chemed.[25]

122.    CW1, a former Vitas sales representative with inside knowledge of Vitas' sales organization, stated that Chemed and Vitas executives made a "big push" to market the availability of continuous (or crisis) care because Medicare pays a higher rate for this type of care when compared to lower levels of hospice care.  The availability of [crisis care] was perceived to be a "selling point" to families that might be looking to relieve an exhausted caregiver.  CW1 reported directly to a Director of Market Development, giving him familiarity

---

[25] The CWs are referred to in the masculine to help protect his/her identify.

and access to Vitas' sales tactics and marketing strategies.  CW1 stated that the availability of (crisis care) was perceived to be a selling point to families that might be looking to relieve an otherwise exhausted caregiver.  In addition, CW1 stated that "the push to meet numbers came from [Vitas] CEO O'Toole."  CW1 further stated that O'Toole could be heard in the Palm Beach program office screaming over the phone at a General Manger "about the numbers" and how the Company did not have enough patients in (crisis care) care.  In addition, CW1 further declared that O'Toole yelled about the need to increase admissions.  As a result of these orders from O'Toole, CW1 declared that all the employees in Vitas Palm Beach were told by the General Manager that "the percentage of patients in continuous [or crisis care] is too low."  According to CW1, these messages were sent to pagers that Vitas issued to nurses and other employees and the message would read, for example, "This is the percentage of patients on continuous care, please evaluate patients for [crisis care] appropriateness."

123.    CW1 also acknowledged that Vitas employees received a "State of the Hospice" report every quarter that detailed and compared the ADC of the current quarter to the previous quarter.  In addition, CW1 indicated that O'Toole and other corporate personnel from Chemed visited Palm Beach regularly during CW1's last year with the Company.  CW1 further stated that it was clear that O'Toole was receiving regular ADC numbers from Palm Beach.  CW1's immediate director urged CW1 to get his ADC numbers turned in because "O'Toole needs them."

124.    CW1 confirmed many of the accusations by the government in the DOJ Action and specifically that Chemed and Vitas pressured employees to admit patients to hospice care. CW1 also confirmed his belief that the Company purposely did not train employees on the Medicare criteria for hospice admissions.

125.    Another former Vitas employee, CW2, was employed as a Senior Director of Recruitment and Retention at Vitas' corporate headquarters.  CW2 confirmed O'Toole's hands-on approach to the numbers.  CW2 stated that "once or twice a month" O'Toole and CFO David Wester ("Wester") "traveled to Cincinnati to meet with Chemed executives at the Chemed corporate headquarters."  In addition, CW2 testified that once or twice a month, O'Toole and Wester traveled to the Chemed headquarters in Cincinnati to meet with Chemed executives.  CW2 also confirmed that Chemed's internal audit team regularly visited the Vitas headquarters in Miami, Florida.  CW2 further noted that there were only 35 or so Chemed employees, so Chemed did not have much to do but monitor the performance of Vitas.  Further, as corroborated by the DOJ Action and multiple other CWs, CW2 noted, "the [average daily census] was the pulse of the Company" and everything was driven by these numbers.

126.    CW3 was a former Vitas employee who supervised patients, medical directors, nurses, and chaplains at a large Vitas location.  CW3 likewise commented that he believed that that Vitas' employed tactics aimed at improperly enrolling hospice patients.  Additionally, CW3 corroborated many of the allegations in the DOJ Complaint and stated further that Vitas marketing employees would "troll the halls" of assisted living facilities looking for potential hospice patients.  CW3 described an instance where a former Patient Care Manager overruled a doctor's decision that a patient was ready to be discharged, saying "we are not going to discharge this patient."  When the doctor returned the following week, he was told that his decision had been reversed.  The doctor left Vitas not long after that.  CW3 stated that this type of wrongful conduct led to the Company having "so many patients on continuous care that people who needed it couldn't get it."  CW3 confirmed that Vitas had patients on continuous care for as long as two weeks, when it was supposed to be limited to two days.

127.    CW4 was employed as a Director of Market Development at Vitas.   In that capacity, CW4 supervised a team of sales representatives responsible for securing hospice patient referrals for Vitas.   CW4 confirmed many of the high-pressure tactics and emphasis that Chemed and Vitas put on "the numbers."   CW4 stated that Vitas sales representatives were expected to meet their admission numbers each month, and if they failed to do so three months in a row, they were encouraged to leave.   According to CW4, the closer it was to the end of the month, "the more admissions went up."   In this respect, CW4 said he "could see in my program they were admitting patients who didn't belong."   According to CW4, Chemed executives "rode" Vitas executives: "Chemed was brutal as to numbers."

128.    CW5 was a physician employed by Vitas who had direct contact with patients. CW5 confirmed the high pressure environment and the related push for Vitas to increase its hospice census.   CW5 stated that "there was a lot of pressure to bring in patients who didn't qualify and didn't qualify to stay based on Medicare criteria."   CW5 "felt a lot of pressure to accept patients who did not qualify for hospice."   CW5 acknowledged that Vitas was "not an ethical place to work."   In this regard, CW5 claimed that he felt his employment was in jeopardy if he did not agree to admit patients to hospice.

129.    CW5 also described weekly "inter-disciplinary meetings" that focused on, among other things, recertifying patients currently enrolled in the program.   At these meeting, CW5 stated that his direct supervisor threatened to get another Vitas physician to certify that CW5's patients were eligible for hospice, if CW5 refused to admit these patients to hospice because they did not meet the Medicare eligibility requirements.   A regular refrain from CW5's supervisor was "we gotta have our numbers up, we gotta have our numbers up."[26]

---

[26] The testimony of CW1 through CW5 is corroborated by the remarkably consistent allegations of 14 other confidential witnesses set forth in the Amended Complaint filed by the court-appointed lead plaintiffs in *In re*

130.   CW5 said that he often objected to certifying patients for an additional six months of care because they did not meet Medicare criteria.  "It was just a struggle. . . .  [There was] a lot of browbeating" to get CW5 to agree to recertify patients.

**J.     Chemed's Board of Directors and Executives Knew or Should Have Known About Improper Medicare Hospice Billing**

131.   As noted above, hospice care has become big business.  The government, elected officials and watchdogs have taken notice.  For example, in June, 2008 and March, 2009, the Medicare Payment Advisory Commission ("MedPAC") released reports concluding that Medicare's hospice payment system contained incentives that could lead to inappropriate utilization of the benefit among hospices.  In addition, MedPAC stated that CMS lacks adequate administrative and other controls to monitor and ensure that hospice providers are in compliance.

132.   Likewise, the OIG in recent years has increased its scrutiny of hospice care providers and whether they have maintained compliance with Medicare and Medicaid.  In September, 2009, the OIG published a report titled "Medicare Hospice Care For Beneficiaries In Nursing Facilities: Compliance With Medicare Coverage Requirements."   This OIG report indicated that "eighty-two percent of hospice claims for beneficiaries in nursing facilities did not meet at least one Medicare coverage requirement."  As a result, the OIG recommended that CMS increase its scrutiny and strengthen its monitoring practices of hospice claims.

133.   In addition, on July 18, 2011, the OIG released a report titled "Medicare Hospices That Focus on Nursing Facility Residents" (the "July 2011 OIG Report").  That report set forth

---

*Chemed Corp. Securities Litigation*, No. 1:12-cv-00028-MRB (S.D. Ohio), a federal securities fraud class action brought under the Securities Exchange Act of 1934.  In that action, the lead plaintiffs allege that Chemed and its senior management defrauded the Company's investors by concealing a scheme to "admit and recertify as many patients as possible, without regard to the eligibility of those patients for Medicare's hospice reimbursement."  The confidential witnesses in question include two former Directors of Market Development, a former Senior Director of Compliance, a former patient administrator, a former general manager, and four former admissions nurses, among others.

various concerns regarding inappropriate hospice care claims being submitted to Medicare.  The

OIG reported that hospice providers intentionally sought out patients with conditions that

required longer stays because of the increased financial payments associated with hospice care.

This OIG report specifically stated that the "OIG plans to look at the marketing practices of these

hospices and their relationships with nursing facilities."

134.    The Board first received notice of the OIG's increased scrutiny of improper

hospice billing practices on April 7, 2005.  At that time, Vitas received subpoenas from the OIG

alleging improper Medicare and Medicaid billing for hospice care.  (The Company filed a Form

8-K on this subject on April 8, 2005.  That form 8-K included a copy of a Company press release

dated April 7, 2010.)  McNamara spoke about the OIG subpoena at Chemed's Q1 2005 Earnings

call:

> As most of you are aware, Vitas received subpoenas in the mail earlier this month
> from the OIG for the Department of Health and Human Services relating to Vitas'
> alleged failure to appropriately bill Medicare and Medicaid for hospice services
> . . .  I also want to reiterate our understanding of the critical role in the OIG and
> CMS and these types of investigations, the role they play . . . this established a
> level playing field for all providers and creates an environment that allows
> patients to receive appropriate access and quality outcome . . . .

135.    Additionally, Individual Defendants McNamara, Williams, Tucker, Hutton,

Grace, Krebs, O'Toole, Saunders, Walsh and Wood certified and/or signed the following Form

10-K, which referenced the following *qui tam* actions and government investigations of Chemed:

- March 16, 2006 Form 10-K disclosure that Chemed was provided
  a copy of a *qui tam* complaint that filing also disclosed civil
  subpoenas from the OIG on April 7, 2005 regarding alleged failure
  to appropriately bill Medicare and Medicaid for hospice services.
  That disclosure added that as  part of this investigation, the OIG
  selected medical records for 320 past and current patients from
  Vitas' three largest programs for review.  According to the filing,
  the OIG also sought policies and procedures dating back to 1998
  covering admissions, certifications, recertifications, and
  discharges.

136.     Likewise, Individual Defendants McNamara, Williams, Tucker, Hutton, Grace, Krebs, Lindell, Mrozek, Rice, Saunders, Walsh, Wood, certified and/or signed the following Form 10-K, which referenced the activities of the OIG as it related to Chemed:

- February 26, 2010 Form 10-K discloses that in May 2009, Vitas received an administrative subpoena from the DOJ requesting Vitas to deliver to the OIG documents, patient records, and policy and procedure manuals for its headquarters and its Texas programs since January 1, 2003. In addition, this filing noted that in August 2009, the OIG requested to review medical records for 59 past and current patients from Vitas' Texas hospice program. In addition, the Company disclosed that Vitas had received a companion civil investigative demand from the state Texas Attorney General's Office in February 2010 regarding compliance with hospice reimbursements for Medicare and Medicaid.

137.     During the period between November 9, 2010 and November 2, 2012, Individual Defendants McNamara, Williams, and Tucker certified and signed the following Forms 10-Q, which referenced the activities of the OIG and/or certain state investigations as related to Chemed:

- November 3, 2010 Form 10-Q disclosing a second civil investigative demand and subpoena on September 2010 from the Texas Attorney General seeking documents relating to compliance with Medicare and Medicaid.

- April 29, 2011 Form 10-Q disclosing that in April 2011, the U.S. Attorney provided Chemed with a copy of a *qui tam* complaint filed under seal.

- August 5, 2011 Form 10-Q disclosing that in June 2011, the U.S. Attorney provided the Company with a partially unsealed third *qui tam* complaint filed under seal.

- August 2, 2012 Form 10-Q disclosing that in June 2012, Vitas received a subpoena from the OIG in connection with an investigation of possible improper claims submitted to Medicare and Medicaid.

- November 2, 2012 Form 10-Q disclosure of a September 2012 OIG subpoena, a subpoena from the Florida AG's Office, and the unsealing of two additional *qui tam* complaints (*United State, et al.*

*ex rel. Urick v. Vitas HME Solutions, Inc. et al.; United States, et al. ex rel. Spottiswood v. Chemed Corp.*).

138.    The Company has also noted in its Form 10-K filings with the SEC, beginning on February 28, 2007, that Congress established the OIG to identify and eliminate fraud, abuse and waste in HHS programs.  Specifically, the Form 10-K reports in question stated that, "[T]he OIG conducts audits, investigations and inspections across the country and issues public pronouncements identifying practices that may be subject to heightened scrutiny.  *In the last several years, there have been a number of hospice related audits and reviews conducted.*" (Emphasis added.)  Individual Defendants McNamara, Williams, Tucker, Hutton, Grace, Krebs, O'Toole, Saunders, Walsh and Wood certified and/or signed this 10-K.

139.    In a Q2 2011 Earnings Call hosted by McNamara, Williams, and O'Toole, a question was asked regarding increased regulation scrutiny by the OIG.  O'Toole responded that the government has been scrutinizing the hospice industry for a "long time":

> Q:  Brian Zimmerman, Deutsche Bank – [L]ast week the OIG came out with a report focusing on Medicare hospices that focus on nursing facility residents.  Do you see the government's interest in this area as a potential risk?  And I guess the second part of that question is we've noticed a decline year-over-year in average daily census within nursing facilities.  Is that changed from competition?
>
> A:  O'Toole – **[S]o there's parts of the [July 2011 OIG Report] that I disagree with. Some of their comments are not new, they've been focused on them for a long time.**

140.    Additionally, on November 16, 2011 *Bloomberg News* published an article entitled "Whistleblower Accuses Chemed Unit of Medicare HMO Conspiracy" that further addressed Chemed's scheme to defraud the government.[27]  The article disclosed that a former Vitas general manager uncovered wrongdoing throughout the Company that included a

---

[27] Peter Waldman, "Whistleblower Accuses Chemed Unit of Medicare HMO Conspiracy," *Bloomberg* (Nov. 16, 2011) *available at* http://www.bloomberg.com/news/2011-11-16/whistleblower-accuses-chemed-unit-of-medicare-hmo-conspiracy.html.

conspiracy with health insurers to enroll patients into hospice care even when those patients were not dying or were not otherwise eligible.  As a result, Vitas' reimbursement for this hospice care was in violation of Medicare's rules and regulations.  The article also reported that the DOJ was investigating whether Vitas was involved in a company-wide "extensive scheme" to defraud the Federal Government out of "hundreds of millions of dollars" by falsifying records and hospice certifications.

141.    In a Q2 2012 Earnings Call, McNamara confirmed the industry-wide knowledge of the government's increased scrutiny on the hospice business: "[W]e're in a business where 95% of the sales approximately are to the Federal Government directly or indirectly and we know that we're always going to be under a microscope."

142.    Notwithstanding the increased regulation scrutiny on hospice billing throughout the industry, Chemed focused on maximizing Medicare reimbursement for as many patients as possible while disregarding patients' medical needs and Medicare rules and regulations.  As noted herein, the Company consistently ignored numerous concerns expressed by its own physicians and nurses regarding whether regulatory requirements were being followed.

### K.    Chemed Shareholders Have Expressed Disapproval of the Board's Executive Compensation Decisions

143.    In light of the constant parade of regulatory investigations and government and whistleblower lawsuits, it comes as no surprise that Chemed's shareholders have expressed dissatisfaction with the Company's executive compensation, policies.  In the three years since the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), the SEC has required large public companies to hold advisory "say-on-pay" votes.  These votes provide shareholders with the opportunity to express their views on executive

compensation policies at the public companies in which they have invested.[28]   Since then, Chemed shareholders have expressed resounding disapproval at the Company's executive compensation policies.

144.   For example, in 2013, only 64.82% of Chemed shareholders voted in favor the Board's executive compensation package.[29]  This placed Chemed's say-on-pay approval rating in the approximately the bottom 8% of public companies.[30]

145.   In 2012, Chemed *failed its say-on-pay vote*, with only 47.77% of shareholders voting in favor, after Institutional Shareholder Services recommended that Chemed shareholders vote against the Board's pay plans.[31]  According to Equilar, only 5.4% of public companies had their executive compensation proposals rejected by a majority of shareholders in 2012.[32]

146.   Similarly, in 2011 (the first year that Chemed was required to hold an advisory say-on-pay vote), the Board's compensation package received the support of only 69.82% of shareholders,[33] placing the Company in the bottom 7.4% of to receive shareholder support according to Equilar.[34]

147.   The proportion of Chemed shareholders that have consistently disapproved of the Company's executive compensation make Chemed an outlier among public companies.

---

[28] Pursuant to Dodd-Frank, Pub. L. No. 111-203, 124 Stat. 1375 (2010), the SEC required a say-on-pay vote at shareholder meetings of public companies with more than a $75 million public equity float held after January 20, 2011.

[29] *See* Chemed Corp., Current Report, Form 8-K, at 2 (May 21, 2013).

[30] *See* Client Update, Meridian Compensation Partners, LLC (June 27, 2013) (citing ISS Voting Analytics Database) (available at http://www.meridiancp.com/images/uploads/TNU-2013-7B_2013_Say_on_Pay_Votes.pdf).

[31] *See* Chemed Corp., Current Report, Form 8-K, at 2 (May 21, 2012).

[32] *See* Equilar, Say on Pay: Punch those Ballots (available at http://www.equilar.com/corporate-governance/2012-reports/say-on-pay-punch-those-ballots).  Despite having their 2012 executive compensation plan rejected by a majority of their shareholders, the Board did not alter its 2012 compensation.

[33] *See* Chemed Corp., Current Report, Form 8-K, at 5 (May 17, 2010).

[34] *See* Equilar, Say on Pay: Punch those Ballots (available at http://www.equilar.com/corporate-governance/2012-reports/say-on-pay-punch-those-ballots).

## VI.   DERIVATIVE ALLEGATIONS

148.   Plaintiff brings this action derivatively in its right and for the benefit of Chemed to redress injuries suffered, and to be suffered, by Chemed as a direct result of the breaches of fiduciary duties by the Individual Defendants.

149.   Chemed is named as a nominal defendant in this case solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

150.   As alleged above, Plaintiff currently is a stockholder of Chemed.   Plaintiff also was a stockholder of Chemed at the time of the breaches of fiduciary duties complained of herein.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in prosecuting this action.   Because the Individual Defendants face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its shareholders.

151.   The wrongful acts complained of herein subjected, and continue to subject, Chemed to harm.

## VII.   DEMAND ON THE BOARD OF DIRECTORS IS EXCUSED AS FUTILE

152.   Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

153.   The Board is currently comprised of the following ten directors: Defendants McNamara, Gemunder, Grace, Hutton, Krebs, Lindell, Rice, Saunders, Walsh III, and Wood. Plaintiff did not make a demand upon the Board prior to instituting this action because a majority of the Board either: (1) lacks independence from the Company; (2) engaged in conduct that was not a legitimate exercise of business judgment and/or was *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule; and/or (3) is interested and therefore conflicted from and unable to fairly consider a demand because they face a substantial likelihood of

liability for their role in Chemed's illegal conduct and/or because they sat idle in the face of red flags that should have placed them on notice of the wrongdoing alleged herein.

### A. Demand Is Excused Because the Individual Defendants' Conduct Is Not a Valid Exercise of Business Judgment

154.     The challenged misconduct at the heart of this case involves the direct facilitation of illegal activity, including the Individual Defendants' knowingly and/or consciously presiding over the Company's pervasive violations of the FCA and various state health-care fraud and false-claims statutes.    The Individual Defendants in their capacity as corporate directors affirmatively adopted, implemented, and/or condoned a business strategy based on Chemed's deliberate and widespread violations of law.    The Board cannot plausibly claim ignorance concerning these wide-ranging compliance failures.    Indeed, the Chemed Board was specifically and uniquely accountable and responsible for the compliance failures discussed herein given that, according to O'Toole, the Board as a whole received compliance reports from Vitas:

> Compliance with standards is monitored by internal compliance advocates who review a representative sample of billing documents each month.  Feedback on any identified issues is given to the responsible individual in the program, and trends are monitored on a monthly basis to assure that any issues requiring attention are promptly addressed.  ***In addition to these reviews, Vitas' parent company, Chemed, maintains an Internal Audit function to independently review these documents as well.  Regular reports from these reviews are provided to the Vitas Compliance Committee and the Chemed Board of Directors for yet another level of oversight.***

*See supra* ¶ 118.

155.     The Board's "do nothing' strategy in the face of information evidencing the systematic violations of applicable laws and regulations over a ten-year period is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.

156.    A derivative claim to recoup damages for harm caused to the Company by pervasive unlawful activity represents a challenge to conduct that is outside the scope of appropriate business judgment—conduct for which the Individual Defendants should face potential personal liability.   As such, the protections of the "business judgment rule" do not extend to such malfeasance.   Nor can such malfeasance ever involve the "good faith" exercise of directorial authority.   Accordingly, any demand on the Board to initiate this action would be futile.

**B.    Demand Is Excused Because a Majority of the Current Board Members Are Either Not Independent or Are Conflicted Because They Face a Substantial Likelihood of Liability Arising From Their Misconduct**

157.    Even if knowingly presiding over illegal conduct somehow falls within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the members of the Board are not disinterested or independent and cannot, therefore, properly consider any demand.

158.    As an initial matter, the Board has effectively conceded, in the Company's SEC filings, that McNamara and Hutton are not independent directors of the Company.   Indeed, in Chemed's April 5, 2013 proxy statement, the Company states that "the following directors and nominees . . . are independent of the Company and its management: Messrs. Gemunder, Grace, Krebs, Rice, Saunders, Walsh, and Wood and Ms. Lindell."   By excluding McNamara and Hutton, Chemed acknowledges that McNamara and Hutton are not independent.

159.    Specifically, McNamara is not independent because his principal occupation is serving as the Company's President and CEO.   According to the Company's SEC filings, since 2004, McNamara has received in excess of $44 million in salary and other compensation from Chemed.   Moreover, as demonstrated by the chart below, a significant portion of McNamara'a

compensation is incentive-based, which means that he was personally incentivized to perpetuate

misconduct (such as described herein) that artificially inflates the performance of the Company:

| MCNAMARA COMPENSATION[35] | | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
| **INCENTIVE** | $3,899,201 | $3,422,341 | $4,330,321 | $4,304,775 | $4,916,979 | $3,821,147 |
| **TOTAL** | $5,070,248 | $4,633,237 | $5,732,640 | $5,838,230 | $6,362,480 | $5,260,887 |
| **% INCENTIVE-BASED** | 77% | 74% | 76% | 74% | 77% | 73% |

160.    In addition to the above, McNamara is a member of Vitas' Executive Team,

serving as its Chairman.  *See supra* ¶ 15.  Thus, he cannot realistically distance himself from the

misconduct alleged herein.   McNamara is therefore incapable of impartially considering a

demand to commence this action.

161.    Similarly, Hutton is not independent because his principal occupation is serving

as the Company's VP.  As a result of this employment relationship, Hutton has received and will

receive valuable financial benefits from the Company – benefits that would be lost if Hutton's

employment relationship were severed.  As such, Hutton is incapable of impartially considering

a demand to commence this action.

162.    Defendants Grace, Rice, Saunders, and Krebs have all been members of the Audit

Committee since at least 2008, are conflicted from considering a demand because they each face

a substantial likelihood of liability as a result of their conduct on the committee.   The Audit

Committee's charter imposes specific duties on members of this committee to, among other

things, "assist the Board in monitoring . . . the compliance of the Company with legal and

regulatory requirements"; and "[a]ssist Board oversight of, and review with the Company's

counsel, ***legal matters that may have a material impact on the financial statements and any***

---

[35] All incentive-based references include Bonus, Stock Awards, and Options.

*material reports or inquiries received from regulators or governmental agencies*." (Emphasis added.)

163.    In accordance with its charter, the Audit Committee also reviews "with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures."

164.    As long-time members of the Audit Committee, Defendants Grace, Rice, Saunders, and Krebs violated their fiduciary duties to act in good faith to address the pervasive legal violations discussed herein. Accordingly, Defendants Grace, Rice, Saunders, and Krebs face a substantial likelihood of liability and cannot impartially consider a demand. Therefore, demand is excused with respect to these defendants.

165.    The Board is likewise conflicted from and unable to pursue Chemed's claims against members of the Company's management, including Defendants McNamara, Williams, Tucker, and O'Toole. Any effort to prosecute such claims against the these four Defendants for their direct roles in implementing a business strategy designed to ignore or otherwise circumvent the FCA and various state health-care fraud and false-claims statutes would necessarily expose the Board's own culpability for the very same conduct. In other words, given that the Board regularly received compliance reports from Vitas, any effort by the Board to hold Defendants McNamara, Williams, Tucker, and O'Toole liable would surely lead these executives to defend on the ground that their own conduct was consistent with Chemed's corporate policy and practice, as established and by and known to the Board.

166.    Moreover, the lavish executive compensation that Chemed's Board has extended to Defendants McNamara, Williams, Tucker, and O'Toole notwithstanding the disapproval expressed by Chemed's shareholders further demonstrates the Board's unwillingness to

impartially consider a pre-suit demand.  In particular, on May 22, 2012, Chemed reported that its shareholders had rejected the Board's executive compensation policies.  *See* ¶ 145 *supra*.  Yet, the Company took no action in response to that vote.  The Board's willingness to ignore shareholder concerns as expressed in May 2012 and to instead favor the interests of corporate insiders demonstrates the Board's utter inability and/or unwillingness to fairly consider the interests of the Company as a whole.  Further to this point, notwithstanding the near decade-long misconduct that occurred at Vitas, Defendant O'Toole, who has been CEO of Vitas since February 2004 , has been rewarded handsomely by the Board for his performance.  As is the case with Defendant McNamara, a significant percentage of O'Toole's compensation is incentive-based, which means that he too is personally incentivized to continue to engage in unlawful business practices described herein:

| O'TOOLE COMPENSATION[36] | | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
| **INCENTIVE** | $  1,424,203 | $     971,023 | $  1,784,691 | $  1,812,178 | $  1,912,136 | $  1,330,242 |
| **TOTAL** | $  2,171,509 | $  1,745,067 | $  2,582,112 | $  2,678,031 | $  2,701,647 | $  2,162,222 |
| **% INCENTIVE-BASED** | 66% | 56% | 69% | 68% | 71% | 62% |

### C.   The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith

167.   Under Delaware law and Chemed's Corporate Governance Principles, the Board, as the Company's highest decision-making body, is charged with ensuring that processes are in place for ensuring legal and regulatory compliance.  This is particularly true when such compliance concerns a core operation of the Company.  In the case at bar, the misconduct alleged was pervasive, took place over a nearly a decade, and involved the Company's core

---

[36] All incentive-based references include Bonus, Stock Awards, and Options.

business operations and primary source of revenue. Organized and long-running violations of the law do not result from an isolated failure of oversight. At the very least, the Individual Defendants consciously turned a blind eye to these persuasive violations of law, creating a substantial likelihood of liability. Accordingly, demand is excused.

168. All of the Board's directors, at the time this action was initiated, failed to act in the face of known duties. Indeed, as explained herein, they were presented with – but consciously ignored (and/or perpetuated) – substantial "red flag" warnings that Vitas' hospice care enrollment practices were not in compliance with requirements set forth by Medicare and Medicaid. These and other wrongful acts have caused and will continue to cause the Company to be subjected to significant potential fines and penalties, and numerous lawsuits. They have also resulted in severe harm to the Company's business reputation. Since the wrongdoing and harm alleged in this Complaint flows directly from the Board's conscious decision to permit the sustained and systemic violations of law in question, the Individual Defendants are incapable of exercising the independent judgment required to determine whether the initiation of an action against the Individual Defendants is appropriate.

## VIII. COUNT I - DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY (AGAINST THE INDIVIDUAL DEFENDANTS)

169. Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

170. The Individual Defendants each owed and/or owes Chemed and its shareholders the highest fiduciary duties of good faith, loyalty, and due care in managing and administering the Company's affairs.

171. As detailed herein, the Individual Defendants committed unlawful and *ultra vires* acts. They also consciously failed to fulfill their fiduciary obligations to the Company and its shareholders. As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary duties of good faith, loyalty, and due care, Chemed has suffered and continues to suffer significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company in an amount to be determined at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    Declaring that Plaintiff may maintain this derivative action on behalf of Chemed and that Plaintiff is a proper and adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached their fiduciary duties to Chemed;

(c)    Determining and awarding to Chemed the damages sustained by it as a result of the breaches of fiduciary duty set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

(d)    Awarding Chemed restitution from Defendants, and each of them;

(e)    Awarding Chemed exemplary damages;

(f)    Directing the Individual Defendants to cause the Company to implement policies and procedures to ensure that Chemed never again deliberately engages in illegal conduct;

(g)    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, costs, and expenses;

(h)    Awarding pre- and post-judgment interest; and

(i)    Granting such other and further relief as this Court deems just and equitable.

## X.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

DATED:  November 6, 2013

/s/ P. Bradford deLeeuw
Jessica Zeldin (Del. Bar No. 3558)
P. Bradford deLeeuw (Del. Bar No. 3569)
ROSENTHAL, MONHAIT & GODDESS, P.A.
P. Bradford deLeeuw (Del. Bar No. 3569)
919 N. Market Street, Suite 1401
Wilmington, Delaware 19801
Telephone:  (302) 656-4433

Counsel for Plaintiff

OF COUNSEL:

MOTLEY RICE LLC
Joseph F. Rice
Gregg S. Levin
William S. Norton
Joshua C. Littlejohn
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450