## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KBC ASSET MANAGEMENT NV, derivatively on behalf of CHEMED CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 13-1854-LPS-CJB |
| KEVIN J. MCNAMARA, et al., | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CHEMED CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Nominal Defendant. | ) | |
| MILDRED A. NORTH, derivatively on behalf of CHEMED CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 14-1209-LPS-CJB |
| KEVIN J. MCNAMARA, et al., | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CHEMED CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

In these related shareholder derivative suits (referred to herein as the "*KBC* Action" and the "*North* Action," respectively), presently pending before the Court are Plaintiff KBC Asset

Management NV's ("KBC") "Motion to Consolidate and Appoint Lead Plaintiff, Lead Counsel and Liaison Counsel" ("Motion"). (D.I. 30; *North* Action D.I. 38)[1] No party in either action opposes the request for consolidation. However, the Motion is otherwise opposed by Plaintiff Mildred A. North ("North"). The individual Defendants ("Individual Defendants")[2] and nominal Defendant Chemed Corporation ("Chemed," and collectively with the Individual Defendants, "Defendants") take no position on the remainder of the Motion. For the reasons stated below, the Court GRANTS KBC's Motion.

I.  **BACKGROUND**

KBC filed its Complaint on November 6, 2013. (D.I. 1) In that *KBC* Action, in lieu of an Answer, Defendants filed a motion seeking dismissal of the Complaint pursuant to Federal Rules of Civil Procedure 12(b) and 23.1. (D.I. 12) That motion was fully briefed in May 2014. (D.I. 18).

North, in the meantime, had filed her Complaint on November 14, 2013, in the United States District Court for the Southern District of Ohio ("Southern District of Ohio"). (*North* Action, D.I. 1) North thereafter moved the United States Judicial Panel on Multidistrict

---

[1] KBC is the Plaintiff in Civil Action Number 13-1854-LPS-CJB, in which it is suing derivatively on behalf of Chemed Corporation. Plaintiff Mildred A. North is the Plaintiff in Civil Action No. 14-1209-LPS-CJB, in which she is also suing derivatively on behalf of Chemed Corporation. Although KBC is not a plaintiff in the *North* Action, it filed the Motion both in its own action and in the *North* Action. Citations herein are, unless otherwise noted, to the docket in the earlier-filed *KBC* Action.

[2] The Individual Defendants in the *KBC* Action are 14 Chemed officers and directors: Kevin J. McNamara, Joel F. Gemunder, Patrick B. Grace, Thomas C. Hutton, Walter L. Krebs, Andrea R. Lindell, Thomas P. Rice, Donald E. Saunders, George J. Walsh III, Frank E. Wood, Timothy S. O'Toole, David P. Williams, Arthur V. Tucker, Jr., and Ernest J. Mrozek. (D.I. 1) The Complaint in the *North* Action names all but Mr. Tucker and Mr. Mrozek as Individual Defendants. (*North* Action, D.I. 1)

2

Litigation (the "MDL Panel") to centralize the litigation in the Southern District of Ohio; the MDL Panel later denied that motion. (*North* Action, D.I. 21) Upon Defendants' request, the Southern District of Ohio thereafter transferred the *North* Action to this Court. (*North* Action, D.I. 28).

In light of the transfer of the *North* Action, on September 29, 2014, Chief Judge Leonard P. Stark ordered that the pending motion to dismiss in the *KBC* Action should be denied without prejudice. (D.I. 29; *North* Action, D.I. 31) Chief Judge Stark then ordered the *KBC* Action and the *North* Action be referred to the Court for all purposes, up to and including resolution of case-dispositive motions. (*Id.*)

On October 15, 2014, KBC filed the instant Motion, (D.I. 30; *North* Action D.I. 38), which was fully briefed as of November 13, 2014, (D.I. 37; *North* Action D.I. 46). At KBC's request, (D.I. 39; *North* Action D.I. 48), the Court held oral argument on the Motion on January 22, 2015.

## II. DISCUSSION

As its title indicates, the Motion raises three separate issues: (1) whether the cases should be consolidated; (2) whether KBC should be designated as Lead Plaintiff; and (3) whether KBC's counsel, Motley Rice LLC ("Motley Rice") and Rosenthal, Monhait & Goddess, P.A. ("Rosenthal Monhait") should be designated Lead Counsel and Liaison Counsel, respectively. The Court will address these issues in turn.

### A. Consolidation

"If actions before the court involve a common question of law or fact, the court may . . . consolidate the actions[.]" Fed. R. Civ. P. 42(a). The Court has broad authority to consolidate

3

actions for trial involving common questions of law or fact if, in its discretion, it finds that such consolidation would "facilitate the administration of justice." *Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir. 1964); *see also Resnik v. Woertz*, 774 F. Supp. 2d 614, 624-25 (D. Del. Mar. 28, 2011). Although the existence of common questions of law or fact is a prerequisite to consolidation, their presence does not require consolidation pursuant to Federal Rule of Civil Procedure 42(a). *Rohm & Haas Co. v. Mobil Oil Corp.*, 525 F. Supp. 1298, 1309 (D. Del. 1981). Instead, in considering such a motion, the Court must balance any savings of time and effort gained through consolidation against any "inconvenience, delay, or expense" that may result. *Id.*

Here, all parties agree that the two cases should be consolidated, and there is no dispute that both cases involve common questions of law and fact. (D.I. 31 at 8-9; D.I. 33 at 3-4 & n.1; D.I. 34 at 3, 9; D.I. 36) Both actions were filed by shareholders of Chemed derivatively on behalf of the company, and the respective Defendants in both actions are nearly identical. (D.I. 1; *North* Action, D.I. 1) Both Complaints allege common (though not identical) facts. (*Id.*) And both assert that certain officers and members of Chemed's Board of Directors ("Board") breached their fiduciary duties to the company by implementing, sanctioning and/or consciously ignoring systematic violations of the False Claims Act, via the submission of improper and ineligible claims to Medicare and Medicaid over a number of years.[3] (*Id.*) For all of these reasons, KBC's request for consolidation for all purposes, including pre-trial proceedings and trial, shall be granted. *See, e.g., Resnik*, 774 F. Supp. 2d at 625.

---

[3] These violations are alleged to have occurred in the Vitas Innovative Hospice Care segment of Chemed's business.

4

## B. Designation of Lead Plaintiff

Federal Rule of Civil Procedure 23.1(a) provides that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders . . . who are similarly situated in enforcing the rights of the corporation[.]" Fed. R. Civ. P. 23.1(a). Here, there is no question that the competing Plaintiffs will "fairly and adequately" represent the shareholders' interests. The question instead is whether to appoint a lead plaintiff, and if so, which Plaintiff will best represent shareholder interests.

Although no statutory authority exists for the appointment of a lead plaintiff in shareholder derivative actions like these, courts have the inherent "authority to appoint a lead plaintiff . . . in a derivative action in order to create an efficient case-management structure." *N. Miami Beach Gen. Employees Retirement Fund*, No. 10 C 6514, 2011 WL 12465137 at *1-2 (N.D. Ill. July 5, 2011) (appointing a lead plaintiff and lead counsel to avoid "the potential for disagreements and inefficiencies"); *see also Horn v. Raines*, 227 F.R.D. 1, 3 (D.D.C. 2005) (appointing, *inter alia*, a lead plaintiff in derivative actions, as it was "necessary to provide for an orderly litigation"). Here, the Court finds that although there are only two derivative actions at issue and two competing Plaintiffs, appointing a lead plaintiff (and, relatedly, lead plaintiff's counsel) would be beneficial. *See Berg v. Guthart*, Case Nos. 5:14-CV-00515-EJD, 5:14-CV-01307-EJD, 2014 WL 3749780, at *1-2, *7 (N.D. Cal. July 30, 2014) (appointing a lead plaintiff and consolidating two similar shareholder derivative actions); *Clark v. Thiry*, Civil Action No. 12–cv–2074–WJM–CBS, Civil Action No. 13–cv–1308–WJM–MJW, 2014 WL 4050057, at *1, *4 (D. Colo. Jan. 7, 2014) (same); *Sexton v. Van Stolk*, No. C07-1782RSL, 2008 WL 1733242, at *1 (W.D. Wash. Apr. 10, 2008) (same). To date, these two litigations have taken divergent

5

paths in multiple courts, and the absence of an efficient, streamlined structure for directing this litigation on behalf of the corporation has only led to delay and inefficiency. Appointing a lead plaintiff should help to change this course.

In determining which plaintiff should be chosen as lead plaintiff, a number of courts have considered the following factors: (1) which plaintiff has the largest financial interest; (2) the preference for institutional investors to lead a lawsuit for shareholders; (3) the quality of the pleadings; (4) the vigor with which the plaintiff has pursued the suit; and (5) the plaintiff's arrangement on the payment of attorney's fees. *See Berg*, 2014 WL 3749780, at *4; *N. Miami Beach*, 2011 WL 12465137 at *1; *Dollens v. Zionts*, Nos. 01 C 5931, 01 C 2826, 2001 WL 1543524, at *5-6 (N.D. Ill. Dec. 4, 2001). Here, both KBC and North address the applicability of these factors in their briefing, (D.I. 31 at 10-15; D.I. 34 at 9-17), and the Court will utilize them as well.

As to the first factor—which plaintiff has the largest financial interest—courts have recognized that "financial stake has some relevance to the plaintiff's interest in a derivative action and the likelihood that the plaintiff will pursue the derivative claims vigorously." *In re Foundry Networks, Inc. Derivative Litig.*, No. C-06-05598, 2007 WL 485974, at *1 (N.D. Cal. Feb. 12, 2007) (finding this factor to favor a group of plaintiffs that held at least 2,700 shares in the corporation at issue, over a plaintiff who owned 666 shares). KBC's customers own a substantial amount of Chemed stock, and have assigned their right to sue to KBC; those holdings total 19,664 shares, with a current value (as of the time when briefing on the Motion commenced) of $1.96 million. (D.I. 31 at 11; D.I. 34 at 11; D.I. 37 at 5; D.I. 38, ex. B at 2) Unfortunately (and somewhat disconcertingly), North did not indicate, either in her Complaint or

in her briefing, exactly how many shares of Chemed stock she owns, nor for how long she has owned that stock. The most North would commit to say in her answering brief was that KBC's stock ownership was "larger than Plaintiff North's in absolute dollar terms." (D.I. 34 at 15) Even at the time of oral argument, North's counsel was not in a position to answer this question with any specificity; there, her counsel could say only that North owned less than 100 shares of the stock (i.e., somewhere between 1 share and 99 shares)—shares worth less than a thousand dollars at most. (Transcript of January 22, 2015 Oral Argument ("Tr.") at 49 (North's counsel representing that the value of North's holdings is "[i]n the hundreds [of dollars,]" although noting that he was uncertain of the current share price)) With KBC's customers owning well over 150 times more shares than North and with those shares having a far larger total value than North's shares, this factor clearly falls in KBC's favor. *Cf. N. Miami Beach*, 2011 WL 12465137 at *1 ("[T]his factor does tip in [one plaintiff's] favor, particularly where [that plaintiff] owns more than double the number of shares that [the competing plaintiffs] own individually."); *see also Chester Cnty. Emps.' Ret. Fund v. White*, No. 11 C 8114, 2012 WL 1245724, at *3 (N.D. Ill. Apr. 13, 2012) (same).[4]

The second factor relates to institutional investor status. *Dollens*, 2001 WL 1543524, at

---

[4] North argues that the number of Chemed shares as a percentage of KBC's total portfolio is very small, and suggests this will mean that KBC will not be motivated to "divert[] its attention" from managing that large portfolio in order to oversee this litigation. (D.I. 34 at 13); *cf. Berg*, 2014 WL 3749780, at *5 ("Because his Intuitive stock represents such a large percentage of his portfolio, Berg will certainly be motivated to pursue this case vigorously."). However, the Court has no insight at all into North's stock holdings, nor as to how much of her portfolio is made up of Chemed stock. It is thus hard to draw any strong comparative conclusions in this regard. And as noted further below, KBC has a track record of serving in this role in other litigations, and the Court has no indication that it did so with any lack attention or lack of vigor.

7

*5 (suggesting that as to this factor, a court should examine not just the fact of a party's institutional investor status, but whether the particulars of that status gave it "any greater incentive to litigate this case than [would] any other plaintiff who seeks to lead"). This is not a case that implicates the Private Securities Litigation Reform Act ("PSLRA"),[5] but even in derivative actions, courts have recognized something of a preference for an institutional investor lead plaintiff—the kind of party that "acting as lead plaintiff can, consistent with its fiduciary obligations, balance the interest of the [shareholders] with the long-term interests of the company and its public investors." *Horn*, 227 F.R.D. at 3 (internal quotation marks and citations omitted); *see also Dollens*, 2001 WL 1543524, at *5. Here, KBC is by all accounts a large and sophisticated institutional investor, managing assets of approximately $215 billion. (D.I. 38, ex. B at 2) It should be motivated to continue to pursue this litigation, since the KBC-related funds who own the Chemed stock in question have empowered KBC to act on their behalf, and have assigned KBC the right to any and all claims against Defendants arising from this suit. (D.I. 38, ex. B at 2) KBC also has experience in this type of role—it has served as a representative plaintiff in a number of shareholder and securities fraud actions, and its corporate representatives have previously appeared in the United States (including in Delaware) to testify or observe court hearings in such cases. (D.I. 31 at 12-13; D.I. 38, ex. B at ¶¶ 7-9)[6] Lastly, KBC's Company

---

[5]  The PSLRA relates to fraud class actions filed under the Securities Exchange Act of 1934 and the Securities Act of 1933. *Dollens*, 2001 WL 1543524, at *4. In appointing a lead plaintiff in shareholder derivative actions, courts have sometimes taken into account the statutory criteria used to govern the appointment of a lead plaintiff in PSLRA actions, including the preference for institutional investors and investors with a larger financial stake in the litigation. *See id.*; *see also Chester Cnty. Employees' Ret. Fund*, 2012 WL 1245724 at *3.

[6]  The Court is a bit troubled by the assertions of North and her counsel in North's answering brief, to the effect that KBC's status as a Belgium-based company "with considerable

Lawyer has submitted a declaration under penalty of perjury confirming KBC's understanding of its responsibilities to oversee counsel and manage this litigation efficiently, were it selected as the lead plaintiff. (D.I. 38, ex. B at ¶¶ 4-5) For all of these reasons, and with nothing in the record regarding North's ability to well play the role of a representative plaintiff,[7] this factor too redounds in KBC's favor.

The third factor relates to the quality of the pleadings. *See In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849 (NGG)(RER), 2006 WL 3511375, at *5 (E.D.N.Y. Dec. 5, 2006) (noting that the "pleadings serve as an accurate and appropriate barometer through which

---

geographical, linguistic, and cultural distance to Delaware" suggests that its "ability to manage and to control American lawyers conducting litigation in the United States" is in question. (D.I. 34 at 13 (internal quotation marks and citation omitted)) In response to that assertion, KBC cited to a 2009 filing in which North's counsel's firm (then known as Johnson Bottini, LLP) argued to the United States District Court for the Southern District of California that KBC should be appointed lead plaintiff in a securities class action, because KBC was a "large institutional investor accustomed to acting as a fiduciary[,]" and was a "sophisticated institutional investor" that was "ideally suited to serve as the lead plaintiff[.]" (D.I. 38, ex. A; Tr. at 20) As North's counsel acknowledged during oral argument here, "[his] former firm represented that KBC would be a suitable plaintiff" in that action, and it went so far as to tout KBC's "ability to effectively manage the lawyers in a case like that." (Tr. at 58-59) And in any event, "courts routinely appoint foreign investors as lead plaintiffs" particularly in "today's increasingly global economy." *Sgalambo v. McKenzie*, 268 F.R.D. 170, 176-77 (S.D.N.Y. Mar. 29, 2010) (internal quotation marks and citation omitted). Indeed, Johnson Bottini LLP made this same point in the above-referenced 2009 filing, when it noted that the "fact that KBC is a foreign investor has no bearing on the adequacy or ability to serve as lead plaintiff" as "[c]ourts across the country have frequently appointed foreign investors lead plaintiffs in putative securities class actions." (D.I. 38, ex. A at 7 (citing no fewer than 22 judicial opinions in support of that proposition))

[7] The Court also notes that when litigating the *North* Action in the Southern District of Ohio, North argued that were the case transferred to Delaware, that would be "'seriously inconvenient'" for her, due particularly to the "increased difficulty and costs" such a transfer would entail for her. (*North* Action, D.I. 28 at 14 (citation omitted)) Assuming those assertions should be taken at face value, that provides the Court with some additional concern as to North's ability to persist with this litigation through to its conclusion, were she to be named the lead plaintiff.

9

the court can assess which firm would best represent the interests of the shareholders and the rights of the corporation"). Without making any statement as to the legal merit of the claims in the respective Complaints, both Complaints appear to be of a high quality, in that they contain many detailed factual allegations relating to the alleged wrongs at issue. *N. Miami Beach*, 2011 WL 12465137 at *2. The Court does, however, credit KBC's point that its Complaint gives evidence of independent investigation conducted by its counsel—such as through the use of interview statements generated by Motley Rice investigators, or the use of statistical data that Motley Rice obtained from the National Hospice and Palliative Care Organization. (D.I. 31 at 5, 13-14; D.I. 37 at 6; *see also* D.I. 1 at ¶¶ 6, 79, 81, 107, 118, 121-30); *see also N. Miami Beach*, 2011 WL 12465137 at *2 (citing one plaintiff's use of non-public information in their complaint as a positive factor demonstrating a high-quality pleading). On the other hand, KBC notes (and North does not really dispute) that a "substantial portion of the substantive allegations in the North Complaint were copied – either verbatim or nearly verbatim" from a proposed complaint filed by another party in a securities-fraud class action in the Southern District of Ohio. (D.I. 31 at 7-8, 14 (noting that 133 out of 283 paragraphs were copied in this way) (emphasis omitted); D.I. 34 at 7 n.5); *see Dollens*, 2001 WL 1543524, at *5 (citing the fact that a party "merely reworked" another complaint as a factor reflecting negatively on its request to be lead plaintiff). These aspects of the respective Complaints suggest that this factor should slightly favor KBC.

The fourth factor relates to the vigor with which the respective Plaintiffs have pursued their suits. Both have done so vigorously, albeit on very different paths—a fact that has led to quite a lot of procedural wrangling at an early stage. "Vigorousness of effort is not going to be a problem in this lawsuit[,]" *N. Miami Beach*, 2011 WL 12465137 at *2, and the Court is hard-

pressed to conclude that one side or the other here has a better record of making "a consistent effort to move the case forward in an inclusive manner[,]" *Berg*, 2014 WL 3749780, at *7. This factor is neutral.

The fifth factor is the plaintiff's arrangement on the payment of attorney's fees. KBC's counsel has indicated that it would be "willing to accept the court's decision concerning a reasonable fee" and would strive to avoid "duplication of effort" by counsel. *Dollens*, 2001 WL 1543524, at *6; *see also* (D.I. 31 at 15 (internal quotation marks and citations omitted)). The Court has no indication that North's counsel would not do the same. Thus, this factor is neutral.

Ultimately, with three of these factors weighing in KBC's favor, and none in North's favor, the totality of the circumstances favors appointing KBC as Lead Plaintiff. KBC has a more significant financial stake in the litigation, a better developed history of serving in this role, and, on the margins, has better demonstrated the ability to bring unique contributions to this litigation. The Court will thus appoint KBC as Lead Plaintiff.

### C. Designation of Lead Counsel and Liaison Counsel

Although the decision on a lead plaintiff should guide the Court's related decision as to Lead Counsel and Liaison Counsel, the Court will nevertheless analyze the parties' arguments in that regard as well. "'The Court, if it sees fit, may appoint one or more attorneys as liaison counsel, lead counsel, or trial counsel for the consolidated cases'" and "'can assign the designated lawyers specific responsibilities.'" *Resnik*, 774 F. Supp. 2d at 625 (quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2385 (3d ed. 2008)). The selection of lead counsel in a shareholder derivative action filed in federal court is left to the sound discretion of the Court. *Id.*; *Horn*, 227 F.R.D. at 3. The Court must determine "'which

11

counsel will best serve the interest of the plaintiffs'" with respect to "'experience and prior success record, the number, size, and extent of involvement of represented litigations, the advanced stage of the proceedings in a particular suit, and the nature of the causes of action alleged.'" *Resnik*, 774 F. Supp. 2d at 625 (quoting 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 9.35 at 388 (4th ed. 2002)); *see also Horn*, 227 F.R.D. at 3.

KBC moves to appoint its counsel, Motley Rice, as Lead Counsel, and Rosenthal Monhait as Liaison Counsel.[8] (D.I. 30; D.I. 31 at 15-20) In addition, it contends that the Court

---

[8] Attorneys who are appointed as lead counsel act as the primary counsel for the plaintiff:

> Lead counsel is "charged with formulating (in consultation with other counsel) and presenting positions on substantive and procedural issues during the litigation. Typically they act for the group—either personally or by coordinating the efforts of others—in presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing a litigation plan, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for support services, and seeing that schedules are met."

*Outten v. Wilmington Trust Corp.*, 281 F.R.D. 193, 197 n.9 (D. Del. 2012) (quoting *Manual for Complex Litigation* (Fourth) § 10.221 (2005)) (certain emphasis omitted). Liaison counsel's role is different:

> Liaison counsel is "charged with essentially administrative matters, such as communications between the court and other counsel (including receiving and distributing notices, orders, motions, and briefs on behalf of the group), conveying meetings of counsel, advising parties of developments, and otherwise assisting in the coordination of activities and positions. Such counsel may act for the group in managing document depositories and in resolving scheduling conflicts. Liaison counsel will usually have offices in the same locality as the court[.]"

*Id.* (quoting *Manual for Complex Litigation* (Fourth) § 10.221 (2005)) (certain emphasis

should designate its Complaint as the sole operative complaint. (D.I. 30) North has not filed her own motion, but in opposing KBC's motion, contends that the Court should appoint her counsel, Bottini & Bottini, LLP ("Bottini & Bottini") as Lead Counsel, or, at a minimum, as co-Lead Counsel. (D.I. 34 at 17-19) North also argues that the Court should order that a consolidated Complaint be filed. (*Id.* at 20)

The Court concludes, pursuant to Rule 42(a)(3), that Motley Rice shall serve as Lead Counsel with Rosenthal Monhait serving as Liaison Counsel.[9] In doing so, the Court acknowledges that both Motley Rice and Bottini & Bottini are capable firms. Both firms are comprised of attorneys who possess extensive experience as lead or co-lead counsel in complex litigation, and who have successfully represented shareholders in class and derivative actions. (D.I. 31 at 16-18; D.I. 32, ex. B; D.I. 35 at ¶¶ 8-9 & ex. C; D.I. 37 at 9 n.13; D.I. 34 at 17-18) While Motley Rice is a far larger firm and appears to have more significant resources from a financial and manpower perspective, Bottini & Bottini (and its predecessor firms) appears to have been involved in shareholder derivative litigation for a longer period of time. (D.I. 31 at 16; D.I. 32, ex. B; D.I. 35 at ¶¶ 8-9; D.I. 34 at 18-19)[10] While they may each have different strengths,

---

omitted).

[9] No party questions the ability of Rosenthal Monhait, a Delaware firm with extensive experience representing shareholders in Delaware-based derivative and class action litigation, to serve ably as Liaison Counsel. (D.I. 31 at 18-19; D.I. 32, ex. E)

[10] In her answering brief, North questions the substance of Motley Rice's history with shareholder litigation. (D.I. 34 at 19) In the 2009 filing referenced above, however, Johnson Bottini, LLP stated that Motley Rice's members have "substantial experience in the prosecution of shareholder and securities class actions." (D.I. 38, ex. A at 11 & n.6) At oral argument, North's counsel acknowledged that "[w]e think Motley Rice is a well-regarded firm," and that they would not have worked with Motley Rice in the past if they thought Motley Rice was incapable of processing derivative litigation of this kind. (Tr. at 67)

13

it is difficult to say which strengths will be most important in this case. In the end, both firms are qualified to do this work.

However, the Court concludes that Motley Rice is better qualified to serve as Lead Counsel here, for a few reasons. First, the Court takes note of Motley Rice's recent work as sole lead counsel in *Manville Personal Injury Settlement Trust v. Gemunder*, No. 10-CI-01212 (Ky Cir. Ct.), a case concerning the alleged submission of false claims to Medicare and Medicaid and related illegal kickbacks, brought on behalf of Omnicare, Inc. ("Omnicare"). (D.I. 37 at 9) In that case, involving complex and difficult claims, Motley Rice successfully obtained a $16.7 million payment and enhanced corporate governance measures that benefitted Omnicare, (*id.* at 9-10; D.I. 38, ex. H at 5-8), a company spun off from Chemed in 1981 and for which Defendants O'Toole, Gemunder, Hutton and Lindell served as members of the Board of Directors, (D.I. 1 at ¶¶ 16, 18, 20, 22). As KBC notes, the fact that Motley Rice has a "successful track record of litigating on behalf of Omnicare concerning similar allegations of misconduct makes [the firm] uniquely suited to lead the instant litigation." (D.I. 37 at 9 n.14); *cf. Chester Cnty. Emps.' Ret. Fund*, 2012 WL 1245724, at *4 (citing a plaintiff's counsel's involvement with a similar prior derivative suit on behalf of the same corporation as a factor adding to the weight afforded to that plaintiff's bid to be lead plaintiff). Second, the Court takes into account its earlier conclusion that although both Complaints appear to be of a high quality, the KBC Complaint, drafted by Motley Rice, evidences a slightly greater level of investigatory effort and unique work product. Third, as noted above, *see supra* notes 6 & 10, in North's answering brief, Bottini & Bottini has made a few strained arguments. These factors, along with the weight afforded Lead Plaintiff KBC's choice of counsel, *see, e.g., Berg*, 2014 WL 3749780, at *7; *Sexton*, 2008 WL 1733242,

14

at *2; *Dollens*, 2001 WL 1543524, at *6, all weigh in favor of appointment of Motley Rice as Lead Counsel.

With regard to KBC's request to have its Complaint designated as the sole operative complaint, it is true that the KBC Complaint does not include, *inter alia*, four claims found in the North Complaint (claims for abuse of control, gross mismanagement, unjust enrichment and insider trading) and certain arguments regarding demand futility made in the North Complaint. (*See, e.g.*, D.I. 34 at 8) It is difficult to tell with certainty at this stage if those claims and arguments are strong (as North claims) or weak (as KBC claims). But it will be Lead Counsel's role, as part of its obligation to represent the interests of the shareholders in an action brought on behalf of Chemed, to make decisions as to what type of complaint provides the best chance at a positive outcome. The Court can find no support for North's assertion, (Tr. at 59-64), that empowering lead counsel to make such decisions, even if those decisions result in the exclusion of certain claims or arguments from the remaining complaint, is legally problematic.[11] *See, e.g.*, *In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849 (NGG)(RER), 2006 WL 3761986, at *5-6 & n.9 (E.D.N.Y. Sept. 22, 2006) (in derivative actions where the respective complaints raised different claims and contained different allegations, appointing lead counsel and permitting lead counsel time to either file a consolidated complaint or to designate one of the

---

[11] So that there is clarity in the record, and to allow for further consultation among Plaintiffs' counsel in light of this Memorandum Opinion, the Court's subsequent Order will require Lead Counsel to, within 30 days from the date of this Memorandum Opinion, file a consolidated complaint or designate one of the pending complaints as the operative complaint. The Order will also require Defendants to respond to that complaint within 21 days thereafter. Counsel for the respective parties should meet and confer regarding whether and how—assuming Defendants again seek to file a motion to dismiss—any briefing on Defendants' prior motion to dismiss could be re-utilized.

complaints as the operative complaint), *objections overruled*, No. 06-CV-1849 (NGG)(RER), 2006 WL 3511375 (E.D.N.Y. Dec. 5, 2006); *cf. Lieblein ex rel. W. Union Co. v. Ersek*, Civil Action No. 14-cv-00144-MSK-KLM, 2015 WL 73815, at *2 (D. Colo. Jan. 5, 2015) (holding, where the decision as to lead plaintiff status was not opposed, that six derivative cases would be consolidated and that the co-lead plaintiffs must file a consolidated complaint "adopting or discarding parties and claims asserted in the various consolidated actions as [the co-lead plaintiffs] see fit.").

## III. CONCLUSION

For the reasons set forth above, KBC's Motion is GRANTED. The Court will separately enter an Order of Consolidation and Appointment of Lead Plaintiff, Lead Counsel and Liaison Counsel, which will largely mirror the proposed Order put forward by KBC, (D.I. 30), as that proposed Order appears to generally track the guidance from the *Manual for Complex Litigation* (4th ed. 2011) and the content of other similar orders entered in cases of this kind.

Dated: February 2, 2015

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE