# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE CHEMED CORPORATION, SHAREHOLDER DERIVATIVE LITIGATION | Civil Action No. 13-1854-LPS-CJB<br>Consolidated Action |

## REPORT AND RECOMMENDATION

Pending before the Court in this consolidated shareholder derivative action is the motion

("Motion") of Defendants Kevin J. McNamara, Timothy S. O'Toole, David P. Williams, Joel F.

Gemunder, Patrick P. Grace, Thomas C. Hutton, Walter L. Krebs, Andrea R. Lindell, Thomas P.

Rice, Donald E. Saunders, Arthur V. Tucker, Jr., George J. Walsh III, Frank E. Wood, Ernest J.

Mrozek, and Nominal Defendant Chemed Corporation ("Chemed" or the "Company") seeking to

dismiss, pursuant to Federal Rules of Civil Procedure 23.1 and 12(b)(6), the Operative

Complaint (the "Complaint") filed by Plaintiffs KBC Asset Management, NV ("KBC") and

Mildred A. North ("North" and, collectively with KBC, "Plaintiffs").[1]  (D.I. 12)  For the reasons

that follow, the Court recommends that Defendants' Motion be GRANTED in the manner

described below.

## I.   Background

### A.   Factual Background[2]

---

[1]    KBC and North originally filed two separate derivative actions against Defendants, causing this Court to open two separate cases:  Civil Action 13-1854-LPS-CJB, entitled *KBC Asset Mgmt., NV v. McNamara, et al.* (the "*KBC* Action"), and Civil Action 14-1209-LPS-CJB, entitled *North v. McNamara, et al.* (the "*North* Action").  As is noted below, the actions have since been consolidated, and Civil Action No. 13-1854-LPS-CJB has been designated the lead case.  Unless otherwise noted, citations to docket numbers are to documents that have been filed in the lead case.

[2]    The following facts are taken primarily from the Complaint, but also at times from litigation materials and government manuals, as well as from public documents that have been filed with the United States Securities and Exchange Commission ("SEC").  Generally, courts

### 1. The Parties

Plaintiff KBC is an asset management company that is also a stockholder of Chemed. (D.I. 1 at ¶ 13) KBC has owned Chemed stock continuously since at least February 9, 2009. (*Id.*) Plaintiff North is an individual citizen of Illinois who is a current shareholder of Chemed. (*North* Action, D.I. 1 at ¶ 8)

Nominal Defendant Chemed is a publicly traded company that is incorporated in Delaware and maintains its principal place of business in Cincinnati, Ohio. (D.I. 1 at ¶ 14) Chemed, through its affiliated subsidiaries (collectively referred to herein as "Vitas"), provides end-of-life hospice care services under the Vitas Innovative Hospice® brand; Vitas serves its patients through 52 hospice programs in 18 states and in the District of Columbia. (*Id.* at ¶¶ 1, 14)[3]

The remaining Defendants are current and former members of Chemed's Board of Directors and/or executives at Chemed (collectively, the "Individual Defendants"). At the time this action was instituted, Chemed's Board of Directors was composed of 10 directors (the "Director Defendants"). All current members of the Board are named Defendants in this matter

---

faced with a motion to dismiss must limit their consideration solely to the complaint's allegations, attached exhibits, documents integral to or explicitly relied upon in the complaint, and matters of public record. *See U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (court may consider, *inter alia*, SEC filings relied upon in complaint); *Seinfeld v. O'Connor*, 774 F. Supp. 2d 660, 666 n.3 (D. Del. 2011) (same). To the extent that the Court herein considers facts contained in certain documents other than the Complaint itself, it does so because those documents were either (1) explicitly relied upon in the Complaint; (2) are otherwise integral to the Complaint and/or (3) are public documents that have been filed with the SEC.

[3] Roto-Rooter, which provides residential and commercial repair and maintenance services, is another well-known subsidiary of Chemed. (D.I. 1 at ¶ 14)

and were directors at the time Plaintiffs initiated this action. (*Id.* at ¶¶ 15, 18-24, 26-27, 153) Eight of the current directors are not members of Chemed's or Vitas' management. (D.I. 1 at ¶ 158 (citing Chemed Corp. (Schedule 14A) 12 (Apr. 5, 2013)) With regard to the other two Director Defendants, the first, Defendant Kevin J. McNamara ("McNamara"), served as the President and Chief Executive Officer of Chemed and the Chairman of Vitas at times relevant to the Complaint. (*Id.* at ¶ 15) The second, Thomas C. Hutton ("Hutton"), is a Vice President and attorney for Chemed. (*Id.* at ¶ 20)

Four of the Individual Defendants were not members of the Board at the time this action was filed. Defendants Timothy S. O'Toole ("O'Toole") and Ernest J. Mrozek are both former Directors who served on the Board during time periods when alleged misconduct occurred. (*Id.* at ¶¶ 16, 28) Defendant O'Toole served on the Board until 2008 and has held the positions of Chief Executive Officer of Vitas and Executive Vice President of Chemed at all relevant times. (*Id.* at ¶ 16) Defendant Mrozek served as a Director from May 2009 to May 2010. (*Id.* at ¶ 28) The remaining two Individual Defendants have never held positions on Chemed's Board, but rather served in upper management positions at Chemed. Defendant David P. Williams has served as Executive Vice President and Chief Financial Officer of Chemed since 2007 and 2004, respectively. (*Id.* at ¶ 17) Defendant Arthur V. Tucker, Jr. has served as Vice President and Controller of Chemed since 1989. (*Id.* at ¶ 25)

At the time of the filing of the Complaint, seven of the 10 Director Defendants (Defendants McNamara, Gemunder, Hutton, Walsh, Grace, Saunders and Wood) had served on the Board since at least 2002. (*Id.* at ¶¶ 15, 18-20, 24, 26-27) Defendant Krebs, after having served on the Board prior to the time periods at issue in the Complaint, rejoined the Board in

May 2005 and has served as a Director since that time. (*Id.* at ¶ 20) The other two director Defendants (Defendants Lindell and Rice) have served as directors since 2008 and 2009, respectively. (*Id.* at ¶¶ 22-23; *see also* D.I. 16 at 13 n.14)

### 2. Eligibility and Billing under Medicare

Chemed subsidiary Vitas operates hospice programs providing end-of-life care services, including routine home, general inpatient, crisis, and respite care. (D.I. 1 at ¶¶ 14, 72) It is headquartered in Miami, Florida and is one of the largest hospice providers in the United States. (*Id.* at ¶ 75) In 2012, Vitas accounted for approximately 75% of both Chemed's revenue and its net earnings. (*Id.* at ¶¶ 73-74) Chemed's 2013 Annual Report indicated that approximately 90% of Vitas's revenue came through the United States' Medicare program ("Medicare"). (*Id.* at ¶ 75)

The current action relates to Vitas' compliance with the eligibility and billing requirements of Medicare and Medicaid.[4] (*Id.* at ¶ 9) Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, also known as the Medicare program. (*Id.* at ¶ 36) The United States Department of Health and Human Services, through its agency the Center for Medicare and Medicaid Services ("CMS"), administers and supervises the Medicare program. (*Id.* at ¶ 52)

Medicare consists of four parts, with Part A being particularly relevant to this matter. 42 U.S.C. §§ 1395c-1395i-5; (D.I. 1 at ¶ 37). Part A establishes an insurance program providing assistance with costs related to hospital, related post-hospital, home health services, and hospice

---

[4]     In their Complaint, Plaintiffs describe only the eligibility and billing requirements of Medicare. (D.I. 1 at ¶¶ 36-61)

care[5] for qualified individuals. 42 U.S.C. § 1395c.

To be eligible to elect hospice care under Medicare, an individual must be entitled to Part A coverage and certified as being terminally ill (that is, the individual must have a medical prognosis of a life expectancy of six months or less if the illness runs its normal course). (D.I. 1 at ¶ 40); 42 C.F.R. §§ 418.3, 418.20; *see also* Ctrs. for Medicare & Medicaid Servs., Medicare Benefit Policy Manual, Ch. 9, § 10 ("Manual"). The hospice care must be reasonable and necessary for the palliation and management of the terminal illness, elected by the individual certified as being terminally ill, and consistent with the pre-hospice plan of care established and reviewed by physicians. Manual, Ch. 9, § 40; *see also* (D.I. 1 at ¶ 38). In order to bill Medicare for hospice care of an individual, a hospice provider must have a written certification of that patient's terminal illness that, among other things, includes: a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; specific clinical findings and other documentation that support this determination; and the signature(s) of the physician(s) certifying these medical conclusions. 42 C.F.R. § 418.22; *see also* Manual, Ch. 9, § 20.1; (D.I. 1 at ¶ 46). Written certification of terminal illness from both a hospice-affiliated physician and from the individual's attending physician (if applicable) is required for the first 90-day period of hospice care; for subsequent periods, the hospice provider must obtain re-certifications from a hospice-affiliated physician. Manual, Ch. 9, § 20.1; (D.I. 1 at ¶ 50). Any such written certification must also be on file in the hospice patient's record prior to submission of a claim to a Medicare contractor, along with

---

[5] Hospice care is a comprehensive set of services identified and coordinated by an interdisciplinary group to provide for the physical, psychosocial, spiritual, and emotional needs of terminally ill patients. 42 C.F.R. § 418.3.

clinical information and other documentation in support of the medical prognosis. Manual, Ch. 9, § 20.1.

Hospice care is generally divided into four types of care, each associated with a different rate of Medicare payment. 42 C.F.R. §§ 418.302; 418.306; Medicare Claims Processing Manual, Ch. 11, § 30.1. Continuous home care, also known as "crisis care," demands the highest daily rate. Medicare Claims Processing Manual, Ch. 11, § 30.2; (D.I. 1 at ¶ 42). To bill Medicare for crisis care, the patient must be in a period of crisis (that is, a period requiring continuous care which is predominantly nursing care to achieve palliation or management of acute medical symptoms) and not in an inpatient facility (e.g., a hospice inpatient unit or hospital). 42 C.F.R. §§ 418.204(a), 418.302(b)(2); Manual, Ch. 9, § 40.2.1; Medicare Claims Processing Manual, Ch. 11, § 30.1. The hospice must provide this care for a minimum of eight hours during a 24-hour day, otherwise the services are considered routine home care. Manual, Ch. 9, § 40.2.1; (D.I. 1 at ¶ 44).

### 3. Plaintiffs' Claim

In the Complaint, Plaintiffs allege that the Board "cause[d] and permitt[ed] [Chemed, through its Vitas subsidiaries] to engage in nearly a decade of systematic illegal billing . . . in disregard for Medicare guidelines and patients' medical needs." (D.I. 1 at ¶ 1) This misconduct, Plaintiffs assert, was at the core of Chemed's business strategy and deeply embedded in its regular practices. (*Id.* at ¶ 2)

More specifically, Plaintiffs claim that "since at least 2004" and through at least 2013, Chemed, through Vitas, submitted or caused the submission of fraudulent claims to Medicare

and Medicaid in violation of the False Claims Act ("FCA"),[6] other federal statutes, and state laws. (D.I. 1 at ¶¶ 1, 65 (citing 18 U.S.C. §§ 286-87, 1320a-7b(a), 1341 & 1343), 66 & ex. A; *see also* D.I. 16 at 13 n.14) Plaintiffs assert, *inter alia*, that the fraudulent submissions stem from Vitas' enrollment and billing of Medicare for patients who: (1) received crisis care services but who were not, in fact, actually eligible for such care because they were not terminally ill; (2) received crisis care services that were not consistent with Medicare requirements; and (3) were in hospice care but were not, in fact, in a period of crisis. (*Id.* at ¶¶ 1, 106; D.I. 16 at 2-3)

The Complaint contains one Count (Count I): an allegation that the Individual Defendants breached their fiduciary duties to Chemed and its shareholders. (D.I. 1 at ¶¶ 169-71) Plaintiffs assert that the Individual Defendants breached the fiduciary duties of good faith, loyalty and due care by, "*inter alia*, approving, authorizing, acquiescing in and/or willfully turning a blind eye to Chemed's substantial and systematic violation of federal and state law and the Company's submission of thousands of fraudulent claims to Medicare and Medicaid." (D.I. 1 at ¶¶ 169-71; *see also id.* at ¶¶ 9, 154)

### 4. Allegations Regarding Additional Relevant Lawsuits, Investigations and Witness Interviews

The Complaint spells out Vitas' and Chemed's alleged legal violations largely by drawing from the content of other lawsuits and governmental investigations, or from witness interviews.

For example, the Complaint notes that during the relevant period, Chemed and Vitas have

---

[6]     The FCA imposes liability for a person who, *inter alia*: (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (3) "conspires to commit a violation of [(1) or (2)]"; or (4) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money" to the Government. 31 U.S.C. § 3729(a); (D.I. 1 at ¶ 63).

been subject to a number of *qui tam* FCA lawsuits. (*Id.* at ¶¶ 82-98)[7] In total, Plaintiffs'

Complaint quotes liberally from complaints in four *qui tam* suits (and incorporates the contents

of those *qui tam* complaints by reference): *Spottiswood ex. rel. United States v. Chemed Corp.*,

No. 1:07-cv-04566 (N.D. Ill.) ("*Spottiswood*"); *United States and Texas ex rel. Urick v. Vitas*

*HME, et al.*, No. 5:08-cv-00663-OLG (W.D. Tex.) ("*Urick*"); *Rehfeldt ex rel. United States and*

*Texas v. Vitas Healthcare Corp.*, No. 3:09-cv-00203-B (N.D. Tex.) ("*Rehfeldt*")[8]; and *United*

*States ex rel. Gonzales v. Vitas Healthcare Corp.*, No. 12-cv-0761 (C.D. Cal.) ("*Gonzales*").

(*Id.*) The *qui tam* actions were filed in 2007, 2008, 2009, and 2012, respectively, and detail

alleged wrongdoing occurring at Vitas beginning as early as 2001. In these actions, as set out in

the instant Complaint, *qui tam* relators alleged that, *inter alia*, Vitas billed for continuous home

care when such care was unnecessary or was not in fact provided to individuals, (*see, e.g., id.* at

¶¶ 82, 85, 92), "forced" continuous home care on patients who did not need it, (*see, e.g., id.* at ¶

86), and engaged in a management-driven scheme to fabricate justifications for the certification

and/or re-certification of hospice care for otherwise ineligible patients, (*see, e.g., id.* at ¶¶ 96-97).

---

[7]     The Complaint also briefly references a securities fraud lawsuit that was brought against Chemed in 2012. (D.I. 1 at ¶ 129 n.26) In that action, the lead plaintiffs alleged that Chemed and its senior management defrauded Chemed's investors by concealing a scheme of fraudulent billing relating to Medicare hospice reimbursement. (*Id.*) On September 16, 2013, the defendants in that case reached an agreement in principle with the putative class members to settle the case in full and with prejudice, and to provide defendants with full releases of all claims that were or could have been asserted by the plaintiffs, in exchange for a $6 million payment by Chemed's insurer. (D.I. 13 at 6 n.6; D.I. 14, ex. 5 at 11 (Chemed Corp., Quarterly Report (Form 10-Q) (Nov. 1, 2013)))

[8]     The *Rehfeldt* action was voluntarily dismissed about six months prior to Plaintiff KBC's filing of suit in the instant case. (D.I. 13 at 6 n.6; D.I. 14, ex. 4)

On May 2, 2013, the United States Department of Justice ("DOJ") filed, on behalf of the federal government, a civil FCA complaint in *United States v. Vitas, et al.*, No. 4:13-cv-00449-BCW (W.D. Mo.) (the "DOJ Action"). (*Id.* at ¶¶ 99-120) In the complaint in the DOJ Action ("the DOJ Action Complaint"), which is frequently cited in and incorporated by reference into Plaintiffs' instant Complaint,[9] the government similarly charged that Chemed and Vitas "knowingly submitted or caused the submission of false claims to Medicare for crisis care services that were not necessary or not actually provided[,]" that "Vitas' management set goals for the number of crisis care days that were to be billed to Medicare and pressured staff to increase the numbers of crisis care claims submitted to Medicare, without regard to whether the services were appropriate or were actually being provided[,]" that "Chemed and Vitas knowingly submitted or caused the submission of false claims for patients who were not terminally ill" and that the companies "violated the FCA and misspent tens of millions of taxpayer dollars from the Medicare program." (*Id.* at ¶ 100) The government also alleged that Chemed and Vitas "executives closely monitored the Company's ADC [average daily census] and set aggressive admissions goals for their direct reports[,]" and that "Chemed management regularly corresponded" with Vitas management about the ADC and growth in admissions, "making focused frequent inquiries if they believed the numbers reported were too low." (*Id.* at ¶ 115 (emphasis omitted))

The instant Complaint additionally details how Chemed and Vitas have been the subject

---

[9]      A copy of the DOJ Action Complaint was submitted as an exhibit to Defendants' Motion. (D.I. 14, ex. 2) That complaint has survived a motion to dismiss in the DOJ Action, and the case remains ongoing. Additionally, on the same day as the DOJ Action was filed, the DOJ also intervened in three of the *qui tam* suits referenced above—in *Spottiswood*, *Urick*, and *Gonzales*. (D.I. 1 at ¶ 99)

of certain federal and state inquiries or investigations since 2005. (*Id.* at ¶¶ 134, 137) The Office

of Inspector General ("OIG") for the Department of Health and Human Services first subpoenaed

Vitas on April 7, 2005 regarding allegations of improper Medicare and Medicaid billing for

hospice care. (*Id.* at ¶ 134) Additional OIG subpoenas or requests for Vitas records in this

subject matter area came in May 2009, August 2009, June 2012 and September of 2012. (*Id.* at

¶¶ 136-37) Chemed also received similar Vitas-related subpoenas regarding investigations by the

Texas Attorney General's Office in 2010 and by the Florida Attorney General's Office in 2012.

(*Id.* at ¶ 137)

The Complaint alleges that at various points from 2005 through 2012, certain of the *qui*

*tam* complaints, state investigative subpoenas, and OIG subpoenas/record requests set out above

were noted in Chemed's SEC filings, and that these filings, in turn, were certified and signed by

certain of the Individual Defendants. (*Id.* at ¶¶ 134-37) And the Complaint also makes reference

to public statements from certain Individual Defendants, to the effect that they were aware that

the hospice industry in general was often under scrutiny by the federal government during the

relevant period. (*See, e.g., id.* at ¶ 80 (quoting Defendant McNamara on an October 2013

investor conference call as acknowledging that the "fact that we provide more [crisis] care than

the average, that's going to draw a lot of scrutiny") (emphasis omitted); *id.* at ¶ 139 (quoting

Defendant O'Toole as stating in 2011 that the government has been "focused on" the hospice

industry "for a long time") (emphasis omitted); *id.* at ¶ 141 (quoting Defendant McNamara in

2012 stating that the hospice industry is "'always going to be under a microscope'"))

Additionally, the Complaint contains reference to a series of interviews with former Vitas

employees that were conducted by Plaintiff KBC's investigator. In those interviews, the former

Vitas employees stated that Chemed and Vitas executives (including Defendant O'Toole) pushed other Vitas employees to increase the number of patients in crisis care. (*See, e.g.*, *id.* at ¶¶ 122, 125, 127-28, 130) One witness, for example, states that Defendant O'Toole could be heard in Vitas' Palm Beach program office "screaming" over the phone to a Vitas General Manager about the need to increase crisis care admissions. (*Id.* at ¶ 122)

### 5. Allegations Regarding Statistical Data on the Number of Vitas Patients Receiving Crisis Care

In addition to setting out the above allegations, the Complaint provides data drawn from Chemed's own annual reports, as well as from statistics provided by the National Hospice and Palliative Care Organization ("NHPCO"). These statistics are alleged to demonstrate that Vitas' patients "receive more expensive crisis and inpatient care much more often than the national industry average, and remain in hospice much longer than the national average." (*Id.* at ¶ 6) For example, the Complaint details that according to Chemed's own SEC Forms 10-K, the percentage of Vitas' patients receiving crisis care was approximately 13 times the national average in 2006, 5 times the national average in 2007, 4 times the national average in 2008, 4.5 times the national average in 2009, 4 times the national average in 2010, 11 times the national average in 2011 and 9 times the national average in 2012. (*Id.* at ¶¶ 6, 79) It also asserts that when comparing Vitas' patient statistics with those from the NHPCO, the data shows that Vitas was obtaining Medicare reimbursement for crisis care at a rate 6 times the national average, and that Vitas billed Medicare for twice as many crisis care days as all other hospice providers combined. (*Id.* at ¶ 107)

### 6. Allegations Regarding Chemed's Internal Audit Function

11

The Complaint additionally contains allegations that Chemed's Board approved Corporate Governance Principles requiring that it oversee management and that it ensure that processes are in place for maintaining the company's compliance with the law and with ethical regulations. (*Id.* at ¶ 33) Relatedly, the Complaint cites to an article posted on Vitas' website written by Defendant O'Toole, in which he states that as "part of Chemed's 'Internal Audit function,' 'regular reports' are 'collated at the corporate level' to monitor 'any compliance related disciplinary action' and [are] *provided directly to the Chemed Board*[.]" (*Id.* at ¶ 118 (emphasis in original)) Defendant O'Toole is then cited as further explaining that "internal compliance advocates" at Vitas review "a representative sample of billing documents each month," and that "*Vitas' parent company, Chemed, maintains an Internal Audit function to independently review these documents as well.*" (*Id.* (emphasis in original)) He wrote that "*[r]egular reports from* [the reviews performed by those associated with Chemed's Internal Audit function] *are provided to the Vitas Compliance Committee and the Chemed Board of Directors for yet another level of oversight.*" (*Id.* (emphasis in original); *see also id.* at ¶ 154)[10]

The Complaint also details an interview with a former Vitas employee who stated that Chemed's internal audit team regularly visited the Vitas headquarters in Florida. (*Id.* at ¶ 125) According to this former Vitas employee, "there were only 35 or so Chemed employees, so Chemed did not have much to do but monitor the performance of Vitas." (*Id.*)

---

[10] In a different portion of the Complaint, there is a description of a Vitas document written in 2010 for its San Fernando, California hospice program. The document explained that after an internal review, only 50 percent of Vitas' records showed that Vitas was acting consistently with Medicare's criteria for crisis care, and that only 10 percent of Vitas' crisis care reimbursement claims complied with the patients' plans of care set by Vitas' medical staff. (D.I. 1 at ¶ 106)

## B.    Procedural History

On November 6, 2013, without first making a demand on the Board, KBC filed this

shareholder derivative action in this Court. (D.I. 1)  In lieu of an Answer, Defendants filed the

instant Motion.  (D.I. 12)  That Motion was initially fully briefed in May 2014.  (D.I. 18)

North, in the meantime, had filed a similar shareholder derivative action against nearly all

of the Defendants on November 14, 2013 in the United States District Court for the Southern

District of Ohio ("Southern District of Ohio").  (*North* Action, D.I. 1)  North then moved the

United States Judicial Panel on Multidistrict Litigation (the "MDL Panel") to centralize the

litigation in the Southern District of Ohio; the MDL Panel later denied that motion.

(*North* Action, D.I. 21)  Upon Defendants' request, the Southern District of Ohio thereafter

transferred the *North* Action to this Court.  (*North* Action, D.I. 28)

In light of the transfer of the *North* Action, on September 29, 2014, Chief Judge Leonard

P. Stark ordered that the pending Motion in the *KBC* Action should be denied without prejudice.

(D.I. 29; *North* Action, D.I. 31)  Chief Judge Stark then ordered the *KBC* Action and the

*North* Action be referred to the Court for all purposes, up to and including resolution of case-

dispositive motions.  (D.I. 29)

On October 15, 2014, KBC filed a motion seeking consolidation of the two cases.  (D.I.

30; *North* Action, D.I. 38), which was fully briefed as of November 13, 2014, (D.I. 37;

*North* Action, D.I. 46).  At KBC's request, (D.I. 39; *North* Action, D.I. 48), the Court held oral

argument on the consolidation motion on January 22, 2015.  On February 2, 2015, the Court

issued a Memorandum Opinion and related Order, in which, *inter alia*, it:  (1) ordered the two

cases consolidated for all purposes; (2) appointed KBC as Lead Plaintiff and its counsel as Lead

Counsel in the consolidated action; and (3) allowed Lead Counsel 30 days to file a consolidated complaint or to designate one of the pending complaints as the operative complaint in the case. (D.I. 40, 41; *North* Action, D.I. 50, 51)

Subsequently, the parties submitted a joint stipulation, asking the Court to, *inter alia*: (1) designate the Complaint as the sole, operative complaint; (2) deem the instant Motion to have been re-filed and/or re-submitted; (3) allow the submission of supplemental briefing on the Motion; and (4) take the Motion under advisement and decide the Motion upon the previously-filed briefs and supporting documents, as well as the new supplemental briefing. (D.I. 42) The Court issued an order adopting the parties' stipulation on March 3, 2015. Thereafter, on March 30, 2015, Plaintiffs and Defendants submitted their supplemental briefing on the Motion. (D.I. 43-44)

## II.   LEGAL STANDARD

### A.   Rule 23.1

Generally, a corporation's board of directors is tasked with the decision of whether to initiate or pursue a lawsuit on behalf of the corporation. Del. Code tit. 8, § 141; *see also In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009). This responsibility flows from the "'cardinal precept'" of Delaware corporate law[11] that "'directors, rather than shareholders, manage the business and affairs of the corporation.'" *Citigroup*, 964 A.2d at 120 (quoting *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).

Pursuant to Rule 23.1, in order to maintain a derivative action on behalf of a corporation

---

[11]    It is undisputed that because Chemed is a Delaware corporation, Delaware law governs the substantive analysis of whether demand is excused. (D.I. 13 at 2; D.I. 16 at 10-13)

in federal court, a shareholder plaintiff's complaint must, *inter alia*, "state with particularity": "(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3); *see also Raul v. Rynd*, 929 F. Supp. 2d 333, 340 (D. Del. 2013). In this way, Rule 23.1 reflects a requirement for "a shareholder plaintiff [to] make a pre-suit demand on the board of directors prior to filing a derivative suit on behalf of the company, or to provide a satisfactory explanation for why the plaintiff has not done so." *Raul*, 929 F. Supp. 2d at 340. The "demand requirement allows the corporate machinery to self-correct problems and to safeguard against frivolous lawsuits." *Id.*; *see also Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007).

In considering a motion to dismiss filed pursuant to Rule 23.1, a court considers the well-pleaded allegations of the complaint, the documents incorporated into the complaint by reference and judicially-noticed facts, drawing all reasonable inferences from the complaint's allegations in favor of the plaintiff. *Raul*, 929 F. Supp. 2d at 337 n.1; *Resnik v. Woertz*, 774 F. Supp. 2d 614, 635 (D. Del. 2011); *Brambles USA, Inc. v. Blocker*, 731 F. Supp. 643, 644 n.1 (D. Del. 1990). However, the court is not obligated to accept as true bald assertions, unsupported conclusions and unwarranted inferences, or allegations that are self-evidently false. *In re Caterpillar Inc. Derivative Litig.*, Civil Action No. 12-1076-LPS-CJB, 2014 WL 2587479, at *7 (D. Del. June 10, 2014) (citing *Raul*, 929 F. Supp. 2d at 341).

While Rule 23.1 sets out the pleading standard for derivative actions in federal court, including the specificity of pleading required as to pre-suit demand, the substantive requirements of demand are ultimately a matter of state law. *King v. Baldino*, 409 F. App'x 535, 537 (3d Cir.

2010). In that regard, Delaware state law, applicable here, instructs that when making a demand

on the board of directors would clearly be futile, the demand requirement may be excused. *See*

*Aronson*, 473 A.2d at 814-15, *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244

(Del. 2000). Successfully alleging that demand is excused, however, is a "difficult feat under

Delaware law." *Ryan*, 918 A.2d at 352 n.23; *see also Richelson v. Yost*, 738 F. Supp. 2d 589,

597 (E.D. Pa. 2010) (citing *Ryan* and explaining that demand futility "is a very onerous standard

for a plaintiff to meet").

As to allegations of demand futility, if what is at issue in the lawsuit is an actual decision

made by the board of directors of a company, then a court must determine whether, under the

particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested

or independent; or (2) the challenged decision or transaction was otherwise the product of a valid

exercise of business judgment. *Aronson*, 473 A.2d at 814; *In re J.P. Morgan Chase & Co.*

*S'holder Litig.*, 906 A.2d 808, 820 (Del. Ch. 2005) (explaining that demand is excused if either

prong of the *Aronson* test is satisfied). If, however, a plaintiff "does not challenge a decision of

the board of directors[,]" then the test articulated in *Rales v. Blasband*, 634 A.2d 927, 930 (Del.

1993) applies instead.[12] *See also In re China Auto. Sys. Inc. Derivative Litig.*, C.A. No. 7145-

VCN, 2013 WL 467059, at *5 (Del. Ch. Aug. 30, 2013).

Pursuant to the *Rales* test, a court must determine "whether or not the particularized

factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the

---

[12]     The *Rales* Court explained that requiring demand even when a board has not
acted, such as in a circumstance where the board has "fail[ed] to oversee subordinates[,]" is
"consistent with the board's managerial prerogatives because it permits the board to have the
opportunity to take action where it has not previously considered doing so." *Rales*, 634 A.2d at
934 n.9.

time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934; *see also In re China Auto. Sys.*, 2013 WL 4672059, at *5. Here, in their briefing, both Plaintiffs and Defendants now agree that the *Rales* test applies, because (as Plaintiffs now put it) the "challenged conduct was an omission or failure to act by the board." (D.I. 16 at 12 (Plaintiffs asserting that in light of this, the *Rales* test applies); *see also* D.I. 13 at 9 (Defendants arguing that the *Rales* test applies because Plaintiffs "do[] not challenge a particular act of the board"); D.I. 18 at 3)[13]

---

[13]     The Court acknowledges that prior to the filing of their answering brief, Plaintiffs' position as to which test applies was less than clear. This was due to the fact that: (1) in the portion of the Complaint addressing demand futility, Plaintiffs appeared to structure their allegations so as to mirror the *Aronson* test, including by asserting that the Board's conduct was not a "valid exercise of business judgment[,]" (*see, e.g.*, D.I. 1 at ¶¶ 153-56); and (2) in the Complaint, Plaintiffs occasionally used language suggesting that they are asserting that the Board made an actual, coordinated decision to permit the alleged wrongdoing to occur at Vitas, (*see, e.g., id.* at ¶ 154 (alleging that the Individual Defendants "affirmatively adopted [and] implemented . . . a business strategy based on Chemed's deliberate and widespread violations of law") & ¶ 168 (citing the Board's alleged "conscious decision" in this regard)). For what it is worth, the Court agrees with what is apparently now both parties' current position—that the *Rales* test applies. The Complaint's factual allegations really never reference any particular Board decision to act or to not act; instead, they suggest a failure by the Board to manage or oversee Vitas employees, a failure to recognize "red flags" at Vitas and/or an overall failure to act in the face of those red flags. (*See, e.g., id.* at ¶ 155 (citing the Board's "'do nothing' strategy") & ¶ 168 ("All of the Board's directors . . . failed to act in the face of known duties.")) Under those circumstances, applying the *Rales* test is appropriate. *See, e.g., Taylor v. Kissner*, 893 F. Supp. 2d 659, 669 (D. Del. 2012) (applying *Rales* where the directors allegedly knew of pervasive accounting problems, but "took no corrective action"); *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 173 (D. Del. 2009) (applying *Rales* where the plaintiff's allegation was that the board was guilty of a failure of oversight, or, at most, that the board engaged in conscious inaction); *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012) (applying *Rales* where the "plaintiffs do not allege that any particular director in office at the time of the filing of the complaint made a specific decision challenged in the complaint[]"). And because Plaintiffs do not now assert that the Complaint's bare-bones allegations regarding a "conscious decision" of the Board are sufficient to excuse demand, the Court need not hereafter address Defendants' arguments in their opening brief regarding that issue. (D.I. 13 at 12 (citing D.I. 1 at ¶ 1))

**B.    Rule 12(b)(6)**

When a Court considers a Rule 12(b)(6) motion, it similarly accepts as true the well-pleaded allegations of the complaint, drawing all reasonable inferences in favor of the plaintiff. *See Raul*, 929 F. Supp. 2d at 341.  As with review of a Rule 23.1 motion, a court reviewing a Rule 12(b)(6) motion is not obligated to accept as true bald assertions, unsupported conclusions and unwarranted inferences, or allegations that are self-evidently false. *Id.*  The standard for pleading demand futility with particularity under Rule 23.1 is more stringent than the standard under Rule 12(b)(6). *Halpert v. Zhang*, 966 F. Supp. 2d 406, 415 (D. Del. 2013); *cf. In re China Agritech, Inc. S'holder Derivative Litig.*, C.A. No. 7163-VCL, 2013 WL 2181514, at *24 (Del. Ch. May 21, 2013).

**III.    DISCUSSION**

In resisting Defendants' Motion, Plaintiffs' primary argument is that the Complaint's allegations have raised a reasonable doubt as to the disinterestedness of at least half of the Board in the relevant time period.  (D.I. 16 at 13-20)[14]  One way of making such a showing, sufficient to satisfy *Rales*, is pleading facts sufficient to demonstrate that at least half of the directors would face a "substantial likelihood of personal liability" were they to comply with a shareholder's demand to pursue litigation. *See In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 170 (D. Del. 2009); *see also Taylor v. Kissner*, 893 F. Supp. 2d 659, 666 (D. Del. 2012).  And that is Plaintiffs' allegation here—that, *inter alia*, all of the Director Defendants are interested because,

---

[14]    The only Director whom Plaintiffs argue is not independent is Defendant McNamara.  (D.I. 16 at 19 n.19)  Because Plaintiffs have failed to allege particularized facts to create a reasonable doubt as to the independence or disinterestedness of the other directors, it is unnecessary to address whether Defendant McNamara would have the requisite independence when considering a demand.

in light of the Complaint's allegations, they "are subject to a substantial likelihood of liability." (D.I. 16 at 13)

Delaware courts have explained that although the "mere threat of personal liability is insufficient to render a director interested in a transaction, plaintiffs are entitled to a reasonable inference of interestedness where a complaint indicates [that the requisite] 'substantial likelihood' of liability will be found." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007); *see also In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995); *Rales*, 634 A.2d at 936. To make this showing, a plaintiff must establish "a sufficient connection between the corporate trauma [at issue] and [at least half of] the board"; without "a connection to the board, a corporate trauma will not lead to director liability." *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012) (citing *Desimone v. Barrows*, 924 A.2d 908, 914 (Del. Ch. 2007)).

Defendants, for their part, provide multiple arguments as to why Plaintiffs' allegations are insufficient to meet this standard.[15] Below, the Court will address each of Defendants' arguments in turn.

## A. Failure to Often Plead Facts Specific to Any Director

Defendants' first argument is that Plaintiffs have largely failed to plead "facts *specific to each Director Defendant* demonstrating his or her inability to consider a demand with disinterest, and [that] on that basis alone the Complaint must be dismissed." (D.I. 13 at 10 (emphasis added)) The only allegations specific to each Director, Defendants argue, concern the Individual Directors' "names, titles, committee assignments, compensation and [the director's]

---

[15] The demand-related allegations are set forth in paragraphs 152 to 168 of the Complaint, though they also incorporate by reference the remainder of the prior paragraphs in the Complaint. (D.I. 1 at ¶¶ 152-68)

acknowledgment in securities filings and earnings calls of the FCA lawsuits, government investigations and Chemed internal controls." (*Id.*)

In support of this argument, Defendants cite primarily to *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007), a case in which the Delaware Court of Chancery noted that a "derivative complaint must plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." (D.I. 13 at 10 (emphasis in original)) But the *Desimone* Court was considering a circumstance where, at most, it could be assumed that two members of a six-member board faced a significant likelihood of liability—and the Court was explaining that "Delaware law does not permit the wholesale imputation of [the two directors' knowledge] to every other [director] for demand excusal purposes." *Desimone*, 924 A.2d at 942-43. Ultimately, in *Desimone*, because no facts were alleged to permit the inference that the misconduct at issue was discussed amongst board members (including the remaining four board members) during the applicable time period, demand was not excused. *Id.*

This case is unlike that in *Desimone*, in that by and large, the allegations do not suggest that certain Director Defendants had significantly more exposure than others to evidence of misconduct taking place at Vitas. Nor does the Court read Plaintiffs to be suggesting that knowledge that can be established as to certain Director Defendants should in turn be imputed to others. Instead, the allegations are that during the time period in question, well over a majority of the Director Defendants[16] were roughly similarly situated—and that those Board members, in a

---

[16]     As was previously noted, seven of the 10 Director Defendants served on the Board for the entirety of the time period at issue in the complaint (2004-2013). (D.I. 1 at ¶¶ 15, 18-20, 24, 26-27) An eighth, Defendant Krebs, has served since May 2005—encompassing nearly all of

basically similar way, turned a blind eye to the asserted Vitas-misconduct at issue.[17] (*See, e.g.*,

D.I. 1 at ¶¶ 131-42)

If this is the nature of a plaintiff's allegations regarding demand futility, and (crucially) if

that plaintiff's allegations are sufficiently particular as to the knowledge and acts of all such

directors, the Court is not convinced that Delaware law would necessarily require the plaintiff to

specifically call out each director by name throughout the Complaint in order to avoid dismissal.

*Cf. In re Am. Apparel, Inc. S'holder Deriv. Litig.*, No. CV 10-06576, 2012 WL 9506072, at *41

(C.D. Cal. July 31, 2012) (concluding that such "group pleading is [not] per se impermissible

[under Delaware law, in the context of derivative litigation], so long as group pleading is limited

---

the time period at issue. (*Id.* at ¶ 21) The other two Director Defendants, Defendants Lindell and Rice, have served only since 2008 and 2009 respectively—and so could only be interested as to their Board service due to action or inaction since those time periods. (*Id.* at ¶¶ 22-23)

[17]     Defendants also cite *King v. Baldino*, 648 F. Supp. 2d 609 (D. Del. 2009) in support of the same argument. (D.I. 13 at 10) The allegation in *King* related to an affirmative action—there, the director defendants "choosing to implement a marketing scheme that completely ignored [government] mandates." *King*, 648 F. Supp. 2d at 623. The *King* Court found no facts supporting the conclusory statement that the defendants made that choice. *Id.* In doing so, it noted that the allegations were particularly problematic because while this alleged wrongful choice was made in late 2001, many of the individual director defendants did not begin their period of board service until well after that time. *Id.* at 624. In this matter, in contrast, Plaintiffs are not alleging that a specific choice, made during one discrete time period, is what gives rise to a substantial likelihood of director liability. Instead, they assert that liability is driven by a failure of at least a majority of the Board, over a lengthy period of time, to respond to knowledge of alleged wrongdoing. Here, seven of the 10 Director Defendants have been Board members since at least 2002, and so they served for the entirety of the time period in question. (D.I. 1 at ¶¶ 15, 18-20, 24, 26-27) Because of this, this case is very much unlike that in *King*. *Cf. In re Am. Apparel, Inc. S'holder Derivative Litig.*, No. CV 10-06576, 2012 WL 9506072, at *41 (C.D. Cal. July 31, 2012) (distinguishing *King* as a case where certain board members did not sit on the board during the time period of the wrongful conduct at issue, and noting that making allegations as to the entire board may be less problematic where "most of the director defendants are alleged to have served on [the company's] board for the entire duration of the events in question").

to defendants who are similarly situated"); *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 563 (D.N.J. 2011) (finding it unnecessary to distinguish among the knowledge of particular directors in the court's analysis of demand futility, in a case where the court analyzed Delaware legal precedent, because "Plaintiffs do not distinguish among the various directors but suggest that all directors received equal information"). Thus, the Court will not conclude that because the Complaint's allegations often refer to the Director Defendants collectively, this necessarily means that those allegations are *per se* insufficient under Rule 23.1.

With all of that said, the Court agrees that where a plaintiff engages in this type of group pleading, that may be an indicator that the plaintiff's allegations are unlikely to be sufficiently particularized to meet the Rule's requirements. As is set out in Section III.B.2 below, the Court concludes that this is, in fact, the case here.

### B.     Substantial Likelihood of Personal Liability

Defendants' next argument is that "even if Board-wide allegations" were not problematic, Plaintiffs otherwise have failed to plead sufficient facts to create a reasonable doubt that the Board was disinterested because they faced a substantial likelihood of personal liability. (D.I. 13 at 11) In doing so, Defendants address Plaintiffs' claims in Count I as to alleged breaches of the duty of care and the duty of loyalty, respectively. (*Id.* at 11-17) The Court will do the same below.

### 1.     Duty of Care

Defendants argue that Plaintiffs' allegations as to possible director liability stemming from a breach of the duty of care must be insufficient, (*see* D.I. 1 at ¶ 171), because Chemed has adopted an exculpatory provision in its Certificate of Incorporation pursuant to Del. Code tit. 8, §

102(b)(7), (D.I. 13 at 11 (citing D.I. 14, ex. 1)). Article IX, an amendment to Chemed's Certificate of Incorporation, excuses directors for personal liability for monetary damages for breaches of fiduciary duty committed as a director, except for: (1) breaches of the duty of loyalty; (2) acts or omissions not in good faith or involving intentional misconduct or illegality; or (3) transactions where the director received an improper personal benefit. (D.I. 14, ex. 1)[18] This mirrors the language of the exculpation clause provided in Delaware corporate law. Del. Code tit. 8, § 102(b)(7).

Plaintiffs do not take issue with this argument in their answering brief. Nor do they make any reference to pressing a duty of care claim against the non-Board member Defendants. (D.I. 13 at 20 n.13) Instead, in their answering brief, Plaintiffs focus solely on Director Defendants' asserted liability for breaches of the fiduciary duty of loyalty. (D.I. 16 at 13-14 & n.15) Consequently, the Court finds that any claim for the breach of the duty of care cannot serve as the basis for the Plaintiffs' theory that the Board faces a substantial likelihood of personal liability, and it also recommends dismissal as to any claim for the breach of the duty of care as to all Individual Defendants. *See, e.g., Taylor*, 893 F. Supp. 2d at 669; *In re IT Grp. Inc.*, No. 02-10118, Civ. A. 04-1268-KAJ, 2005 WL 3050611, at *11 (D. Del. Nov. 15, 2005); *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 464 (D. Del. 2004).

### 2. Duty of Loyalty

---

[18]     The Court may take judicial notice of the certificate of amendment in deciding a motion to dismiss. *Baxter*, 654 A.2d at 1270 (citing *In re Wheelabrator Techs. Inc. S'holders Litig.*, C.A. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992)); *see also Amalgamated Bank v. Yost*, No. Civ.A.04-0972, 2005 WL 226117, at *5 (E.D. Pa. Jan. 31, 2005).

Defendants next argue that the Director Defendants have not been shown to face substantial liability due to a breach of the duty of loyalty. (D.I. 13 at 12-17) As to this form of breach, one way for a board to face liability (relevant to the allegations here) is through a so-called "*Caremark* claim": a claim asserting that the "directors failed to act when they otherwise should have done so." *David B. Shaev Profit Sharing Account v. Armstrong*, No. Civ.A. 1449-N, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996)). One way to satisfy a plaintiff's burden in a *Caremark* case is to demonstrate that the directors "consciously failed to act after learning about evidence of illegality—[such as becoming aware of] the proverbial 'red flag.'" *Baker*, 62 A.3d at 15; *see also Intel*, 621 F. Supp. 2d at 174; *Shaev*, 2006 WL 391931, at *5 ("A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss[.]").[19] Pressing a *Caremark* claim requires "a showing that the directors *knew* they were not discharging their fiduciary obligations or that they demonstrated a *conscious* disregard for their duties." *Intel*, 621 F. Supp. 2d at 174 (emphasis in original); *see also Citigroup*, 964 A.2d at 122–25. Overall, this theory of liability has been said to be "'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *Intel*, 621 F. Supp. 2d at 174 (quoting *Caremark*, 698 A.2d at 967).

In asserting that they have met their burden under Rule 23.1, Plaintiffs make three

---

[19]     Alternatively, a plaintiff can allege that a board failed to exercise oversight over the corporation by for example, either: (1) failing to implement any reporting or information system or control, or (2) having implemented such a system or controls, consciously failing to monitor or oversee them and thus preventing themselves from being informed of risks. *Citigroup*, 964 A.2d at 123; *Shaev*, 2006 WL 391931, at *5; *see also Baker*, 62 A.3d at 15. In their briefing, Plaintiffs do not suggest that they are pressing these types of *Caremark* claims.

arguments. First, Plaintiffs argue that they have sufficiently alleged that the entire Board faces

the requisite likelihood of liability because the Complaint's allegations allow the reasonable

inference that the Board *actually knew* that the Vitas-related misconduct was occurring (and did

nothing about it). (D.I. 16 at 14-16) Second, even if the allegations do not support an inference

of actual knowledge, Plaintiffs claim that they have sufficiently demonstrated that the Board

ignored red flags that should have put it on notice of the misconduct (and thereafter failed to stop

the misconduct). (*Id.* at 16-18) And third, Plaintiffs argue that the Complaint sufficiently

demonstrates that certain Board members who served on Chemed's Audit Committee since at

least 2008 (Defendants Grace, Krebs, Rice and Saunders) face the requisite likelihood of

liability; they claim that this Audit Committee service alone establishes that these Defendants

had to know of the misconduct and thereafter failed to discharge their fiduciary duty of oversight.

(*Id.* at 19) Below, the Court will address each argument in turn, ultimately explaining why the

Complaint does not meet or exceed the bar set by Rule 23.1.

### a.     Plaintiffs Failed to Sufficiently Demonstrate the Board's Actual Knowledge

Plaintiffs' first assertion is that the facts pleaded[20] support the inference that "at least half

---

[20]     Some of the facts pleaded in the Complaint and further addressed below in
Section III.B.2 occurred prior to February 9, 2009, the date on which it is alleged that Plaintiff
KBC acquired shares in Chemed. (D.I. 1 at ¶ 13) Defendants assert that because (pursuant to
Rule 23.1 and Delaware law) a plaintiff in a derivative action must allege that he or she was a
shareholder at the time of the challenged transaction, *see Blasband v. Rales*, 971 F.2d 1034, 1039
(3d Cir. 1992), the Court must dismiss Plaintiffs' claims based on events occurring prior to
February 9, 2009. (D.I. 13 at 18) Plaintiffs respond by asserting that an exception to this
"contemporaneous ownership" requirement is applicable here—one implicated where the alleged
wrongful acts amount to a "continuing wrong." (D.I. 16 at 20); *Blasband*, 971 F.2d at 1045
(internal quotation marks and citations omitted). The Court declines to decide this issue now, for
at least the following two reasons. First, doing so is not necessary to the Court's decision below,
which concludes that (even accounting for the pre-February 2009 allegations) Plaintiffs have not

of the Board had [actual] knowledge of" Vitas' alleged improper billing scheme. (D.I. 16 at 14-16) In making this argument, Plaintiffs highlight various allegations in the Complaint, discussed below.

### 1. The Board's Receipt of Audit Reports

Plaintiffs first point to the Complaint's allegations suggesting that "the Board received regular internal audit reports concerning Medicare billing and enrollment compliance at Vitas[.]" (*Id.* at 14) Here, the Court agrees that Plaintiffs have pleaded facts allowing the inference that—as a very general matter—the Board regularly received at least some type of information regarding these topics. But the Complaint is vague about exactly what type of information the Board actually did receive.

For example, the Complaint alleges that in the time periods in question, Vitas "internal compliance advocates" reviewed "a representative sample of billing documents each month." (D.I. 1 at ¶ 118 (emphasis omitted) & ¶ 154) The Complaint does not, however, explain what type of "billing documents" these were, or how they might relate to the types of Medicare/Medicaid fraud at issue in the Complaint. It then states that Chemed "maintains an Internal Audit function to independently review these [same billing] documents as well." (*Id.* (emphasis omitted)) From there, the Complaint alleges that "[r]egular reports from these [independent] reviews are provided to the Vitas Compliance Committee and the Chemed Board of Directors for yet another level of oversight." (*Id.* (emphasis omitted)) The Complaint, however, says nothing about what these "reports" of the unspecified "billing documents" looked

---

met their burden under Rule 23.1. Second, in their briefing, the parties spend almost no time addressing the relevant law regarding this "continuing wrong" exception (and how it does or does not apply to the facts here). (D.I. 13 at 18; D.I. 16 at 20; D.I. 18 at 10)

like, what their subject matter was, what level of detail they provided to the Board, or how often they were provided to the Board. And so, even after reading these allegations, it is decidedly unclear as to: (1) what the content was of any particular "report" provided to the Board; (2) whether the Vitas "billing documents" referenced in these reports had anything to do with the appropriateness of crisis care-related treatment or admissions decisions; or (3) why the content of any particular report would have revealed the existence of ongoing Medicare or Medicaid fraud to the Board.

There *is* one instance in which the Complaint (in the course of describing certain allegations made in the DOJ Action), makes specific reference to a particular type of Vitas "report": the reference to the September 2010 Vitas internal audit of its San Fernando, California hospice program (the "San Fernando report"). The San Fernando report is said to have revealed that only 50 percent of Vitas' records demonstrated that Vitas was acting consistently with Medicare's criteria for crisis care, and that only 10 percent of crisis care reimbursement claims complied with the patients' plans of care set forth by Vitas medical staff. (*Id.* at ¶ 106; *see also* D.I. 43 at 2) Although it is not described in great detail, this report at least appears to relate to the general subject matter of Plaintiffs' allegations (that is, to problems with Vitas's crisis care admissions procedures). Yet it is unclear if the San Fernando report is even the type of Vitas "billing document[]" that would have been summarized and provided to the Chemed Board in one of the "reports" referenced above. Indeed, there is no definitive statement in the Complaint that the San Fernando report ever *actually was* provided to the Chemed Board in some form. On these facts, the Court cannot reasonably infer that this particular San Fernando report ever

actually reached the Board's attention. (D.I. 1 at ¶ 118).[21]

### 2. The Alleged Pervasive, Open and Widespread Nature of the Wrongdoing and its Statistical Impact

Next, Plaintiffs rely on their allegations that the illegal billing scheme at issue was "pervasive [and] open" and "was widespread and of substantial magnitude and duration." (D.I. 16 at 15) More specifically, they point to the allegations indicating that, *inter alia*, for a long span of years, Chemed and/or Vitas executives pressured lower-level Vitas employees to meet "aggressive quotas" for crisis care enrollments, used "aggressive marketing tactics" and, in some cases, fabricated rationales for Vitas patients to remain in hospice care when they should no longer have been there. (*Id.* (citing D.I. 1 at ¶¶ 87, 96, 101-02, 115, 122, 124, 126-28)) They also note the allegations that in the relevant period, "Chemed's enrollment statistics have been significantly out-of-line with national averages for the industry for a sustained period of time." (*Id.* at 16 (citing D.I. 1 at ¶¶ 6, 79, 81-90, 95-98, 107))

The allegations in the Complaint do span a lengthy period of years. Yet while that is so, and while the allegations are otherwise long on describing misconduct of Vitas and/or Chemed executives, they are short on particularized facts indicating that Board members were aware of any such misconduct and failed to take action.

---

[21]     Moreover, even were there enough facts pleaded for the Court to assume that the Board was aware of the content of the San Fernando report—in and of itself, that report would amount to one (albeit troubling) data point, regarding activity at one particular Vitas hospice program. Without much more, the Board's knowledge of that report would not allow the reasonable inference that the Board had actual or constructive knowledge of anything approaching the "company-wide 'plan' that underlies Plaintiffs' suit." (D.I. 18 at 6 n.5); *cf. Taylor*, 893 F. Supp. 2d at 673 (noting that even to the extent that allegations established that a board knew that an accounting system at issue was compromised, "that is a long way from showing that the Board was also aware of the accounting breakdown to such an extent that they would face a substantial likelihood of personal liability if they were to pursue litigation").

By way of one type of example, the Complaint makes reference to events such as where Vitas Team Managers fabricated rationales for keeping patients on hospice care during regional team meetings, (D.I. 1 at ¶ 96), or where a former Vitas Patient Care manager overruled a doctor's decision that a patient was ready to be discharged from hospice care, (*id.* at ¶ 126). But because the Court cannot reasonably infer that Board members would have participated in these types of meetings or events, Plaintiffs need to set out facts suggesting that the Board would have nevertheless been aware that they were occurring. *See In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453, 464 (S.D.N.Y. 2009) ("Allegations regarding misconduct or awareness of misconduct by employees without a connection to [defendant board members] are, however, insufficient to show that Defendants consciously or recklessly failed to monitor or oversee [the company's] operations.") (applying Delaware law). Now, one way that the Board might be argued to have gleaned that knowledge is through review of *qui tam* complaints, investigative demands, or other contacts with federal or state government actors, in which such events would be described—an issue more fully discussed below. But aside from those kinds of mechanisms, the Complaint describes few ways in which allegedly fraudulent activity on the one hand is said to be linked to Board knowledge of such conduct on the other.

At a minimum, one *could* reasonably infer that were these types of strong-arm tactics occurring at Vitas regularly between 2004 and 2013, this would have led to Vitas having a much greater percentage of patients in crisis care than was the national average. And indeed, the Complaint alleges just that. Using data drawn from Chemed's Forms 10-K and the NHPCO, the Complaint makes the case that during these years, Vitas had many times more patients in crisis care than the national average, and that it charged patients for far longer stays in hospice care

than was the national average. (D.I. 1 at ¶¶ 77-81, 107) Even here, though, there is very little in the Complaint that directly indicates that the Director Defendants were actually aware of the nature of these large discrepancies at the time. *Cf. King*, 648 F. Supp. 2d at 624 ("There are also no facts plead indicating that members of the Board were privy to the data, reported in the 2006 *Wall Street Journal* articles, concerning the percentage of patients prescribed Actiq off-label or the percentage of Actiq sales that were the result of prescriptions made by oncologists.); (*but see* D.I. 1 at ¶ 80 (citing Defendant McNamara's awareness, expressed during an October 2013 conference call, that Vitas was a "statistical outlier" in providing more crisis care than the national average)).

But even were it a fair inference that a majority of the Board did know well before the institution of this suit that Vitas was this kind of statistical outlier as to crisis care admissions, it would be quite another thing to show that the Board knew this was due to outright fraud. And on that score, the Complaint's lack of particularized allegations as to exactly what the Board knew or discussed during these years becomes very significant. There are no allegations, for example, about: (1) whether and how many times the Board met to discuss any of the facts asserted to have led to their knowledge of fraud; (2) how those facts would have come to the Board's attention in the first place; or (3) whether any members of the Board initiated proceedings or investigations to learn more about any such facts. In the absence of such particularized allegations (or something like them), the asserted pervasiveness and duration of the improper billing scheme does not strongly suggest the Board's bad faith intent or knowledge of the conduct. *See Intel*, 621 F. Supp. 2d at 174 ("Though Plaintiff identifies a number of so-called 'red flags,' Plaintiff fails to identify what the Directors actually knew about the 'red flags' and

how they responded to them."); *Baker*, 62 A.3d at 17 ("Although the complaint asserts that the directors knew of and ignored the 2011 safety incidents, the complaint nowhere alleges anything that the directors were told about the incidents, what the Board's response was, or even that the incidents were connected in any way."); *Citigroup*, 964 A.2d at 129 ("The Complaint and plaintiffs' answering brief repeatedly make the conclusory allegation that the defendants have breached their duty of oversight, but nowhere do plaintiffs adequately explain what the director defendants actually did or failed to do that would constitute such a violation.").[22]

In arguing to the contrary, Plaintiffs cite to a few judicial decisions from non-Delaware courts. For multiple reasons, the Court does not find these cases persuasive.

For example, Plaintiffs cite the decision in *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795 (7th Cir. 2003), in support of the proposition that there, "the court held plaintiffs had adequately alleged that certain directors were aware of [allegedly pervasive, open] wrongdoing by virtue of their positions 'as members of the Audit Committee' because information concerning the wrongdoing 'would have been shared at the board meetings.'" (D.I. 16 at 15 (citing *Abbott Labs.*, 325 F.3d at 806))

In *Abbott Labs.*, the United States Court of Appeals for the Seventh Circuit considered whether the plaintiffs had sufficiently demonstrated that demand was excused in a case involving a *Caremark* claim—one alleging that Abbott demonstrated conscious inaction by failing to address legal violations that the board knew about. *Abbott Labs.*, 325 F.3d at 809. In that case,

---

[22]     *See also Johnson & Johnson*, 865 F. Supp. 2d at 567 ("While Plaintiffs' allegations specify which Board members sat on the Public Policy Committee, there are no allegations regarding meeting dates, who was actually present at the meetings, or what subjects were discussed. Without this sort of factual detail, the Court cannot infer that a majority of the Board knew about the substance of the [alleged "red flags"].") (citing Delaware law).

the allegations were that during a six-year period (from 1993 to 1999), the United States Food & Drug Administration ("FDA") conducted 13 separate inspections of Abbott facilities, in order to assess whether the company's in vitro diagnostic kits and devices were in compliance with relevant federal regulations and to ensure that human subjects were protected during the course of scientific investigations. *Id.* at 799. The FDA sent Abbott a letter noting deviations from the regulations after each of these visits. *Id.* It also sent three formal certified warning letters to Abbott in 1993 and 1994, certain of which were copied to the chairman of Abbott's board. *Id.* These warning letters, which were "'clearly information that was required to be brought to the attention of [all of] the Board members by the Chairman[,]'" advised that Abbott's failure to correct the deviations would result in regulatory action. *Id.* at 799, 802. After a 1995 *Wall Street Journal* article highlighted the FDA's findings, Abbott entered into a "Voluntary Compliance Plan" with the FDA to remedy known issues. *Id.* at 800. However, after Abbott continued to violate applicable regulations during the time when this compliance plan was in place, the FDA sent the equivalent of a warning letter to Abbott, advising it that due to its failings, the FDA was closing out the compliance plan. *Id.* Then, in 1999, the FDA sent another warning letter to a member of Abbott's board (who also served as Abbott's Chief Executive Officer). *Id.* This letter, which was reported on by a national news service later in that year, discussed how the FDA had recently found new regulatory violations regarding in vitro diagnostic kits at an Abbott plant. *Id.* By September 1999, Abbott had filed a disclosure form with the SEC acknowledging that it had received notice of the above-mentioned violations (though noting that the company disagreed with the FDA's findings). *Id.* at 800-01.

It was thus in the context of this particular factual record—where the FDA had found

years of regulatory violations by Abbott, and had directly advised multiple board members (including Abbott's board chairman) of these violations through warning letters that were, in turn, required to be communicated to the rest of the board—that the Seventh Circuit inferred that "information of the violations would have been shared at [Abbott] board meetings" with Audit Committee members. *Id.* at 806; *see also Intel*, 621 F. Supp. 2d at 177 (distinguishing *Abbott Labs.* by noting that unlike in that case, "[here] there is no indication that government agencies have specifically reached out to individual board members to apprise them of problems within the company"). The factual allegations here, in contrast, are far less specific as to the question of Board knowledge. The Complaint's allegations are serious, to be sure, and paint a picture of billing violations at Vitas occurring over a lengthy period of time at various facilities. But, Plaintiffs have not alleged any communications, direct or otherwise, to any Board member advising that such violations had occurred, similar to what took place in *Abbott Labs.*[23]

Plaintiffs also cite *Abbott Labs.* and three other non-Delaware judicial decisions in support of their claim that "'[w]hen a derivative plaintiff alleges a particularized scheme of substantial magnitude and duration that allegedly occurred when a majority of a board served as directors, *courts infer that the board had notice of the scheme* for purposes of assessing demand

---

[23]    A number of subsequent decisions have declined to find *Abbott Labs.* applicable to complaints that fail to set forth similarly detailed allegations suggesting director knowledge. *See, e.g., Garza ex rel. Navistar Int'l Corp. v. Belton*, No. 08 C 1387, 2010 WL 3324881, at *8 (N.D. Ill. Aug. 13, 2010); *In re ITT Corp. Derivitive Litig.*, 653 F. Supp. 2d at 464 n.6. It is also worth noting that at least one other court has criticized the decision in *Abbott Labs.*, to the extent it could be read to suggest that the court there "infer[red] Board knowledge from committee membership alone." *Johnson & Johnson*, 865 F. Supp. 2d at 564.

futility.'" (D.I. 16 at 15 (emphasis in original))[24] With regard to this assertion, the Court does not doubt that the magnitude and duration of alleged misconduct can be a *factor* that bears on whether it can be reasonably inferred that board members knew of that misconduct. But in *Abbott Labs.* (as set out above) and in the other three cited cases, the alleged facts conveyed a much stronger picture of direct board knowledge of misconduct that what is contained in the Plaintiffs' Complaint.[25] It is those stronger facts regarding director knowledge, not present here, that appears to have made the difference in those cases as to the issue of demand futility.

---

[24]    The other three cases cited by Plaintiffs are *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001); *In re Abbott Depakote S'holder Derivative Litig.*, No. 11 C 8114, 2013 WL 2451152 (N.D. Ill. June 5, 2013); and *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010).

[25]    In *Pfizer*, for example, the district court discussed how the complaint "detail[ed] at great length a large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct [relating to off-label drug marketing practices and payment of illegal kickbacks for drug promotion]" including a large number of FDA violation notices and warning letters, several internal reports of continuing violations and allegations made in *qui tam* lawsuits. *Pfizer*, 722 F. Supp. 2d at 460. Importantly, many of these reports came during a time when the Pfizer board was obligated by the terms of two prior corporate integrity agreements—entered into after Pfizer's subsidiaries had engaged in similar misconduct in prior years—to "closely monitor and prevent such misconduct" and to receive reports regarding such misconduct from its chief Compliance Officer. *Id.* at 460-62; *see also Stanley v. Arnold*, No. 1:12-cv-482, 2012 WL 5269147, at *8 (S.D. Ohio Oct. 23, 2012) (distinguishing *Pfizer* on similar grounds). Similarly, in *McCall*, where the alleged misconduct related to various fraudulent practices meant to improperly increase revenue and profits, the complaint identified, *inter alia*, specific facts illustrating how these practices were brought to the attention of the board's audit committee. *Cf. Intel*, 621 F. Supp. 2d at 177-78 (characterizing *McCall* this way). Among those were the fact that the board's audit committee received audit reports that provided "unmistakable signs that improper practices were being employed throughout the corporation" (including one that indicated major discrepancies between cost reports submitted to the government and secret reserve cost reports, along with the fact that a $3.7 million reserve had been set aside in case this very error was later discovered). *McCall*, 239 F.3d at 820 & n.12; *see also Stanley*, 2012 WL 5269147, at *7 (distinguishing *McCall* on these grounds and also on the ground that the case involved the execution of search warrants by four federal agencies on the company's offices in Texas).

For all of these reasons, the Court does not find that the allegations relating to the magnitude or duration of the alleged scheme strongly suggest that the Board faced a substantial likelihood of liability at the time when demand would be made.

### 3. Existence of Complaints, of Governmental Investigations and of Settlements Entered Into by Other Hospice Care Providers

Lastly, Plaintiffs assert that "multiple *qui tam* complaints, federal and state investigations, [and] settlements entered into by other hospice-care providers . . . all put the Board on notice that Chemed's Medicare billing and enrollment practices were unlawful." (D.I. 16 at 16 (citing D.I. 1 at ¶¶ 29-43, 67, 82-98, 131-42)) Here, the Court will focus particularly on the allegations regarding the various investigatory demands and complaints that are referenced in the Complaint, all of which are said to relate to the alleged improper scheme at Vitas.[26] These are the most

---

[26]     The Court agrees with Defendants that, as to "settlements entered into by other hospice-care providers[,]" any such allegations would do very little to "support an inference that [a Chemed Director] was thus informed of wrongdoing *at Chemed*." (D.I. 18 at 9 (emphasis in original)) The Complaint does make brief reference to 14 different settlement agreements, entered into "[s]ince 2009," in which "the government" settled claims against hospice providers regarding allegations, *inter alia*, that the providers had wrongfully enrolled patients into hospice care in violation of the FCA. (D.I. 1 at ¶ 67) But the Complaint says nothing more about these settlement agreements—nothing about how high-profile they were, or about why it should be inferred that any particular Director Defendant knew of their existence. Nor does it allege anything about the nature of the cases that led to the settlement agreements, such that one could assess whether these agreements were anything "more than a business decision" on the settling companies' part. *Johnson & Johnson*, 865 F. Supp. 2d at 570 (citing *Markewich ex rel. Medtronic, Inc. v. Collins*, 622 F. Supp. 2d 802, 812 (D. Minn. 2009)); *see also White v. Panic*, 783 A.2d 543, 553 (Del. 2001). The most the Complaint does is to cite to a few statements made in 2011 and 2012 by Defendants O'Toole and McNamara, to the effect that federal regulators have been scrutinizing certain hospices "for a long time[,]" or that the hospice business was "always going to be under a microscope." (D.I. 1 at ¶¶ 139, 141 (internal quotation marks omitted); *see also* D.I. 16 at 16) But those citations are of little value in advancing Plaintiffs' case that the Board knew of widespread wrongdoing *at Chemed itself* (or even that such wrongdoing was rampant in the broader hospice industry).

significant allegations in the Complaint going to the assertion that the Director Defendants had actual knowledge of the alleged scheme.[27]

The first relevant data point here is the allegation that on April 7, 2005, Vitas received subpoenas from the OIG "alleging improper Medicare and Medicaid billing for hospice care." (D.I. 1 at ¶ 134 (quoting Defendant McNamara speaking at a 2005 Earnings call about these subpoenas, and characterizing their content as "relating to Vitas' alleged failure to appropriately bill Medicare and Medicaid for hospice services")) Although the Complaint does not provide further indication as to whether any other Board members were aware of the OIG subpoenas in 2005, it clearly alleges that in a March 16, 2006 Form 10-K disclosure (signed by Defendants McNamara, Williams, Tucker, Hutton, Grace, Krebs, O'Toole, Saunders, Walsh and Wood), the April 2005 OIG subpoenas were referenced. (*Id.* at ¶ 135) The Form 10-K disclosure added that the OIG had selected medical records for 320 past and current Vitas patients for review, and that it sought information on Vitas policies and procedures dating back to 1998. (*Id.*)

And so, what can be fairly inferred is that by mid-2006, a majority of the Director Defendants were aware that the OIG had instituted what seems like a fairly wide-ranging inquiry into Vitas' Medicare/Medicaid billing practices. *Johnson & Johnson*, 865 F. Supp. 2d at 565-66 (noting that the fact that directors signed a Form 10-K disclosing investigative subpoenas

---

[27]     The Complaint also cites a 2011 *Bloomberg News* article disclosing a Vitas general manager's discovery of wrongdoing at Vitas, including a conspiracy with health insurers to increase hospice care enrollment for ineligible patents. (D.I. 1 at ¶ 140) The article discussed the DOJ's investigation of similar misconduct as well. (*Id.*) Although the allegation concerns an article from a large news entity, Plaintiffs fail to plead facts suggesting the reasonable inference that a majority of the Director Defendants knew of or discussed the article and its contents. *Cf. Johnson & Johnson*, 865 F. Supp. 2d at 579; *Intel*, 621 F. Supp. 2d at 175. If Plaintiffs had alleged such facts, the Court agrees that the article could have been a meaningful data point to look to in assessing the Board's knowledge.

"provides a basis for the Court to infer that [these Board members were] aware of the subpoenas"). That said, according to the Complaint, the Form 10-K characterized the content of the subpoenas as referring to "alleged" wrongdoing, (D.I. 1 at ¶ 135), not to any acknowledgment that misconduct had actually occurred at Vitas. Courts have noted that the receipt of such a subpoena under these circumstances is certainly something to "be taken into consideration along with [a plaintiff's] other red flag allegations," but do not on their own "suggest that a board was aware of corporate misconduct—they suggest only that the board was aware that the company was under investigation." *Johnson & Johnson*, 865 F. Supp. 2d at 566; *cf. In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 277 (S.D.N.Y. 2014) (citing a Form 10-K signed by director defendants as evidence that the board was aware of problems with internal controls and yet took no action to address them for more than one year, but in a situation where the Form 10-K contained an admission that "a deficiency existed in the internal control over financial reporting"). And there is little other reference in the Complaint to what (if any) follow-up occurred between Chemed and the OIG in the few years after these subpoenas were issued (or what the Board knew about any such follow-up).

The Complaint does go on to reference additional investigative demands made to Vitas a few years later: (1) that in May 2009, Vitas received an administrative subpoena from the DOJ requesting that Vitas deliver documents from 2003 onward regarding Vitas' "Texas programs[,]"; (2) that in August 2009, the OIG requested to review medical records for 59 past and current patients in Vitas' Texas hospice program; and (3) that in February 2010, Vitas received a civil investigative demand from the Texas Attorney General's Office regarding compliance with hospice reimbursements for Medicare and Medicaid. (D.I. 1 at ¶ 136) And the

Complaint also states that, in a February 26, 2010 Form 10-K disclosure signed by Defendants McNamara, Williams, Tucker, Hutton, Grace, Krebs, Lindell, Mrozek, Rice, Saunders, Walsh and Wood, Chemed acknowledged having received these various requests for information. (*Id.*) Thus, it can be reasonably inferred that a majority of the Director Defendants were aware of those requests at least as of early 2010.

Therefore, it is fair to conclude that as of early 2010, more than half of the Director Defendants were aware of multiple regulatory inquiries into Vitas' Texas-based hospice programs, which came years after a 2005 OIG inquiry as to this general subject matter area. But with little more in the Complaint as to what discussion the Board had about these inquiries, or how it did (or did not) address them, it is difficult to infer much more. In and of itself, the fact that these Form 10-Ks reported on the ongoing investigations is not sufficient to draw the inference that a majority of the Board had actual knowledge of underlying wrongful conduct. Nor is it sufficient to infer that the Board knew that any failure to take action in light of the investigative demands would amount to a breach of the Board's fiduciary duties. *Cf. Intel*, 621 F. Supp. 2d at 174 (finding that the allegation that director defendants signed Form 10-Ks reporting on certain investigations was insufficient to allow the inference that the directors had constructive knowledge that a failure to respond to these "'red flags'" would breach their fiduciary duties); *In re ITT Corp. Derivative Litig.*, 588 F. Supp. 2d 502, 513 (S.D.N.Y. 2008) (finding that allegations that a board was aware of a government investigation—which included a search warrant being executed at the company facility—and a consent decree entered into with the government were sufficient to put the directors on notices as to "possible misconduct" at the company, but that without any information as to the individual directors' responses, such

allegations did not excuse demand).

Next, the Complaint notes that the four previously-referenced *qui tam* actions were filed against Chemed, with the earliest being filed in August 2007 (*Spottiswood*), and the remaining three filed in August 2008 (*Urick*), January 2009 (*Rehfeldt*), and January 2012 (*Gonzales*), respectively. (D.I. 1 at ¶¶ 82-98) The *Spottiswood* Complaint included reference to approximately 15 detailed, first-hand accounts of situations in which, at least according to the complainant, Vitas was submitting false claims to Medicare for Illinois-based hospice services in 2001 and 2002. (*Id.* at ¶¶ 82-83)[28] The *Urick* Complaint includes similar allegations as to 19 Vitas patients served in and around San Antonio from 2006 through 2008; these include allegations that Vitas "'forced'" crisis care on certain patients and wrongly backdated certain hospice records. (*Id.* at ¶¶ 84-90) The *Rehfeldt* Complaint and the *Gonzales* Complaint detail additional instances of asserted fraud in Vitas crisis care admissions in San Antonio and Los Angeles, respectively, occurring roughly in the time period 2006 through 2011. (*Id.* at ¶¶ 91-98) These fraudulent admissions were said to be directed by high-level Vitas employees in these offices, and the *Gonzales* Complaint contained details regarding 34 individual patients who were asserted to have been falsely certified or re-certified as qualifying for Medicare hospice benefits. (*Id.* at ¶ 98)

To be sure, these four *qui tam* complaints contained only allegations of wrongdoing—allegations that may or may not later go on to be substantiated. *Johnson &*

---

[28]     These examples from the 2001-2002 time period pre-date Chemed's acquisition of Vitas (and also pre-date the relevant period of wrongdoing alleged by the Complaint) by at least two years. But the Complaint asserts that the allegations "should have placed Defendants on notice (at least as of 2007 when the case was filed) that Vitas employees were enrolling ineligible patients into the Company's hospice care programs." (D.I. 1 at ¶ 83)

*Johnson*, 865 F. Supp. 2d at 567 ("[K]nowledge of unsubstantiated *qui tam* allegations, on their own, do not suggest that the Board was aware of continued corporate misconduct."). And allegations in any one complaint (particularly the *Spottiswood* Complaint, which contained allegations predating by two years Chemed's acquisition of Vitas), might reasonably be discounted as weak indicators of a real or company-wide problem. But the Court agrees with Plaintiffs that were it sufficiently clear that a majority of the Board was aware of the allegations in all of these *qui tam* complaints in or around the time they were filed—allegations that spanned years and related to activity at various Vitas outposts—this would at least strengthen Plaintiffs' argument regarding demand futility.

But what evidence is there that the Board actually knew of the substance of these four *qui tam* complaints, and when they knew it? Plaintiffs' Complaint does not plead facts suggesting that *any* Director Defendant knew of any of the *qui tam* complaints or their contents until at least April 2011 (and in some cases, long after). What can reasonably be inferred is as follows:

- Regarding the *Rehfeldt* Complaint, the instant Complaint cites a Form 10-Q disclosing Chemed's receipt of "a copy of a *qui tam* complaint filed under seal" in April 2011. (D.I. 1 at ¶ 137 (referencing an April 29, 2011 Form 10-Q)). Chemed later acknowledged that this was the *Rehfeldt* Complaint.[29]

- As for the *Urick* Complaint, Plaintiffs pleaded facts indicating that Chemed first received a partially unsealed version of it in June 2011, and that the entire complaint was

---

[29] The April 29, 2011 Form 10-Q states that this particular *qui tam* complaint was filed in the "U.S. District Court for the Northern District of Texas[.]" Chemed Corp., Quarterly Report (Form 10-Q), 10 (Apr. 29, 2011). A later Chemed Form 10-Q, filed in August 2012, confirms that this *qui tam* complaint was in fact the *Rehfeldt* Complaint. *See* Chemed. Corp., Quarterly Report (Form 10-Q), 11 (Aug. 2, 2012) (also noting that the *Rehfeldt* Complaint had been unsealed in November 2011 and describing allegations contained therein).

unsealed in June 2012.[30]

- With respect to the *Spottiswood* Complaint, although Plaintiffs assert at one point that the Director Defendants should have been on notice of the wrongdoing detailed therein "at least as of 2007 when [that] case was filed,]" (*id.* at ¶ 83), the instant Complaint does not plead any facts suggesting that Chemed even knew of the action before June 2011.[31] Perhaps more significantly, the version of the *Spottiswood* Complaint that is described in Plaintiffs' Complaint is the amended *Spottiswood* Complaint—not the original version of the *Spottiswood* Complaint that Chemed received in June 2011. The original version of the *Spottiswood* Complaint was far less detailed in its allegations than is the amended complaint.[32]

- Lastly, as for the *Gonzales* Complaint, it too was sealed as of the time of its filing, and was not unsealed until April 4, 2013 (approximately seven months before the instant

---

[30]     Chemed's Form 10-Q from August 5, 2011 first discloses Chemed's receipt "[i]n June 2011" of a "partially unsealed . . . qui tam complaint filed under seal in U.S. District Court for the Western District of Texas." Chemed Corp., Quarterly Report (Form 10-Q), 11 (Aug. 5, 2011). In a subsequent Form 10-Q filed on November 2, 2012, Chemed: (1) referenced the *Urick* Complaint by name; (2) confirmed that it had received a partially unsealed version of the *Urick* Complaint in June 2011; (3) described the contents of that complaint; and (4) stated that the Complaint had been unsealed in June 2012. *See* Chemed Corp., Quarterly Report (Form 10-Q), 12 (Nov. 2, 2012); *see also* (D.I. 1 at ¶ 137).

[31]     The Chemed November 2, 2012 Form 10-Q confirms that Chemed received a "partially unsealed" version of the *Spottiswood* Complaint in June 2011. *See* Chemed Corp., Quarterly Report (Form 10-Q), 12 (Nov. 2, 2012). This Form 10-Q indicates that the *Spottiswood* Complaint was unsealed in April 2012, and further sets out some of the allegations therein. *Id.*

[32]     The amended complaint in the *Spottiswood* action—the version cited in the instant Complaint here—was not filed until November 12, 2012, and was not served upon counsel for Defendants until that same day. (*Spottiswood ex. rel. United States v. Chemed Corp.*, No. 1:07-cv-04566 (N.D. Ill.), D.I. 36) In contrast, the partially unsealed *Spottiswood* Complaint that Chemed received in June 2011 was the original *Spottiswood* Complaint. (*Id.*, D.I. 1) The amended *Spottiswood* Complaint describes 11 more instances of billing misconduct than what was set out in the original complaint, (*compare id.* at ¶ 29 *with* D.I. 14, ex. 1 at ¶ 65), and explicitly details which aspect of each instance was alleged to be in violation of applicable Medicare and Medicaid requirements, (D.I. 14, ex. 1 at ¶ 66).

Complaint was filed). (*Id.* at ¶ 95) The instant Complaint
contains no indication as to whether Chemed ever received
the *Gonzales* Complaint.

Moreover, even if Chemed can be reasonably inferred to have received notice of some

portions of certain of these four *qui tam* complaints beginning in 2011, the only Director

Defendant clearly implicated in such knowledge is Defendant McNamara. He is the only

Director Defendant to have signed the various Form 10-Qs setting out Chemed's receipt of

certain of these various complaints. (*Id.* at ¶ 137) The instant Complaint is otherwise silent as to

when or whether other Board members ever learned of the existence of these *qui tam* complaints

or their contents. *See Johnson & Johnson*, 865 F. Supp. 2d at 568 (concluding that, where

plaintiff's allegations did not indicate that the board received copies of certain *qui tam*

complaints alleging corporate wrongdoing, even where the existence of the complaints was

reported in a company Form 10-K, the court could not conclude that the board knew "anything

about the nature of the claims asserted" in the *qui tam* complaints); *cf. In re Allergan, Inc.*, No.

SACV 10-01352 DOC, 2011 WL 1429626, at *4 (C.D. Cal. Apr. 12, 2011) ("Plaintiffs fail to

allege which, if any, Director Defendants actually received notice of Botox's alleged illegal off-

label marketing through the letters from the FDA[.]").

Next, the Complaint alleges that on May 2, 2013, after additional OIG subpoenas had

issued, the government filed the DOJ Action and intervened in the *Spottiswood, Urick* and

*Gonzales* Actions. (D.I. 1 at ¶ 99) The allegations in the DOJ Action are similar to those in the

four *qui tam* complaints and are wide-ranging; in various ways, the DOJ alleges that Chemed and

Vitas knowingly submitted or caused to be submitted false claims to Medicare for crisis care

services not necessary or not actually provided. (*Id.* at ¶ 100) The DOJ Action Complaint

includes, *inter alia*, examples of Vitas management assertedly pressuring lower-level employees to increase the number of crisis care claims submitted to Medicare, or of Vitas employees billing Medicare for crisis care when it was clear that the patient in question did not require it. (*Id.* at ¶¶ 101-110) It describes 14 assertedly false claims submitted by Vitas for patients in seven states. (*Id.* at ¶ 110)

The fact that the federal government intervened in certain of the above-referenced *qui tam* complaints and filed this 2013 suit was surely "significant[.]" *Johnson & Johnson*, 865 F. Supp. 2d at 567-68. The additional allegations in the DOJ Action Complaint, coupled with the effect of the government's intervention, would have to have been disconcerting to a Chemed Board member. *But see Saginaw Police & Fire Pension Fund v. Hewlett-Packard Co.*, No. 5:10-CV-4720 EJD, 2012 WL 967063, at *7 (N.D. Cal. Mar. 21, 2012) ("While Plaintiff claims that as of 2007 the Board knew of violations because of the DOJ litigation [in which the government filed a complaint intervening in *qui tam* actions against defendants] . . . [t]he fact that [the company] was named as a defendant in the DOJ litigation or was the subject of FCPA investigations is not enough to conclude that the Director Defendants acted improperly and face a substantial risk of liability.") (citing Delaware law).

But again, when did the Board know of the filing of the DOJ Action and the contents of the DOJ Action Complaint? The DOJ Action was filed only six months prior to the filing of the instant Complaint. *Cf. Johnson & Johnson*, 865 F. Supp. 2d at 568 (determining that the court cannot infer that directors consciously chose not to act on allegations set out in *qui tam* complaints in which the federal government later intervened, where there was only a three-month gap between government intervention and the filing of the instant suit). And there is no

statement or allegation in the Complaint as to when any Board member had knowledge of the DOJ Action or what the Board did (or did not do) in response. Indeed, in the section of the Complaint focused on the Director Defendants' knowledge of wrongdoing at Vitas, the DOJ Action is not mentioned at all. (D.I. 1 at ¶¶ 131-42) Thus, here the Complaint leaves the reader having to speculate as to when the Board knew what with regard to this serious development, and what is said to have been wanting about its response to the DOJ Action.

Ultimately, to too great a degree, Plaintiffs' approach here amounts to providing a "catalog" of ongoing investigations or lawsuits regarding Vitas' alleged wrongdoing, and then "assert[ing] that the thickness of the catalog demonstrates" that the Board must have known of the underlying acts referred to therein and now faces substantially liability. *Intel*, 621 F. Supp. 2d at 175. Such a tactic, however, is not sufficient under the law. *Id.* That is even more the case where, as here, the allegations as to whether a majority of the Board even knew of each of the parts of that "catalog" are often wanting.

### 4. The Collective Weight of Plaintiffs' Allegations

Taken together, Plaintiffs' allegations and the reasonable inferences drawn therefrom suggest that a majority of the Board knew by mid-2006 of a fairly wide-ranging OIG investigation of Vitas's billing practices. They also suggest that by early 2010, a majority of the Board knew of an apparently more focused investigation of Vitas' Texas-based hospice programs.

Beyond that, undue speculation is required. The Complaint surely pleads facts suggesting that, during the relevant period: (1) billing misconduct was occurring at various Vitas outposts; (2) Vitas was a statistical outlier in these years as to crisis care admissions; and (3) Vitas was the

subject of a number of complaints alleging misconduct in this area. But it fails to allege with particularity that a majority of the Board had knowledge of these facts, sufficiently in advance of the time when demand was required. Nor does it allege with particularity facts regarding what, if anything, the entire Board discussed or did as to these subjects.

One might guess at the answers to these latter questions—as to whether some or all of the Director Defendants must have had certain knowledge, or when they acquired such knowledge, or what they may or may not have done about such facts if they did know about them. But Rule 23.1's requirement for particularization in pleading is supposed to eliminate the need for such guesswork. And Plaintiffs' pleading does not meet or exceed the Rule's requirements in these regards.

In light of all of this, Plaintiffs' allegations do not support the reasonable inference that the Board disregarded actual knowledge about improper billing by Vitas, or that they knew that a failure to respond would be a breach of their fiduciary duties. *Woods*, 953 A.2d at 141 ("[A] plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally improper.") (citation omitted); *Intel*, 621 F. Supp. 2d at 174 (same).

### b. Red Flags/Should Have Known

Plaintiffs also argue that even if the above-referenced pleaded facts are insufficient to demonstrate that the Board actually knew of the Vitas misconduct at issue, they at least amounted to visible "red flags" sufficient to give rise to a *Caremark* claim. (D.I. 16 at 16-18) That is, Plaintiffs assert that the Board "wholly ignored" what the previously-referenced "lawsuits, investigations, industry statistics, internal compliance reports" and other information were telling

45

them—that Vitas was engaging in a scheme to defraud the government. (*Id.* at 17)

Here, the Court agrees with Defendants that "Plaintiff[s']'red flags' theory merely rehashes the same arguments that Plaintiff[s] used to try to show actual Board knowledge of wrongdoing." (D.I. 18 at 9) Thus, it too "fails to establish that any director faces a substantial likelihood of personal liability" for the same reasons. (*Id.*) That is, just as the lack of specificity in the Complaint fails to sufficiently indicate that these Defendants *knew* about the alleged misconduct at issue, it also undermines Plaintiffs' ability to sufficiently plead that the Board was *aware of red flags* that should have put them on notice about that same misconduct.

### c.    Plaintiffs Fail to Plead Liability Due to Committee Membership

Lastly, the Court addresses Plaintiffs' assertion that in light of their longtime service on Chemed's Audit Committee since at least 2008, and that due to the presence of "pervasive red flags and violations of law" in that time, Defendants Grace, Krebs, Rice and Saunders face a substantial likelihood of personal liability. (D.I. 16 at 19; *see also* D.I. 1 at ¶¶ 162, 164) The Audit Committee on which these Defendants sit is charged with assisting the Board in monitoring compliance with legal and regulatory requirements, as well as with oversight and review of legal and regulatory matters that could impact Chemed's financial health. (D.I. 1 at ¶¶ 34, 162)

Here, the Court agrees with Defendants that, pursuant to well-settled Delaware law, "an allegation that the underlying cause of a corporation trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem[.]" *Baker*, 62 A.3d at 17 (citing cases); *see also Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008). Plaintiffs make generalized allegations about the role

46

of the Audit Committee, without citing to specific information presented to that Committee or to specific knowledge held by these participating directors. (D.I. 1 at ¶¶ 162-63) Above, the Court has otherwise concluded that the allegations as to all Director Defendants do not support a finding of demand futility. And so, pursuant to Delaware law, nothing about the bare fact that these four members served on the Audit Committee for a significant portion of the time period at issue would alter the Court's conclusion.

## IV.    CONCLUSION

The Court recommends that Defendants' Motion be GRANTED with prejudice pursuant to Rule 12(b)(6) as to Count I's allegations of breaches of the duty of care.

The Court also recommends that Defendants' Motion be GRANTED pursuant to Rule 23.1 with regard to Plaintiffs' allegations in Count I of breaches of the duty of loyalty. For the reasons set out above, Plaintiffs have failed to meet Rule 23.1's requirements that they plead particularized facts indicating that at least half of the Board faced a substantial likelihood of liability with regard to such a claim. *Intel*, 621 F. Supp. 2d at 174. As a result, Plaintiffs have failed to sufficiently allege that any demand as to that claim would have been futile. In light of this recommendation, the Court need not reach Defendants' alternative argument for dismissal of this claim premised upon Rule 12(b)(6). *See New Jersey Bldg. Laborers Pension Fund v. Ball*, Civil Action No. 11-1153-LPS-SRF, 2014 WL 1018210, at *2 n.3 (D. Del. Mar. 13, 2014); *Freedman v. Redstone*, Civ. No. 12-1052-SLR, 2013 WL 3753426, at *10 (D. Del. July 16, 2013); *Abrams v. Wainscott*, Civil Action No. 1-297-RGA, 2012 WL 3614638, at *4 (D. Del. Aug. 21, 2012).

Plaintiffs, in a footnote, also requested leave to amend should the Court grant

47

Defendants' Motion. (D.I. 13 at 20 n.21) Defendants opposed that request. (D.I. 18 at 10 n.10 (citing to *King*, 409 F. App'x at 539)) Although Plaintiffs' request is admittedly cursory, this is the first instance in which a court has found these allegations as to a breach of the duty of loyalty to be insufficient, and where Plaintiffs would now be attempting to overcome those identified deficiencies. As it is within the Court's discretion to grant leave to amend, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), because amendment should be allowed "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), and because the Court is not absolutely certain at this stage that amendment would cause undue prejudice or would be futile, the Court believes that allowing one opportunity for leave to amend is appropriate. *See, e.g., Abrams*, 2012 WL 3614638, at *1, *4 (dismissing plaintiff's claims pursuant to Rule 23.1, but granting plaintiff leave to amend, despite the fact that plaintiff had already filed an amended complaint); *Johnson & Johnson*, 865 F. Supp. 2d at 581; *In re ITT Corp.*, 588 F. Supp. 2d at 515. Thus, the Court recommends that if the District Court affirms this Report and Recommendation, that: (1) Plaintiffs be given fourteen (14) days from the date of affirmance to file a further amended complaint that addresses the deficiencies cited herein with regard to the duty of loyalty claim; and (2) failure to do so shall give rise to dismissal with prejudice.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006)*; Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: December 23, 2015

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE