## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE CHEMED CORPORATION, | ) | Civil Action No. 13-1854-LPS-CJB |
| SHAREHOLDER DERIVATIVE | ) | Consolidated Action |
| LITIGATION | ) | |
|  | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court in this consolidated shareholder derivative action is the renewed motion ("Motion") of Defendants Kevin J. McNamara, Patrick P. Grace, Thomas C. Hutton, Walter L. Krebs, Andrea R. Lindell, Thomas P. Rice, Donald E. Saunders, Arthur V. Tucker, Jr., George J. Walsh III, Frank E. Wood, David P. Williams, Ernest J. Mrozek, and Nominal Defendant Chemed Corporation ("Chemed" or the "Company") seeking to dismiss, pursuant to Federal Rules of Civil Procedure 23.1 and 12(b)(6), the Corrected Amended Verified Shareholder Derivative Complaint (the "Amended Complaint") filed by Plaintiff Michael Kvint ("Plaintiff" or "Mr. Kvint").[1]  (D.I. 88)  For the reasons that follow, the Court recommends that Defendants' Motion be GRANTED with prejudice.

## I.   BACKGROUND

### A.   The Parties

Mr. Kvint is a current owner of Chemed common stock.  (D.I. 81 at ¶ 15)  He has continuously owned his shares since August 2, 2007 and "will hold Chemed shares continuously throughout the pendency of this action."  (*Id.*)

---

[1]     As is further discussed below, the Court previously consolidated two actions with different plaintiffs and appointed one of those plaintiffs, KBC Asset Management N.V., as lead plaintiff.  (D.I. 40, 41)  Subsequently, Mr. Kvint sought to intervene in the consolidated action because "'KBC [had] inadvertently sold its Chemed stock and, as a result, lost standing to maintain th[e] action.'"  (D.I. 74 at 6 (quoting D.I. 61 at 1))  The Court ultimately allowed Mr. Kvint to intervene and he is now the only named plaintiff in the consolidated action.  (*Id.* at 25; D.I. 79)

Nominal Defendant Chemed is a publicly traded company that is incorporated in Delaware and maintains its principal place of business in Cincinnati, Ohio. (*Id.* at ¶ 16) Chemed, through its affiliated subsidiaries (collectively referred to herein as "Vitas," and together with Chemed, "the Company"), provides end-of-life hospice care services under the Vitas Innovative Hospice® brand; Vitas serves its patients through 44 hospice programs in 15 states and in the District of Columbia. (*Id.* at ¶¶ 1, 16)

The remaining Defendants are current and former members of Chemed's Board of Directors (the "Board") and/or executives at Chemed (collectively, the "Individual Defendants").[2] The background of the various Individual Defendants is set forth more fully in the Court's Report and Recommendation regarding a previous motion to dismiss filed in this case (the "first MTD R&R"). (*See* D.I. 46 at 2-4) At the time the Amended Complaint was filed, Chemed's Board was composed of 10 directors. (D.I. 81 at ¶ 185; D.I. 92 at 11 n.10) For the purposes of the instant Motion, Plaintiff specifies that only five of these directors are relevant. These are five directors that either served on the Board's Audit Committee during the relevant times when it is alleged that misconduct occurred, or who attended meetings of the Audit Committee during that time: Defendants Grace, Rice, Saunders, Walsh and McNamara (the "Audit Committee Defendants"). (*See* D.I. 103 (hereafter "Tr.") at 49-51 ("So we have these five [directors]. And these are really the five I want to focus on for purposes of my argument because

---

[2]      On September 7, 2017, the parties stipulated, *inter alia*, to the dismissal with prejudice of previously-named Individual Defendants O'Toole and Gemunder. (D.I. 87 at 2) The District Court ordered the dismissal on September 13, 2017. To the extent the Court herein makes reference to the "Defendants" or "Individual Defendants" who were named in the original Complaint in this case, it should be understood that Mr. O'Toole and Mr. Gemunder were also a part of the group of then-named Individual Defendants.

all of the [Delaware General Corporation Law Section] 220 documents really go to these five people."); *see also* D.I. 92 at 11 & n.10)

With regard to these five Audit Committee Defendants, three of them actually served on the Audit Committee during the relevant time period at issue here. Defendants Grace and Saunders served on the Audit Committee starting in May 1998 (with Saunders serving as the committee's Chairman since May 2002), (D.I. 81 at ¶¶ 21, 26), and Defendant Rice served on the Audit Committee since May 2009, (*id.* at ¶ 25; *see also* D.I. 92 at 11 & n.10). The other two directors were not members of the Audit Committee during the relevant time period; however they both served as directors during that time period *and* are alleged to have attended the relevant Audit Committee meetings. Defendant Walsh attended Audit Committee meetings from 2009 or 2010 until 2013. (*See* D.I. 81 at ¶ 28 ("According to documents produced in response to the [Section] 220 [r]equest, Walsh attended Audit Committee meetings from 2009 to 2013."); *but see id.* at ¶ 37; D.I. 92 at 11 n.10 ("Defendant Walsh . . . attended Audit Committee meetings from at least 2010 to 2013."))[3] Defendant McNamara attended every Audit Committee meeting from 2007 to 2013. (D.I. 81 at ¶¶ 37, 147; *see also* D.I. 92 at 11 n.10 ("McNamara attended every Audit Committee meeting from 2007 until the filing of the DOJ Action."))

B.    **Procedural History**

The instant case has a very lengthy procedural history. The Court will set out the relevant portions of that history here.

On November 6, 2013, without first making a demand on the Board, former Lead

---

[3]    Defendant Walsh actually served on the Audit Committee from May 1997 to May 1998, but this is not a time period in which the alleged misconduct is said to have occurred. (D.I. 81 at ¶ 28)

Plaintiff KBC Asset Management N.V. ("KBC") filed this shareholder derivative action in this Court. (D.I. 1) In its Complaint (the "KBC Complaint"), KBC alleged that the Individual Defendants breached the fiduciary duties of good faith, loyalty, and due care in managing Chemed's affairs relating to certain alleged misconduct that had taken place at Vitas. (*Id.* at ¶¶ 169-71) In lieu of an Answer, on February 12, 2014, Defendants filed a motion to dismiss for failure to state a claim. (D.I. 12) On September 29, 2014, Chief Judge Leonard P. Stark denied that motion to dismiss without prejudice in light of a related case that had been transferred to this Court from the United States District Court for the Southern District of Ohio (the "*North* action"). (D.I. 29) Chief Judge Stark also ordered that both actions (KBC's action and the *North* action) be referred to the Court for all purposes, up to and including resolution of case-dispositive motions. (*Id.*)

KBC then moved to consolidate the *North* Action with KBC's action, and asked the Court to appoint it as Lead Plaintiff and to appoint its outside and Delaware counsel as Lead and Liaison Counsel, respectively. (D.I. 30) After oral argument on the contested consolidation motion, on February 2, 2015, the Court issued a Memorandum Opinion and related Order, in which it, *inter alia*: (1) ordered the two actions consolidated for all purposes; (2) appointed KBC as Lead Plaintiff and its counsel as Lead Counsel and Liaison Counsel in the consolidated action; and (3) allowed Lead Counsel 30 days to file a consolidated complaint or to designate one of the pending complaints as the operative complaint in the case. (D.I. 40, 41) Subsequently, the parties submitted a joint stipulation, asking the Court to, *inter alia*: (1) designate the KBC Complaint as the sole, operative complaint; (2) deem Defendants' motion to dismiss to have been re-filed and/or re-submitted; (3) allow the submission of supplemental briefing on that motion;

4

and (4) take the motion under advisement and decide the motion upon the previously-filed briefs and supporting documents, as well as the new supplemental briefing. (D.I. 42)

After supplemental briefing on the motion was completed, (D.I. 43-44), on December 23, 2015, the Court issued the first MTD R&R, (D.I. 46). Therein, the Court recommended: (1) dismissal with prejudice as to Plaintiffs' allegations of breaches of the duty of care; (2) dismissal without prejudice of Plaintiffs' duty of loyalty claims; (3) that Plaintiffs be permitted 14 days from the date of the District Court's affirmance to file an amended complaint addressing deficiencies cited in the first MTD R&R relating to the duty of loyalty claims; and (4) dismissal with prejudice of the duty of loyalty claim upon failure to amend. (*Id.* at 47-48)

On May 12, 2016, via a Memorandum Order, the District Court adopted the first MTD R&R. (D.I. 53) In doing so, it dismissed the KBC Complaint, and further ordered that: "(1) Plaintiff shall, if it chooses, file within thirty (30) days of the date of this Order an amended complaint that addresses the deficiencies of its duty of loyalty claim . . . and (2) failure to do so shall result in dismissal with prejudice." (*Id.* at 3)

On June 13, 2016—the deadline for KBC to file an amended complaint per the District Court's May 12, 2016 Order—Mr. Kvint's counsel filed a letter with the Court indicating that they had "just been advised that KBC will not in fact be filing an amended complaint." (D.I. 55-1 at 1) Mr. Kvint's counsel requested that Mr. Kvint be granted an extension of time to file a motion for leave to file an amended complaint, as well as a motion to substitute himself as plaintiff in place of KBC. (*Id.*) The Court granted Mr. Kvint's request and, on June 30, 2016, Mr. Kvint filed his "Motion for Leave to Substitute Plaintiff and File Amended Complaint[.]" (D.I. 58) The reason Mr. Kvint sought to substitute himself as plaintiff in this action (in place of

5

KBC) was that KBC had inadvertently sold its Chemed stock and, as a result, had lost standing to maintain the suit. (D.I. 61 at 1) The Court thereafter held oral argument on Mr. Kvint's motion, and ordered supplemental briefing after oral argument. (D.I. 67) On April 25, 2017, the Court issued a Report and Recommendation recommending that the District Court grant Mr. Kvint's motion to the extent that Mr. Kvint sought to intervene in the action. (D.I. 74 at 28)[4] The Court also recommended that Mr. Kvint be allowed to file an amended complaint asserting a duty of loyalty claim. (*Id.*)[5] The District Court adopted this Report and Recommendation in full on May 16, 2017. (D.I. 79)

Mr. Kvint filed an amended complaint on May 2, 2017, (D.I. 75), and thereafter filed a "corrected" version of that complaint, which is the now-operative Amended Complaint, (D.I. 81). On September 29, 2017, Defendants then filed the instant Motion seeking to dismiss the Amended Complaint. (D.I. 88) Initial briefing was completed on December 29, 2017. (D.I. 96) Upon the request of Mr. Kvint, (D.I. 98), oral argument was held on February 28, 2018, (Tr.). Following oral argument, the Court issued an Order permitting supplemental briefing that: (1) allowed Mr. Kvint to explain his view as to whether the Court could and should take judicial notice of certain materials relating to a federal securities fraud class action in the United States

---

[4]    Although Mr. Kvint's motion was styled a motion seeking leave to *substitute* himself as a plaintiff, at oral argument, Mr. Kvint's counsel represented (and Defendants agreed) that Federal Rule of Civil Procedure 24, which relates to intervention, was the proper rule under which to analyze the motion. (D.I. 74 at 1 n.1) The Court thus treated the relevant portion of the motion as a motion to intervene as of right. (*Id.* at 28)

[5]    With his motion, Mr. Kvint had also sought to add two new federal securities claims to his proposed amended complaint. (D.I. 58-1 at ¶¶ 226-33) The Court recommended denial of the motion to the extent it sought to add those claims and related factual allegations. (D.I. 74 at 28)

District Court for the Southern District of Ohio; and (2) allowed Defendants the ability to

respond to Mr. Kvint's argument regarding judicial notice, and to comment on two cases that Mr.

Kvint's counsel raised for the first time during oral argument. This supplemental briefing was

complete as of March 12, 2018. (D.I. 102)

### C.    Factual Background[6]

The Court's focus with regard to the instant Motion is necessarily on the allegations in

Mr. Kvint's Amended Complaint. However, because there is significant overlap between the

factual allegations in the prior KBC Complaint and those in the Amended Complaint, and

because the Court has previously found that the allegations regarding the duty of loyalty claim in

the KBC Complaint were deficient, the content of the KBC Complaint is also relevant here. Put

differently, it will be helpful to set out what allegations in the Amended Complaint are new (i.e.,

were not found in the KBC Complaint) as a way of helping to articulate whether the Amended

Complaint sufficiently pleads a duty of loyalty claim. Therefore, this "Factual Background"

section will delineate the factual allegations: (1) common to both the KBC Complaint and

---

[6]        The following facts are taken primarily from the Amended Complaint, but also occasionally from government manuals and public documents, including those filed with the United States Securities and Exchange Commission ("SEC"). Generally, courts faced with a motion to dismiss must limit their consideration solely to the complaint's allegations, attached exhibits, documents integral to or explicitly relied upon in the complaint, and matters of public record. *See U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *see also In re NAHC, Inc. Secs. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (finding that a court may consider, *inter alia*, the content of SEC filings relied upon in a complaint); *Seinfeld v. O'Connor*, 774 F. Supp. 2d 660, 666 n.3 (D. Del. 2011) (same). To the extent that the Court herein considers facts contained in certain documents other than the Amended Complaint, it does so because those documents were either: (1) explicitly relied upon in the Amended Complaint; (2) otherwise integral to the Amended Complaint and/or (3) public documents that have been filed with the SEC.

Amended Complaint (collectively, the "Complaints"), and (2) that are new, and are contained only in the Amended Complaint. The latter "new" allegations are mainly drawn from documents that Mr. Kvint obtained from Chemed pursuant to a books and records request made via Section 220 of the Delaware General Corporation Law (the "Section 220" documents). Because the factual allegations not drawn from the Section 220 documents are nearly identical in both Complaints, the Court will cite only to the Amended Complaint unless otherwise indicated.[7]

### 1.    Facts Common to the KBC Complaint and Amended Complaint

### a.    Eligibility and Billing Under Medicare

This action relates to Chemed subsidiary Vitas' compliance with the eligibility and billing requirements of the Health Insurance for the Aged and Disabled Program, commonly known as the Medicare Program ("Medicare").[8] (D.I. 81 at ¶¶ 11, 39) Vitas operates hospice programs providing end-of-life care services, including routine home care, general inpatient care, crisis care, and respite care. (*Id.* at ¶¶ 16, 78) Medicare Part A establishes an insurance program providing assistance with costs related to hospital, related post-hospital, home health services, and hospice care[9] for qualified individuals. (*Id.* at ¶ 40); *see also* 42 U.S.C. § 1395c.

Hospice care is generally divided into four types of care, each associated with a different rate of Medicare payment. 42 C.F.R. §§ 418.302; 418.306; Medicare Claims Processing Manual,

---

[7]    The Court also incorporates by reference the first MTD R&R. (D.I. 46)

[8]    The instant action also relates to Vitas' compliance with the eligibility and billing requirements for Medicaid, (D.I. 81 at ¶ 11), but only the requirements for Medicare are described in detail in the Amended Complaint, (*id.* at ¶¶ 39-64).

[9]    Hospice care is a comprehensive set of services identified and coordinated by an interdisciplinary group to provide for the physical, psychosocial, spiritual, and emotional needs of terminally ill patients. 42 C.F.R. § 418.3.

Ch. 11, § 30.1. Continuous home care, also known as "crisis care," is used for a patient who elects to receive hospice care at home or in a long-term facility (such as a nursing home); crisis care demands the highest daily rate of Medicare payment. Medicare Claims Processing Manual, Ch. 11, § 30.2; (D.I. 81 at ¶ 45). To bill Medicare for crisis care, the patient must actually be in a period of crisis (that is, a period requiring continuous care which is predominantly nursing care to achieve palliation or management of acute medical symptoms) and cannot be in an inpatient facility (e.g., a hospice inpatient unit or hospital). 42 C.F.R. §§ 418.204(a), 418.302(b)(2); Medicare Claims Processing Manual, Ch. 11, § 30.1. Additionally, for the care to be eligible for Medicare billing, the hospice must provide this care for a minimum of eight hours during a 24-hour day (otherwise the services are considered routine home care). (D.I. 81 at ¶ 47)

### b.    Plaintiff's Claim

Both Complaints contain allegations that the Board "cause[d] and allow[ed] [Chemed, through its Vitas subsidiaries] to engage in nearly a decade of systematic illegal billing . . . in disregard of Medicare guidelines and patients' medical needs." (*Id.* at ¶ 1) This misconduct, Plaintiff asserts, was at the core of Chemed's business strategy and deeply embedded in its regular practices. (*Id.* at ¶ 2; *see also id.* at ¶ 8)

Specifically, it is alleged that "since at least 2004" and through at least 2013, Chemed, through Vitas, submitted or caused the submission of fraudulent claims to Medicare in violation of the False Claims Act ("FCA"),[10] other federal statutes, and state laws. (*Id.* at ¶¶ 1, 8, 65, 68

---

[10]    The FCA imposes liability for a person who, *inter alia*: (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (3) "conspires to commit a violation of [(1) or (2)]"; or (4) "knowingly makes . . . or causes to be made [] a false record or statement material to an obligation to pay or transmit

(citing 18 U.S.C. §§ 286-87, 1341, 1343, & 42 U.S.C. §§ 1320a-7b(a)) & 69; D.I. 75-2, ex. A; *see also* D.I. 92 at 1)  Plaintiff asserts, *inter alia*, that the fraudulent submissions stem from Vitas' enrollment and billing of Medicare for patients who:  (1) received crisis care services but who were not actually eligible for such care because they were not terminally ill; (2) received crisis care services that were not consistent with Medicare requirements; and (3) were in hospice care but were not, in fact, in a period of crisis.  (D.I. 81 at ¶¶ 1, 118)

The Amended Complaint contains one Count (Count I):  an allegation that the Individual Defendants breached their fiduciary duties to Chemed and its shareholders.  (*Id.* at ¶¶ 202-04) Plaintiff asserts that the Individual Defendants breached the fiduciary duties of good faith, loyalty, due care,[11] and candor[12] by, "*inter alia*, approving, authorizing, acquiescing in, and/or

---

money" to the Government or "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money" to the Government.  31 U.S.C. § 3729(a); (D.I. 81 at ¶ 66).

[11]     The duty of care claim was previously dismissed with prejudice, (*see* D.I. 46 at 23, 47; D.I. 53 at ¶ 1; D.I. 87 at ¶ 4), and the parties agree that it need not be addressed pursuant to this earlier dismissal, (D.I. 87 at ¶ 4).

[12]     The duty of candor claim is a new addition in the Amended Complaint. Defendants take issue with its inclusion "because it exceeds the limited repleading allowed by the Court's May 12, 2016 Order."  (D.I. 89 at 18 (citation omitted))  And while the District Court did permit KBC to only file "an amended complaint that addresses the deficiencies of its duty of loyalty claim," (D.I. 53 at ¶ 4), Mr. Kvint argues that he has done just that, "as the 'duty of candor is encompassed within the duty of loyalty[,]'" (D.I. 92 at 18-19 (quoting *In re Seidman*, 37 F.3d 911, 935 n.34 (3d Cir. 1994)); Tr. at 99); *cf. OptimisCorp v. Waite*, C.A. No. 8773-VCP, 2015 WL 5147038, at *72 n.578 (Del. Ch. Aug. 26, 2015) (noting that the duty of candor "can implicate either the duty of care or the duty of loyalty") (citing *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 357-363 (Del. Ch. 2008)).  However, counsel for Mr. Kvint advised the Court at oral argument that "[t]he duty of candor claim is subsumed entirely within the duty of loyalty. . . . [a]nd I would also add [that] if we can't establish duty of loyalty based on everything that we've talked about now, then the duty of candor claim fails."  (Tr. at 99)  In light of this, and in light of its recommendation that the Motion be granted with prejudice, the Court need "not focus on [the duty of candor] distraction in terms of adjudicating" this Motion.  (*Id.*)

willfully turning a blind eye to Chemed's substantial and systematic violation of federal and state law and the Company's submission of thousands of fraudulent claims to Medicare[.]" (*Id.* at ¶ 11; *see also id.* at ¶¶ 202-04)

### c.    Allegations Regarding Additional Relevant Lawsuits, Investigations, and Witness Interviews

The Complaints spell out Vitas' and Chemed's alleged legal violations largely by drawing from the content of other lawsuits and governmental investigations.

For example, the Complaints note that during the relevant period, Chemed and Vitas have been subject to a number of *qui tam* FCA lawsuits. (*Id.* at ¶¶ 88-108) In total, the Complaints quote liberally from complaints in four *qui tam* suits (and incorporate the contents of those *qui tam* complaints by reference): *Spottiswood ex. rel. United States v. Chemed Corp.*, No. 1:07-cv-04566 (N.D. Ill.) ("*Spottiswood*"); *United States & Texas ex rel. Urick v. Vitas HME Solutions, Inc.,* No. 5:08-cv-00663-OLG (W.D. Tex.) ("*Urick*"); *Rehfeldt ex rel. United States & Texas v. Vitas Healthcare Corp.*, No. 3:09-cv-00203-B (N.D. Tex.) ("*Rehfeldt*"); and *United States ex rel. Gonzales v. Vitas Healthcare Corp.*, No. 4:13-cv-0344 (W.D. Mo.) ("*Gonzales*"). (*Id.*) The *qui tam* actions were filed in 2007, 2008, 2009, and 2012, respectively, and detail alleged wrongdoing occurring at Vitas beginning as early as 2001. In these actions, as set out in the Complaints, *qui tam* relators alleged that, *inter alia*, Vitas billed for continuous home care when such care was unnecessary or was not in fact provided to individuals, (*see, e.g., id.* at ¶¶ 88, 92, 101), "'forced'" continuous home care on patients who did not need it, (*see, e.g., id.* at ¶ 93), and engaged in a management-driven scheme to fabricate justifications for the certification and/or re-certification of hospice care for otherwise ineligible patients, (*see, e.g., id.* at ¶¶ 105-06). Aside

11

from the *Rehfeldt* action, which was voluntarily dismissed about six months prior to the filing of this action, (D.I. 89 at 7 n.6; D.I. 90, ex. 5 (order of dismissal in the *Rehfeldt* action dated May 1, 2013)), in early May 2013 the United States Department of Justice ("DOJ") partially intervened in the remainder of the *qui tam* lawsuits "with respect to the allegations that Vitas submitted or caused the submission of false or fraudulent claims for continuous home care and routine home care[,]" (D.I. 81 at ¶¶ 90, 98, 108; *see also* D.I. 89 at 7 n.6; D.I. 92 at 2; Tr. at 56-57).

Additionally, on May 2, 2013, the DOJ filed a civil FCA complaint in *United States v. Vitas Hospice Servs.*, No. 4:13-cv-00449-BCW (W.D. Mo.) (the "DOJ Action"). (D.I. 81 at ¶¶ 110-32) In the complaint ("the DOJ Action Complaint"), which is frequently cited in and incorporated by reference into the Amended Complaint,[13] the government similarly charged that: (1) Chemed and Vitas "knowingly submitted or caused the submission of false claims to Medicare for crisis care services that were not necessary or not actually provided[;]" (2) "Vitas' management set goals for the number of crisis care days that were to be billed to Medicare and pressured staff to increase the numbers of crisis care claims submitted to Medicare, without regard to whether the services were appropriate or were actually being provided[;]" (3) "Chemed and Vitas knowingly submitted or caused the submission of, false claims for patients who were not terminally ill[;]"; and (4) the companies "violated the FCA and misspent tens of millions of taxpayer dollars from the Medicare program." (*Id.* at ¶ 111) The government also alleged that Chemed and Vitas "executives closely monitored the Company's ADC [average daily census] and set aggressive admissions goals for their direct reports[,]" and that "Chemed management

---

[13]     A copy of the First Amended DOJ Action Complaint was submitted as an exhibit to Defendants' motion to dismiss the KBC Complaint. (D.I. 14, ex. 2)

regularly corresponded" with Vitas management about the ADC and growth in admissions, "making focused frequent inquiries if they believed the numbers reported were too low." (*Id.* at ¶ 127 (emphasis omitted))[14]

The Complaints also reference a securities fraud class action lawsuit that was filed against Chemed in 2012.[15] (*Id.* at ¶ 141 n.27) In that action, *In re Chemed Corp. Secs. Litig.*, No. 1:12-

---

[14]     Chemed and Vitas settled the DOJ Action in October 2017, pursuant to an agreement in which, *inter alia*, the companies agreed to pay $75 million. (D.I. 93, ex. A) In a DOJ press release, the settlement was described as the largest amount ever recovered under the FCA from a provider of hospice services. (*Id.* at 1) The companies made no admission of liability in settling the action. (*Id.* at 2) As the settlement came after the filing of the instant suit, the Court cannot consider it as part of the demand futility inquiry. *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 176 n.3 (D. Del. 2009).

[15]     The securities fraud class action is not described in the Amended Complaint in any significant detail. Indeed, the Amended Complaint makes substantive reference to the securities fraud class action only in a footnote on page 62 (where it references certain allegations made in an amended complaint filed in the case) and in paragraph 172 (explaining that the action was settled in 2014). (D.I. 81 at 62 n.27 & ¶ 172) Nevertheless, at oral argument on the Motion, Mr. Kvint's counsel called this class action suit "perhaps the most compelling thing we have [to support our demand futility argument], which we didn't have before[.]" (Tr. at 81-82; *see also id.* at 89 ("The Securities Complaint is every bit as powerful as the four *qui tam* actions, if not more powerful, because it shows much more of a sweeping nation-wide fraudulent scheme.")) When the Court asked Mr. Kvint's counsel why, if the securities fraud class action was such a compelling part of Mr. Kvint's argument, it had not been mentioned in any significant way in the Amended Complaint, Mr. Kvint's counsel interjected that "we actually d[id not] do a very good job of . . . bringing [] the Securities Complaint into our Complaint . . . . We mentioned it in passing." (*Id.* at 85; *see also id.* at 88-89 ("[I]f I was redrafting the Amended Complaint, I certainly would pull everything in from the securities case[.]"))

In order for the Court to consider the content of the amended complaint in the securities fraud class action, the Court would need to take judicial notice of that complaint and the allegations contained therein. (*Id.* at 82, 84-85, 89, 103-104; D.I. 101 at 1-2; D.I. 102 at 2-3) In their supplemental letter, Defendants argue that the Court should decline to do so, noting that Mr. Kvint filed the operative Amended Complaint here five years after the securities fraud class action began and over three years after it settled. (D.I. 102 at 2) Defendants analogize Mr. Kvint's request to one the Court rejected in *Varian Med. Sys., Inc. v. Elekta AB*, Civil Action No. 15-871-LPS, 2016 WL 3748772 (D. Del. July 12, 2016). In *Varian*, the Court declined to take judicial notice of facts drawn from certain SEC filings or state government corporate registration

cv-00028-MRB (S.D. Ohio), the lead plaintiffs alleged that Chemed and its senior management defrauded Chemed's investors by concealing a scheme of fraudulent billing relating to Medicare hospice reimbursement. (*Id.*) That action was settled for $6 million in 2014 "without any admission of fault, liability[,] or wrongdoing." (D.I. 89 at 7 n.6; *see also* D.I. 81 at ¶ 172)

Additionally, the Complaints detail how Chemed and Vitas have been the subject of certain federal and state inquiries or investigations since 2005. (D.I. 81 at ¶¶ 163, 166) The Office of Inspector General ("OIG") for the United States Department of Health and Human Services first subpoenaed Vitas on April 7, 2005 regarding allegations of improper Medicare and Medicaid billing for hospice care. (*Id.* at ¶ 163) Additional OIG subpoenas or requests for Vitas records in this subject matter area came in May 2009, August 2009, June 2012 and September of 2012. (*Id.* at ¶¶ 165-66; *see also* D.I. 75-2, ex. 27) Chemed also received similar Vitas-related subpoenas regarding investigations by the Texas Attorney General's Office in September 2010 and by the Florida Attorney General's Office in 2012. (D.I. 81 at ¶ 166)

Both Complaints include allegations that, at various points from 2005 through 2012,

---

records, when assessing the adequacy of a complaint's allegations. 2016 WL 3748772, at *6-7. But in *Varian*, the plaintiff was asking the Court to find that it had established an element of its indirect patent infringement claims *entirely* by taking judicial notice of certain extra-complaint facts. *Id.* In that circumstance, the Court found that doing so "seems at odds with the idea that the factual basis of a plausible claim should actually be set out *in* a pleading." *Id.* at *7 (emphasis in original). The situation is different here, though. Here, the securities fraud class action is at least referenced in the Amended Complaint. And here, the Court is asked to take judicial notice of allegations made in the securities fraud action's amended complaint only to *augment many other* factual allegations in the Amended Complaint that relate to the same legal issue (i.e., Defendants' knowledge as it relates to demand futility). The Court concludes that it may do so. *See DiCicco v. Willow Grove Bank*, 308 F. Supp. 2d 528, 536 & n.4 (E.D. Pa. 2004) ("In taking judicial notice of the complaint filed in the confession action, the Court does not assume the truth of any of Willow Grove's allegations contained in that complaint. The complaint merely establishes that Woodhaven had notice of alleged wrongdoing by Willow Grove so as to trigger a duty to investigate the claims under the discovery rule.").

14

certain of the *qui tam* complaints, state investigative subpoenas, and OIG subpoenas/record

requests set out above were noted in Chemed's SEC filings, and that these filings, in turn, were

certified and signed by certain of the Individual Defendants.  (*Id.* at ¶¶ 163-66)[16]

### 2.    Allegations Drawn from the Section 220 Documents[17]

In an attempt to remedy the deficiencies in the KBC Complaint that were noted by the

Court in the first MTD R&R, Mr. Kvint included in the Amended Complaint additional

allegations drawn from the Section 220 documents.  (D.I. 81 at 1; D.I. 89 at 2; D.I. 92 at 5 ("The

most significant aspect of the Amended Complaint, . . . and what sets it apart from the [o]riginal

Complaint, is the inclusion of the [Section] 220 [d]ocuments[.]"))  The Section 220 documents

include, *inter alia*, Chemed Board minutes, Audit Committee minutes, and "Board packages[.]"

(D.I. 81 at 1; *see also* D.I. 92 at 5; D.I. 75-2, exs. 1-31)[18]

Mr. Kvint alleges that the Section 220 documents indicate that "attendees at Chemed's

---

[16]    The Complaints also contain other data drawn from Chemed's own annual reports and from the National Hospice and Palliative Care Organization ("NHPCO"), which allegedly demonstrate that Vitas' patients receive more expensive crisis and inpatient care much more often than the national industry average, and that these patients remain in hospice much longer than the national average.  (D.I. 81 at ¶¶ 83-87)

[17]    In addition to new allegations drawn from the Section 220 documents, the Amended Complaint also includes slightly more detail on various state and federal investigations into Vitas' billing practices than was detailed in the KBC Complaint.  (D.I. 81 at ¶ 109)  These details do not appear to be derived from Mr. Kvint's Section 220 request—the only citation for the details is to "Chemed Corporation, Quarterly Report (Form 10-Q), at 11-13 (Sept. 30, 2012)."  (*Id.*)  To the extent these additional details are relevant, they will be discussed below along with the supplemental allegations derived from the Section 220 documents.

[18]    As noted above, Mr. Kvint initially filed an amended complaint, (*see* D.I. 75), but thereafter filed a "corrected" version of that complaint (the document referred to herein as the "Amended Complaint"), (*see* D.I. 81).  The corrected version does not include the exhibits referenced in the originally-filed amended complaint, and so citations are to those exhibits appended to Docket Index Number (or "D.I.") 75.

Audit Committee meetings . . . received regular reports, year-after-year, about the 'OIG Investigations' and other 'material legal matters' related to Plaintiff's allegations, including . . . the *Urick qui tam* action and the federal securities fraud class action." (D.I. 81 at ¶ 4; *see also id.* at ¶¶ 143-48) Specifically, Mr. Kvint relies on memoranda sent to the Audit Committee and Audit Committee minutes regarding Audit Committee meetings from 2007 to 2013; these documents show who was in attendance at the meetings and what topics were discussed. (*Id.* at ¶ 147; *see also* D.I. 75-2, exs. 1-26) Additionally, Plaintiff describes a "'Report to Chemed Audit Committee'" (the "Audit Committee Report" or "report"), which the Audit Committee received on May 20, 2013. This Audit Committee Report (Exhibit 27 to the Amended Complaint) contains a list of "'Regulatory Reviews'" and "'Legal Reviews'" that occurred or were occurring between October 2010 and April 2013. (D.I. 81 at ¶ 151; D.I. 75-2, ex. 27) The "Legal Reviews" list makes reference to, *inter alia*, various OIG investigations, and certain of the *qui tam* actions. (D.I. 81 at ¶ 151; D.I. 75-2, ex. 27)[19]

---

[19]    Mr. Kvint also includes Exhibits 28 and 29, which are February 2009 and May 2009 Internal Audit Department reports to the Audit Committee that discuss technical deficiencies in patient records, such as missing paperwork or late certifications that could cause Medicare to deny payment. (*See* D.I. 81 at ¶¶ 152-59; D.I. 89 at 8; D.I. 92 at 17; Tr. 19-20, 37-38, 42, 60, 102; *see also id.* at 61-62) Additionally, Mr. Kvint attaches Exhibits 30 and 31, which are memoranda concerning the "Patient File Optimization [] Project" that were directed to Defendants McNamara and Williams and former Defendant O'Toole; these memoranda "describe the implementation and internal auditing of a 'financial records specialist process[,]'. . . the purpose of which was to 'significantly reduce the number of claim denials.'" (D.I. 89 at 9; *see also* D.I. 92 at 17; Tr. at 61-62) Counsel for Mr. Kvint admitted at oral argument that these documents discuss "technical" deficiencies and thus have "nothing at all to do with the fraudulent billing" that is at the heart of the Amended Complaint's allegations. (Tr. at 60, 62) Mr. Kvint's counsel acknowledged that these exhibits are at most a "seventh or eighth data point on the back of all the other" allegations in the Amended Complaint and that it would be "pretty weak to say that [these exhibits] go to knowledge of the fraud [at issue]"; indeed, he "concede[d] th[e] point [that they do not]." (*Id.* at 62) In the end, Mr. Kvint's counsel stated that the only reason these exhibits had been cited was to juxtapose the "very specific remedial steps" the

Additional information regarding the content of the Section 220 documents and the allegations relating thereto is discussed in Section III below.

## II.   LEGAL STANDARD

### A.   Rule 23.1

Generally, a corporation's board of directors is tasked with the decision of whether to initiate or pursue a lawsuit on behalf of the corporation.  Del. Code tit. 8, § 141; *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) ("*Citigroup*").  This responsibility flows from the "'cardinal precept'" of Delaware corporate law that "'directors, rather than shareholders, manage the business and affairs of the corporation.'"  *Citigroup*, 964 A.2d at 120 (quoting *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).

Pursuant to Federal Rule of Civil Procedure 23.1, in order to maintain a derivative action on behalf of a corporation in federal court, a shareholder plaintiff's complaint must, *inter alia*, "state with particularity": "(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3); *see*

---

Company took in response to these "technical" issues that were "hitting [its] bottom line" with the Company's response to "the Medicare billing fraud" issue, where (according to Mr. Kvint) "there is nothing at all in the [Section] 220 documents showing any type of investigation or remedial" steps being taken. (*Id.* at 62-63)

In the Court's view, these four exhibits, as Defendants suggest, (D.I. 89 at 13; Tr. at 41-45), indicate that in the 2008-11 time frame, the Audit Committee and Vitas were taking action to address certain recordkeeping deficiencies present at the Company.  But beyond that, because both parties agree that none of these exhibits go to the alleged fraudulent Medicare billing scheme, (*see* D.I. 92 at 17; D.I. 96 at 5; Tr. at 14, 62-63), and because even Mr. Kvint acknowledges that the exhibits' utility here is marginal at best, the Court does not find the exhibits' content to be material to its analysis of demand futility issues.  Thus, the Court will not substantively address these exhibits further.

*also Raul v. Rynd*, 929 F. Supp. 2d 333, 340 (D. Del. 2013).  In this way, Rule 23.1 imposes a requirement that "a shareholder plaintiff make a pre-suit demand on the board of directors prior to filing a derivative suit on behalf of the company, or provide a satisfactory explanation for why the plaintiff has not done so." *Raul*, 929 F. Supp. 2d at 340.  The "demand requirement allows the corporate machinery to self-correct problems and to safeguard against frivolous lawsuits." *Id.*; *see also Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007).

In assessing a motion to dismiss filed pursuant to Rule 23.1, a court considers the well-pleaded allegations of the complaint, the documents incorporated into the complaint by reference and judicially-noticed facts; in doing so, it draws all reasonable inferences in favor of the plaintiff.  *Raul*, 929 F. Supp. 2d at 337 n.1; *Resnik v. Woertz*, 774 F. Supp. 2d 614, 635 (D. Del. 2011).  However, the court is not obligated to accept as true bald assertions, unsupported conclusions and unwarranted inferences, or allegations that are self-evidently false.  *In re Caterpillar Inc. Derivative Litig.*, Civil Action No. 12-1076-LPS-CJB, 2014 WL 2587479, at *7 (D. Del. June 10, 2014) (citing *Raul*, 929 F. Supp. 2d at 341).

While Rule 23.1 sets out the pleading standard for derivative actions in federal court (including the specificity of pleading required as to pre-suit demand), the substantive requirements of demand are ultimately a matter of state law.  *King v. Baldino*, 409 F. App'x 535, 537 (3d Cir. 2010).  In that regard, Delaware state law, applicable here, instructs that when making a demand on the board of directors would clearly be futile, the demand requirement may be excused.  *See Aronson*, 473 A.2d at 814-15, *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Successfully alleging that demand is excused, however, is a "difficult feat under Delaware law." *Ryan*, 918 A.2d at 352 n.23; *see also Richelson v. Yost*, 738 F. Supp.

2d 589, 597 (E.D. Pa. 2010) (citing *Ryan* and explaining that demand futility "is a very onerous

standard for a plaintiff to meet").

As to allegations of demand futility, if what is at issue in the lawsuit is an actual decision

made by the board of directors of a company, then a court must determine whether, under the

particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested

or independent; or (2) the challenged decision or transaction was otherwise the product of a valid

exercise of business judgment. *Aronson*, 473 A.2d at 814; *In re J.P. Morgan Chase & Co.*

*S'holder Litig.*, 906 A.2d 808, 820 (Del. Ch. 2005) (explaining that demand is excused if either

prong of the *Aronson* test is satisfied). If, however, a plaintiff does not challenge a "decision" of

the board of directors, then the test articulated in *Rales v. Blasband*, 634 A.2d 927, 930 (Del.

1993) applies instead.[20] *In re China Auto. Sys. Inc. Derivative Litig.*, CONSOLIDATED C.A.

No. 7145-VCN, 2013 WL 4672059, at *5 (Del. Ch. Aug. 30, 2013). Pursuant to the *Rales* test, a

court must determine "whether or not the particularized factual allegations of a derivative

stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the

board of directors could have properly exercised its independent and disinterested business

judgment in responding to a demand." *Rales*, 634 A.2d at 934; *see also In re China Auto. Sys.*,

2013 WL 4672059, at *5.

Plaintiff and Defendants agree that the *Rales* test applies here "because Plaintiff 'never

reference[s] any particular Board decision to act or to not act[.]'" (D.I. 89 at 10 (quoting D.I. 46

---

[20]     The *Rales* Court explained that requiring demand even when a board has not acted, such as in a circumstance where the board has "fail[ed] to oversee subordinates[,]" is "consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so." *Rales*, 634 A.2d at 934 n.9.

at 17 n.13); D.I. 92 at 10 ("The parties agree that the *Rales* test applies here."))

**B.      Rule 12(b)(6)**

When a Court considers a Rule 12(b)(6) motion, it similarly accepts as true the well-pleaded allegations of the complaint, drawing all reasonable inferences in favor of the plaintiff. *See Raul*, 929 F. Supp. 2d at 341.  As with review of a Rule 23.1 motion, a court reviewing a Rule 12(b)(6) motion is not obligated to accept as true bald assertions, unsupported conclusions and unwarranted inferences, or allegations that are self-evidently false. *Id.*  The standard for pleading demand futility with particularity under Rule 23.1 is more stringent than the standard under Rule 12(b)(6). *Halpert v. Zhang*, 966 F. Supp. 2d 406, 415 (D. Del. 2013); *cf. In re China Agritech, Inc. S'holder Derivative Litig.*, C.A. No. 7163-VCL, 2013 WL 2181514, at *24 (Del. Ch. May 21, 2013).

## III.   DISCUSSION

Mr. Kvint's primary argument is that the allegations in the Amended Complaint (and, particularly, the new allegations drawn from the Section 220 documents) cure the deficiencies identified in the first MTD R&R, and raise a reasonable doubt as to the disinterestedness of the five Audit Committee Defendants during the relevant time period.  (D.I. 92 at 5, 10-11)

The Court will assess Mr. Kvint's argument in step-by-step fashion.  First, it will summarize additional principles of Delaware law that are relevant to Mr. Kvint's legal position. Second, the Court will summarize the relevant findings in the first MTD R&R—i.e., it will detail its reasoning as to why the allegations in the KBC Complaint were not sufficient, on their own, to plead demand futility.  Third, it will examine in greater detail the supplemental allegations in the Amended Complaint drawn from the Section 220 documents.  And fourth, it will analyze

whether the Amended Complaint's combined allegations (that is, the allegations that were also
found in the original KBC Complaint, plus the new allegations regarding the Section 220
documents) are sufficient to plead that demand on the Board was futile.

### A.    Pleading a *Caremark* Claim Under Delaware Law

One way a plaintiff can make a showing of demand futility, sufficient to satisfy *Rales*, is
by pleading facts sufficient to demonstrate that at least half of the directors would face a
"substantial likelihood of personal liability" were they to comply with a shareholder's demand to
pursue litigation.  *See In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 170-71 (D. Del.
2009) (internal quotation marks and citation omitted); *see also Taylor v. Kissner*, 893 F. Supp.
2d 659, 666 (D. Del. 2012).  Mr. Kvint argues that here, the Audit Committee Defendants would
indeed have faced a substantial likelihood of personal liability, because they "breached their
fiduciary dut[y of loyalty] by willfully turning a blind eye to the long-running unlawful billing
and enrollment scheme occurring at Vitas." (D.I. 92 at 11)  More particularly, he asserts that the
Audit Committee Defendants were "aware of Vitas' widespread practice of submitting false
Medicare billings for hospice and crisis care services" and that they made "the conscious
decision to condone the illegal activities by failing to investigate and/or remedy the violations."
(*Id.* at 4; *see also id.* at 5 ("[The Audit Committee Defendants] breached their fiduciary duty by
turning a blind eye to the blatant misconduct at Vitas, thereby utterly failing to make a good faith
effort to investigate and take steps to stop the violations.") (citing D.I. 81 at ¶ 144))

Although Mr. Kvint does not cite to or even reference the case in his briefing, it is clear
that his allegations attempt to make out a "*Caremark* claim":  a claim asserting "'that the
defendants are liable for damages that arise from a failure to properly monitor or oversee

21

employee misconduct or violations of law.'" *Melbourne Mun. Firefighters' Pension Trust Fund
v. Jacobs*, C.A. No. 10872-VCMR, 2016 WL 4076369, at *7 (Del. Ch. Aug. 1, 2016) (quoting
*Citigroup*, 964 A.2d at 123); *see also David B. Shaev Profit Sharing Account v. Armstrong*, No.
Civ.A. 1449-N, 2006 WL 391931, at *4 (Del. Feb. 13, 2006) (noting that a *Caremark* claim
is one that asserts that the "directors failed to act when they otherwise should have done so")
(citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996)).[21]  It is
plaintiff's burden in a *Caremark* case to demonstrate either that "'(a) the directors utterly failed
to implement any reporting or information system or controls; *or* (b) having implemented such a
system or controls, consciously failed to monitor or oversee its operations thus disabling
themselves from being informed of risks or problems requiring their attention.'"  *Melbourne*,
2016 WL 4076369, at *7 (emphasis in original) (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del.
2006)).  "Under [the second] formulation of [a] *Caremark* [claim], [i.e., the one at issue here,] a
plaintiff may state a valid oversight claim by pleading (1) that the directors knew or should have
known that the corporation was violating the law, (2) that the directors acted in bad faith by
failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the
corporation."  *Id.* at *8 (citing *Caremark*, 698 A.2d at 971)).[22]

      Pressing this type of a *Caremark* claim requires "a showing that the directors *knew* they
were not discharging their fiduciary obligations or that they demonstrated a *conscious* disregard

---

[21]     Mr. Kvint's counsel agreed at oral argument that the claim at issue here is a
*Caremark* claim.  (Tr. at 54-55)

[22]     Mr. Kvint does not argue the first formulation of a *Caremark* claim—i.e., that
Chemed utterly failed to implement any reporting or information system or controls.  (*See* D.I.
92; *cf.* Tr. at 54-55 (counsel for Mr. Kvint acknowledging that Plaintiff's argument is based on
the second formulation of a *Caremark* claim))

for their duties." *Intel*, 621 F. Supp. 2d at 174 (emphasis in original); *see also Citigroup*, 964 A.2d at 122-25.[23] This test is "rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability." *Citigroup*, 964 A.2d at 123 (emphasis in original). Overall, this theory of liability has been said to be "'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *Horman v. Abney*, C.A. No. 12290-VCS, 2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017); *see also Intel*, 621 F. Supp. 2d at 174.

### B.    The Relevant Allegations and Findings Discussed in the First MTD R&R

In the first MTD R&R, the Court found that KBC had inadequately pleaded that the Director Defendants faced a substantial likelihood of liability for their alleged breach of the fiduciary duty of loyalty; as a result, demand was not excused. (D.I. 46 at 24-25) Specifically, the first MTD R&R focused on the lack of particularized allegations that the Director Defendants knew or should have known that Vitas was violating the law. (*Id.* at 24-47)[24]

---

[23]    "[P]laintiffs often attempt to satisfy the elements of [this type of] a *Caremark* claim by pleading that the board had knowledge of certain 'red flags' indicating corporate misconduct and acted in bad faith by consciously disregarding its duty to address the misconduct." *Melbourne*, 2016 WL 4076369, at *8; *see also South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012) (noting that a plaintiff can set out a *Caremark* claim by pleading "that the board consciously failed to act after learning about evidence of illegality—the proverbial 'red flag'"); *Citigroup*, 964 A.2d at 128 (explaining that "'red flags'" can alert a board "'to potential misconduct' at the [c]ompany") (citation omitted).

[24]    In the first MTD R&R, the Court noted that KBC made a distinction between the Director Defendants having actual knowledge of the alleged fraudulent billing scheme and the Director Defendants having knowledge of "red flags" that should have made them aware of the fraudulent billing scheme. (D.I. 46 at 45-46) Here, in his briefing, Mr. Kvint continually refers to the Audit Committee Defendants' actual "knowledge" of the fraudulent billing scheme, (*see, e.g.*, D.I. 92 at 13), and only refers once to the concept of "red flags[,]" (*id.* at 13 n.12 (internal quotation marks omitted)). But in the Amended Complaint, Mr. Kvint relies much more heavily on the "red flags" concept. That is, he asserts that even if these Defendants did not literally know

The Court came to these conclusions only after summarizing the various allegations made in the KBC Complaint and their legal effect. The Court noted that the "most significant allegations" as to whether "the Director Defendants had actual knowledge of [or should have known of the existence of] the alleged [fraudulent billing] scheme" were those relating to the various investigatory demands and complaints made upon Vitas during the years in question. (*Id.* at 35-36) Below the Court will lay out in greater detail what allegations the KBC Complaint pleaded as to these legal matters, which fell into three general categories: (1) those relating to subpoenas and other investigative demands; (2) those relating to the four *qui tam* actions; and (3) those relating to the DOJ Action and the DOJ intervention in the *Spottiswood*, *Urick*, and *Gonzales* actions. (*Id.* at 35-44) The Court will also explain the other relevant allegations in the KBC Complaint, and will describe why, in the first MTD R&R, the Court found that the collective weight of these allegations were insufficient to plead demand futility.

        **1.**        **Subpoenas and Other Investigative Demands**

The first MTD R&R included discussion of the fact that Chemed's Board had received notice of certain state and federal subpoenas and other investigative demands that had been sent to Vitas.

For example, Chemed's March 16, 2006 Form 10-K disclosure[25] referenced subpoenas

---

that fraud had occurred, they knew of sufficient "red flags" suggesting that such fraud had occurred to put them on "constructive[] . . . notice" of the fraud; he also claims that their later failure to take steps to address the issue amounted to "turning a blind eye" to the fraud. (D.I. 81 at ¶¶ 143-44, 185) Here, because the Amended Complaint focuses on the Audit Committee Defendants having ignored "red flags," and argues that they "should have known" that such fraud was taking place, the Court will primarily use that terminology below.

[25]      Signed by Defendants McNamara, Williams, Tucker, Hutton, Grace, Krebs, Saunders, Walsh, Wood, and (now-dismissed) Defendant O'Toole. (D.I. 46 at 36)

Vitas received from the OIG on April 7, 2005 regarding improper Medicare billing for hospice
care. (*Id.* at 36)  The Form 10-K also disclosed "that the OIG had selected medical records for
320 past and current Vitas patients for review, and that it sought information on Vitas policies
and procedures dating back to 1998." (*Id.*)  These allegations allowed the inference that a
majority of Director Defendants were then aware of a fairly wide-ranging investigation by the
OIG into Vitas' Medicare billing practices. (*Id.*)

Chemed's February 26, 2010 Form 10-K disclosure[26] acknowledged receipt of various
requests for information made on Vitas:  (1) an administrative subpoena from the DOJ in May
2009 that requested documents from 2003 onward regarding Vitas' Texas programs; (2) an
August 2009 request from the OIG to review medical records for 59 past and current patients in
Vitas' Texas hospice program; and (3) a civil investigative demand from the Texas Attorney
General's Office in February 2010, regarding compliance with Medicare hospice
reimbursements. (*Id.* at 37-38)  These allegations allowed the inference that in February 2010,
more than half of the Director Defendants knew of multiple regulatory inquiries into Vitas'
Texas-based hospice programs. (*Id.* at 38)  But with little to nothing in the KBC Complaint
about what discussion the Board had about these inquiries, the pleading did not allow the
inference that the Board knew of "underlying wrongful conduct" or that "failure to take action in
light of the investigative demands would amount to a breach of [its] fiduciary duties." (*Id.*)

### 2.    The Four *Qui Tam* Actions

The first MTD R&R also discussed the importance of the four *qui tam* actions filed

---

[26]    Signed by Defendants McNamara, Williams, Tucker, Hutton, Grace, Krebs,
Lindell, Mrozek, Rice, Saunders, Walsh, and Wood.  (D.I. 46 at 38)

against Chemed. (*Id.* at 39-42) Information regarding these actions was drawn from various Chemed Form 10-Q disclosures, with Defendant McNamara being the only Director Defendant to have signed the disclosures. (*Id.* at 42; *see also* D.I. 81 at ¶ 166)

The first *qui tam* action, *Spottiswood*, was filed in August 2007 and contained reference to approximately 15 first-hand accounts of Vitas "submitting false claims to Medicare for Illinois-based hospice services in 2001 and 2002." (D.I. 46 at 39) A November 2, 2012 Chemed Form 10-Q acknowledged Chemed's receipt of a copy of a "'partially unsealed'" version of the *Spottiswood* Complaint in June 2011; it also indicated that the complaint was unsealed in April 2012. (*Id.* at 41 n.31 (internal citation omitted)) The first MTD R&R also noted that an amended complaint was filed in the *Spottiswood* action on November 12, 2012 and was served on Defendants' counsel the same day; the amended *Spottiswood* Complaint was far more detailed than the original complaint. (*Id.* at 41 & n.32 )

The second action, *Urick*, was filed in August 2008. (*Id.* at 39) The *Urick* complaint contained allegations similar to those in the *Spottiswood* action as to 19 Vitas patients "in and around San Antonio from 2006 through 2008[.]" (*Id.*) Chemed's August 5, 2011 Form 10-Q acknowledged receipt in June 2011 of the partially unsealed *Urick* complaint. (*Id.* at 41 n.30) A November 2, 2012 Chemed Form 10-Q also further described the contents of that complaint and indicated that it was unsealed in June 2012. (*Id.*)

The *Rehfeldt* complaint was filed in January 2009 and it described instances of fraud in Vitas crisis care admissions in San Antonio in the mid-2000s. (*Id.* at 39) An April 29, 2011 Form 10-Q disclosed that Chemed had received a copy of the *Rehfeldt* complaint. (*Id.* at 40)

The *Gonzales* Complaint was filed in January 2012. (*Id.* at 39) It contained detail of

additional instances of asserted fraud in Vitas' crisis care admissions in Los Angeles from approximately 2006 to 2011.  (*Id.* at 39)  The complaint was sealed at the time of filing and was only unsealed on April 4, 2013—approximately seven months before the KBC Complaint was filed.  (*Id.* at 41-42)  The Court noted that there were no indications that Chemed ever received a copy of the *Gonzales* complaint.  (*Id.* at 42)

After describing the various *qui tam* actions, the Court explained why the allegations relating to them were ultimately inadequate to show demand futility.  The Court acknowledged that KBC's argument regarding demand futility would have been strengthened "were it sufficiently clear that a majority of the [Chemed b]oard was aware of the allegations in all of the[] *qui tam* complaints in or around the time they were filed—allegations that spanned years and related to activity at various Vitas outposts[.]"  (*Id.* at 40)  However, the KBC Complaint did not plead such facts.  Indeed, it did not plead facts suggesting that:  (1) any Director Defendant had known of the contents of any of the complaints until at least April 2011 (and in some cases long after); or that (2) any Director Defendant other than Defendant McNamara (the only Director to have signed the various Form 10-Qs setting out Chemed's receipt of the various complaints) had any knowledge of the complaints at all.  (*Id.* at 40-42)

### 3.    The DOJ Action and DOJ Intervention in Three *Qui Tam* Actions

The first MTD R&R also discussed the impact of the filing of the DOJ Action and the DOJ's intervention in the *Spottiswood*, *Urick*, and *Gonzales* actions, both of which occurred in May 2013.  (*Id.* at 42-44)  The Court described the allegations in the DOJ Action as being "similar to those in the four *qui tam* complaints and . . . wide-ranging[.]"  (*Id.* at 42)  The DOJ Action Complaint, *inter alia*, described 14 assertedly false claims submitted to Medicare by Vitas

27

in seven states. (*Id.* at 43)

The Court acknowledged that the allegations in the DOJ Action and the fact that the DOJ intervened in three of the *qui tam* suits were surely "significant" and "would have to have been disconcerting to a Chemed Board member." (*Id.* (internal quotation marks and citations omitted)) However, much like the allegations regarding the *qui tam* actions, there were "no statement[s] or allegation[s] in the Complaint as to when any Board member had knowledge of the DOJ Action or what the Board did (or did not do) in response." (*Id.* at 43-44) Additionally, the Court noted that the DOJ Action and DOJ intervention occurred "only six months prior to the filing of the" KBC Complaint—suggesting that this short time interval may be relevant to the question of whether the Director Defendants consciously chose not to act on the allegations in the DOJ Action. (*Id.* at 43 (citing *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 568 (D.N.J. 2011)).

### 4.    The Collective Weight of These and Other of the KBC Complaint's Allegations

In the first MTD R&R, in assessing the collective weight of the KBC Complaint's allegations, the Court noted that "[t]aken together, [these] allegations and the reasonable inferences drawn therefrom suggest that a majority of the Board knew by mid-2006 of a fairly wide-ranging OIG investigation of Vitas' billing practices. . . . [and knew] by early 2010 . . . of an apparently more focused investigation of Vitas' Texas-based hospice programs." (*Id.* at 44) It also explained that the KBC Complaint had pleaded facts suggesting that, during the relevant time period: (1) billing misconduct was occurring at certain Vitas locations; (2) Vitas was a statistical outlier as to the large number of its crisis care admissions; and (3) Vitas was subject to

a number of complaints and investigations alleging misconduct in this area. (*Id.* at 44-45)[27] But as to these three areas, the Court concluded that there were no particularized allegations that at least half of the Chemed Board had knowledge of these facts. (*Id.*; *see also* D.I. 53 at ¶ 2 ("Plaintiff's demand futility argument hinges on the Board having been aware of the bad facts. Since the Report correctly finds that the [KBC] Complaint does not allege with particularity that the Board was aware of them,[] Judge Burke was correct to conclude that Plaintiffs' pleadings are insufficient.")) Because of those deficiencies, the Court found that KBC's "allegations d[id] not support the reasonable inference that the Board disregarded actual knowledge about improper billing by Vitas, or that they knew that a failure to respond would be a breach of their fiduciary duties." (D.I. 46 at 45) Thus, the KBC Complaint did not show that demand on the Board was futile. (*Id.* at 45, 47)

### C.   The New Allegations in the Amended Complaint That Are Drawn From the Section 220 Documents

In the Amended Complaint, the relevant supplemental allegations drawn from the Section 220 documents are primarily found in paragraphs 143 through 151. These allegations are based on: (1) 12 "Material Legal Matters" memos that were sent to the Audit Committee from February 12, 2007 to May 13, 2013; (2) 14 Audit Committee meeting minutes dating from

---

[27]     In the first MTD R&R, the Court also recognized that the KBC Complaint contained additional allegations, such as those regarding: (1) the Board's receipt of certain information about Medicare billing and enrollment compliance at Vitas; or (2) how Vitas' enrollment statistics as to hospice care were out of line with national averages. (D.I. 46 at 26-35) But the Court concluded that these allegations were sometimes vague, and that in other instances, the KBC Complaint did not well establish that Board was aware of the information at issue. (*Id.*) For these reasons, the Court concluded that such allegations were not helpful to the KBC Complaint's attempt to demonstrate that the Board faced a substantial likelihood of liability at the time when demand would have been made. (*Id.*)

February 16, 2007 to October 28, 2013; and (3) the May 20, 2013 Audit Committee Report.
(D.I. 81 at ¶¶ 143-51; *see also* D.I. 75-2, exs. 1-27)

The "Material Legal Matters" memos were addressed to the Audit Committee and were generally sent days before Audit Committee meetings were held. (D.I. 81 at ¶ 147) Much of the information contained in these memos has been redacted for privilege; thus, they are short on information. However, they do indicate that the Audit Committee was informed at least of the existence of certain relevant investigations and lawsuits. In the memos dated February 12, 2007, February 12, 2008, and February 11, 2009, for example, the Audit Committee was informed that "Vitas continues under investigation by the Office of Inspector General 'OIG' for the Department of Health and Human Services." (D.I. 75-2 at exs. 1, 3, & 5 (*cited in* D.I. 81 at ¶ 147))[28] Based on the dates of the memos, the reference therein to an OIG "investigation" must be to the OIG's April 7, 2005 subpoena and related investigatory efforts undertaken thereafter. (D.I. 81 at ¶¶ 109, 164) Then, in the memos dated February 11, 2010 and February 11, 2011, the Audit Committee was told that "Vitas continues under *two* investigations" by the OIG. (D.I. 75–2, exs. 7, 9 (*cited in* D.I. 81 at ¶ 147) (emphasis added)) This reference to a second investigation presumably relates to investigatory efforts regarding the OIG's August 2009 request to review medical records for 59 past and current patients in Vitas' Texas hospice program. (D.I. 81 at ¶ 165)[29] Thereafter, the unredacted portions of these memos are even more sparse, and contain

---

[28]    In these three memos, the reference to the OIG investigation mentioned above is the only portion of the memos that is not redacted, other than the heading and signature lines.

[29]    Indeed, notes from the Audit Committee's April 25, 2011 meeting indicate that the committee was to receive an update on legal matters relating to "Texas OIG[.]" (D.I. 75-2, ex. 11 (*cited in* D.I. 81 at ¶ 147))

only simple descriptions of the topic of certain Audit Committee discussions.  For example, the

unredacted portions of the body of the respective memos contain only the following phrases:

- The July 25, 2011 memo references "**OIG Investigations**";

- The February 9, 2012 memo references "**OIG Investigations**" and "**Securities Class Action**";

- The April 16, 2012 memo references "**OIG Texas Investigation**";

- The July 23, 2012 and February 11, 2013 memos reference "**OIG Investigations**" and "**Securities Class Action**";

- The April 12, 2013 memo references "**OIG Investigations**";

- The May 13, 2013 memo references "**OIG Investigations**[,]" "**Securities Class Action**[,]" and the first mention of the DOJ Action, "**U.S. v. Vitas**[.]"[30]

(D.I. 75-2, exs. 12, 14, 16, 18, 21, 23 & 24 (*cited in* D.I. 81 at ¶ 147) (emphasis in original))

The Audit Committee meeting minutes are likewise heavily redacted.  Every set of

minutes referenced in the Amended Complaint includes a statement that the Audit Committee

reviewed "material legal matters" and all but one set includes at least some reference to what

those matters were.  (*See, e.g.*, D.I. 75-2, ex. 2 at CHEKV00000001)[31]  For example:

- An "OIG investigation" was discussed at the meetings on February 15, 2008 and February 19, 2009 and "OIG investigations" were discussed at the meetings on February 15, 2010; February 18, 2011; July 26, 2011; and February 17, 2012.  (*Id.*, exs. 4, 6, 8, 10, 13 & 15

---

[30]    The February 11, 2013 and May 13, 2013 memos also contain references to the phrase "**Continuous Care**[,]" (D.I. 75-2, exs. 21 & 24 (emphasis in original)), but Mr. Kvint does not note that reference in the Amended Complaint, (D.I. 81 at 67).

[31]    The minutes of one meeting on April 19, 2012 *only* states that the Audit Committee was updated on "material legal matters"; it does not include any reference to what matters were discussed.  (D.I. 75-2, ex. 17 (*cited in* D.I. 81 at ¶ 147))

31

(*cited in* D.I. 81 at ¶ 147))[32]

- The minutes of the April 25, 2011 Audit Committee meeting note that in addition to the "Texas OIG[,]" the "qui tam complaint filed under seal in Texas" was also discussed. (D.I. 75-2, ex. 11 (*cited in* D.I. 81 at ¶ 147)) While the specific action is not named, this must be a reference to the *Rehfeldt* complaint. (D.I. 92 at 6-7; Tr. at 25, 79; *see also* D.I. 46 at 40)

- Starting during the July 25, 2012 meeting and continuing in the October 29, 2012 and February 20, 2013 meetings, the Audit Committee was said to have reviewed not only the "OIG investigations" but also the "Securities Class Action[.]" (D.I. 75-2, exs. 19, 20 & 22 (*cited in* D.I. 81 at ¶ 147))

- During the July 18, 2013 meeting, the Audit Committee was "provided an update on filing deadlines set by the Court in *US v. Vitas*." (*Id.*, ex. 25 (*cited in* D.I. 81 at ¶ 147))

- On October 28, 2013, in the last meeting minutes included with the Amended Complaint, the Audit Committee was updated on the "U.S. v. VITAS matter" and the "Securities Class Action." (*Id.*, ex. 26 (*cited in* D.I. 81 at ¶ 147))

As for the May 20, 2013 Audit Committee Report, as was noted above, it is provided as Exhibit 27 to the Amended Complaint. (D.I. 81 at ¶ 151; D.I. 75-2, ex. 27) According to Mr. Kvint, "Exhibit 27 is the only document that actually deals with the Audit Committee remedying the wrongdoing alleged in the DOJ Action and *qui tam* complaints[,] . . . [such as by] 'refin[ing] Compliance Committee processes' and [noting the institution of] 'annual compliance training

---

[32]    In the meeting on February 16, 2007, the minutes indicate that the Audit Committee reviewed a "qui tam lawsuit." (D.I. 81 at ¶ 147; D.I. 75-2, ex. 2) These minutes are dated prior to the filing of the earliest *qui tam* action discussed by Mr. Kvint, *Spottiswood*, which was filed in August 2007. (D.I. 81 at ¶ 88) These minutes likely refer to an earlier-filed *qui tam* action that is not addressed in the Amended Complaint or Plaintiff's briefing, but which Defendants referenced in their briefing on the first motion to dismiss. (D.I. 13 at 6 n.6 (citing *Barys ex rel. United States v. Vitas Healthcare Corp.*, No. 04-21431-CIV, 2007 WL 2310862 (S.D. Fla. July 25, 2007)); *see also* Tr. at 22)

and new-hire compliance training[.]'" (D.I. 92 at 17 (citation omitted))  In addition to making reference to these various planned remedial measures (discussed further below), the report includes a spreadsheet dated April 23, 2013 (the "April 23, 2013 spreadsheet" or "the spreadsheet").  (D.I. 81 at ¶ 151; D.I. 75-2, ex. 27)  This is the document that, *inter alia*, lists a number of ongoing "Legal Reviews" and provides updates as to the status of certain legal actions.  (*Id.*)[33]  Among the legal matters listed are some regarding OIG and DOJ investigative requests, including:

- The first entry makes reference to a review by the Missouri Department of Justice, listed as beginning in October 2010 (the "Missouri DOJ investigation").  (D.I. 75-2, ex. 27 at CHEKV00000127)  The entry notes that the regulator sent "a demand letter . . . alleging false claims for approximately $2[ million] because [Vitas'] continuous care days of care are high compared to competitors[.]" (*Id.*)  The entry further indicates that Chemed/Vitas had "retained local counsel, and based on medical review [felt] confident that the[] records [were] defendable[.]" (*Id.*)

- The next entry references an "OIG" request made in August 2012 regarding the state of California that "related to eligibility, bonuses, training, auditing, etc." concerning 269 patients, with a focus on "long stay[s.]" (*Id.*)  It notes that Vitas' "[a]udit team physicians [were] reviewing and summarizing records" and two "submissions h[ad] been made to the government[.]" (*Id.*)

  - Additionally, there were two requests listed from the "California

---

[33]      As was also noted above, the spreadsheet has another section entitled "Regulatory Reviews," in which brief updates are provided regarding inquiries by various regulatory agencies. (D.I. 75-2, ex. 27 at CHEKV00000122-26)  Some of the inquiries listed are inquiries of Vitas-related entities and others are inquiries of state Medicaid administrators.  (*Id.*)  In general, the updates indicate that: (1) the Audit Committee was kept abreast of the Company's response to these inquiries; and (2) the Audit Committee was told how, in some cases, the Company either took issue with regulators' assertions or was ultimately found by regulators to have been in compliance with applicable regulations.  (*Id.*; *see also* D.I. 89 at 7-8)  Mr. Kvint does not really focus on these portions of the spreadsheet in his briefing or argument, so the Court will not further assess them herein.

OIG" regional office, in September and December 2012. (*Id.* at CHEKV00000127-28) These requests concerned "CC"—presumably meaning either "crisis care" or "continuous care." (*Id.*; *see also* D.I. 81 at ¶ 45) The requests sought records regarding 210 unique patient stays from "10 programs nation-wide"; the spreadsheet notes that Chemed/Vitas had submitted, through counsel, all of the patient stays to the government implicated by the September 2012 request and some implicated by the December 2012 request. (D.I. 75-2, ex. 27 at CHEKV00000127-28)

- There was also a January 2013 request listed from the Florida Office of Investigations "in its capacity as a health oversight agency[.]" (*Id.* at CHEKV00000128) It is unclear what the request was for, but the spreadsheet notes that some documents were reviewed and submitted by Chemed. (*Id.*)

The "Legal Reviews" portion of the spreadsheet also makes three references to the *qui tam* actions:

- In an entry dated September 2012, the spreadsheet lists a Texas *qui tam* action as being in the "[r]eview" stage and notes that Chemed/Vitas is doing a "[r]e-review of [the] 2009 submission[.]" (*Id.* at CHEKV00000127) Specifically, the entry notes that it was a "[p]hysician re[-]review and clarification of Corridor/Govn't comments[.]" (*Id.*)[34]

- The next entry regarding a *qui tam* action is dated both September 2012 and April 2013 and specifically calls out the *Urick* action. (*Id.*) The entry notes that the action was in the "[r]equest" stage, that a government subpoena had been received, and that patient charts were with the "audit team for medical review[.]" (*Id.*)

- The last *qui tam*-related entry is dated December 2012 and specifically addresses the *Spottiswood* action. (*Id.* at CHEKV00000128) The entry makes reference to the amended complaint filed in *Spottiswood*, notes that the complaint was

---

[34]    It is not absolutely clear whether this unnamed Texas *qui tam* action is the *Urick* action, which is specifically called out in a subsequent entry, or the *Rehfeldt* action. The entry refers to a re-review of a "2009 submission" and both actions had been filed by 2009. (*See* D.I. 81 at ¶¶ 91, 99, 147) The Court infers that the entry relates to the *Rehfeldt* action, in light of the fact that the *Urick* action is mentioned by name in the subsequent entry.

34

unsealed, and states that charts had been received and were "in review by [the] audit team." (*Id.*)

**D.     Analysis of the Amended Complaint's Combined Allegations As They Relate to Demand Futility**

With the old and new allegations in the Amended Complaint now well set out, the Court can analyze whether Mr. Kvint has sufficiently pleaded facts plausibly indicating that the Audit Committee members:  (1) knew or should have known that the corporation was violating the law; and (2) acted in bad faith by failing to prevent or remedy those violations.[35]

**1.     Are Sufficient Facts Pleaded to Plausibly Demonstrate that the Audit Committee Members Knew or Should Have Known that Vitas Was Violating the Law?**

The first factor relating to a *Caremark* claim asks whether Mr. Kvint has pleaded (with particularity) facts that plausibly establish that the Audit Committee members knew or should have known that Vitas was violating the law.  In answering this question, it is first important to assess what has been pleaded regarding what the Audit Committee Defendants knew, and when they knew it.

In his briefing, Mr. Kvint starts off by repeatedly asserting that the Audit Committee was aware of "illegal practices" at Vitas "for at least *six years*"—that is, from "*2007* until the filing of the DOJ Action[.]"  (D.I. 92 at 11-12 (certain emphasis in original, certain emphasis added); *see also id.* at 13 ("[T]he [Section] 220 [d]ocuments adequately demonstrate that the Audit Committee and the Board had knowledge of Vitas'[] likely fraudulent activity from at least

---

[35]     As was noted above, the third prong of this type of *Caremark* claim is that the plaintiff must plead facts showing that the Audit Committee Defendants' inaction caused damage to the corporation as a result.  Defendants do not challenge the sufficiency of the allegations relating to this prong, and so the Court will not address it further herein.

*February 2007* until the filing of the DOJ Action in May 2013[.]") (emphasis added))  But as to the five Audit Committee Defendants whose knowledge is at issue here, that cannot be correct. To be sure, the Amended Complaint does fairly plead that as early as March 16, 2006, 10 Chemed directors were aware of a "fairly wide-ranging OIG investigation into Vitas' billing practices." (D.I. 46 at 44; *see also* D.I. 81 at ¶ 164)  But that group of 10 directors did not include one of the five Audit Committee Defendants—Defendant Rice, who only joined the Board and the Audit Committee in May 2009.  (D.I. 81 at ¶ 25; D.I. 92 at 11 n.10)  Thus, it would be wrong to say that all five Audit Committee Defendants knew of any OIG investigations regarding improper Medicare and Medicaid billing by Vitas—let alone that the company was engaging in "illegal practices"—anytime before Defendant Rice became a member of the Audit Committee in May 2009.

In fact, in terms of what is pleaded, it is only fair to infer that Defendant Rice (and thus, all five of the Audit Committee Defendants) had knowledge of one or more of the OIG investigations *as of February 2010*.  This is the month in which Defendant Rice is alleged to have first attended a meeting of the Audit Committee where the two then-ongoing "OIG investigations" were discussed.  (D.I. 81 at ¶ 147; D.I. 75-2, exs. 7-8)

But even if the five Audit Committee Defendants had been briefed on these two OIG investigations as of February 2010, does the Amended Complaint fairly plead that they then knew or should have known that Vitas was engaging in violations of the law?  By the time of oral argument, even Mr. Kvint's counsel was acknowledging that this was not a fair inference. During oral argument, Mr. Kvint's counsel admitted that "[w]e don't know much about what [the Audit Committee Defendants] were briefed on because [the memoranda referencing this Audit

36

Committee meeting] are redacted and [include little more than] one-line descriptions." (Tr. at

69)

Instead, during oral argument Mr. Kvint's counsel made some shifting assertions about

when exactly Mr. Kvint is asserting that the five Audit Committee Defendants knew or should

have known of illegality. At times, Mr. Kvint's counsel suggested that "[where] the rubber really

hits the road here, *it's April 2011* [when the Audit Committee Defendants] were put on notice."

(*Id.* at 94 (emphasis added)) This reference to "April 2011" is to the Amended Complaint's

allegation that on April 25, 2011, the Audit Committee Defendants were first provided notice of

the "qui tam complaint filed under seal in Texas" (i.e., the *Rehfeldt* action). (D.I. 81 at ¶ 147;

D.I. 75-2, ex. 11; *see also* Tr. at 94 (Mr. Kvint's counsel noting that in April 2011 "[t]he Audit

Committee and the CEO were put on notice of what was going [on] in Texas")) However, at

numerous other points during oral argument, Mr. Kvint's counsel appeared to concede that Mr.

Kvint had not demonstrated that the Audit Committee could have had such knowledge until

*2012*. One of the many examples of this came when Mr. Kvint's counsel stated that "for

purposes of [Plaintiff's] demand futility [argument, and when notice of illegal activity is

pleaded], it's this 2011, *really 2012 period and 2013 period* where the various regulators and the

Department of Justice really starts to get the company in their sights[.]" (Tr. at 69 (emphasis

added)) Thereafter, Mr. Kvint's counsel continued to reaffirm that any showing of knowledge

could only be made as of 2012. (*See id.* at 88 (Mr. Kvint's counsel stating that "[W]e're putting

on the Audit Committee and CEO knowledge in *August and September of 2012* of widespread

company-wide extremely serious investigatory conduct by the OIG relating to the *qui tam*

actions. . . . and then we also have [some notice] in *April of 2012*") (emphasis added); *id.* at 94

37

(Mr. Kvint's counsel stating that "I think at a minimum they [the Audit Committee Defendants]
had actual knowledge *May 2012* of the company-wide [fraudulent scheme]; April 2011 of
[fraudulent conduct in] Texas because they were reviewing the Texas *qui tam* [complaint] in
April" and that "conscious disregard happened during th[e] *2012 and 2013* period") (emphasis
added); *id.* at 97; *id.* at 106 (Defendants' counsel recognizing that Mr. Kvint was now asserting
that the key period for this knowledge prong was "2012 and 2013"); *id.* at 110 (same))

In light of Mr. Kvint's counsel's admissions and the state of the record, the Court agrees
that the Amended Complaint does not plausibly establish that, prior to 2012, the five Audit
Committee members knew or should have known that Vitas was violating the law. Instead, the
Court will hereafter focus on the time period from 2012 up through the date of the filing of the
KBC Complaint on November 6, 2013. (D.I. 1) Thus, the real question is: Does the Amended
Complaint plead particularized facts plausibly asserting that, at least somewhere in this time
period, the Audit Committee Defendants knew or should have known that Vitas was committing
legal violations? *See Melbourne*, 2016 WL 4076369, at *8.

Defendants argue that the Amended Complaint falls short on this front. They
acknowledge that in this time period, the Audit Committee Defendants did know of the various
OIG investigations, *qui tam* suits and, eventually (in mid-2013) of the DOJ Action. And they
acknowledge that, at least as to some of the lawsuits, Vitas was alleged to have engaged in
outright fraud. But citing to the first MTD R&R, Defendants assert that "mere knowledge of
pending investigations, subpoenas[,] and litigation does not warrant an inference that a director
faces a substantial likelihood of personal liability." (D.I. 89 at 14 (citing D.I. 46 at 44))
Defendants argue instead that, during this time frame, the Audit Committee Defendants were

only "'aware that the company was under investigation' or subject to 'allegations that may or may not later go on to be substantiated[.]'" (*Id.* at 15 (quoting D.I. 46 at 37, 39)) In other words, Defendants contend that knowledge of *the investigations and lawsuits* does not and cannot amount to knowledge of *actual legal misconduct*, since the investigations and lawsuits regard "only *allegations*; they do not evidence corporate misconduct." (D.I. 96 at 4 (emphasis added); *see also id.* at 6-7))

Defendants may well be right that the Audit Committee Defendants' knowledge of the subpoenas issued in the OIG investigations, *on their own*, might not suggest "aware[ness] of corporate misconduct [and instead might] suggest only that [these Defendants were] aware that the company was under investigation." *Johnson & Johnson*, 865 F. Supp. 2d at 566 (*quoted in* (D.I. 46 at 37)). Similarly, it could also be said that knowledge of the filing of one or more of the various *qui tam* suits is insufficient to meet the plausibility threshold, "because knowledge of unsubstantiated *qui tam* allegations, *on their own*, do not suggest that [a] Board was aware of continued corporate misconduct." *Id.* at 567 (emphasis added) (*quoted in* (D.I. 46 at 40)). But here, certainly by at least mid-2013, the Amended Complaint alleges that the Audit Committee Defendants were aware of much more than just isolated investigative subpoenas, or individual *qui tam* actions.

Moreover, even though none of these investigations or suits had led, as of mid-2013, to a finding of or admission of wrongdoing by Vitas, that does not mean that as a legal matter, the cumulative effect of those investigations/suits could not suffice as "red flags" that illegal activity

was ongoing.[36] A "red flag" is merely something that alerts a board to potential misconduct at

the company. *See Citigroup*, 964 A.2d at 128.[37] Indeed, if directors are aware of numerous

lawsuits filed over many years alleging that a company engaged in misconduct or fraud, those

suits, taken together, *can* amount to red flags indicating that misconduct is occurring—even if the

allegations therein have not been proven in court. *See Shaev v. Baker*, Case No. 16-cv-05541-

JST, 2017 WL 1735573, at *11 (N.D. Cal. May 4, 2017) (finding that plaintiffs were "not

rely[ing] on those lawsuits to show that the allegations asserted in them are factually true; rather

they rely on the plain existence of those lawsuits to show that the [b]oard was aware of yet

---

[36]     The case law cited by Defendants is not to the contrary. For example, Defendants cite to *In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453, 462 (S.D.N.Y. 2009), for the proposition that a "criminal investigation [is] not [a] red flag[.]" (D.I. 89 at 15 n.15; *see also* D.I. 96 at 4 n.2) But the cited portion of that opinion does not stand for the proposition that a criminal investigation of a company cannot amount to a red flag suggesting that the company is violating the law. Instead, in that opinion, the *ITT Corp.* Court was addressing the lack of allegations in the operative complaint regarding what actions the corporate defendants "actually took in response" to the criminal investigation at issue. *In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d at 462. Similarly, Defendants cite to *Marvin H. Maurras Revocable Tr. v. Bronfman*, Nos. 12 C 3395, 12 C 6019, 2013 WL 5348357, at *6 (N.D. Ill. Sept. 24, 2013), for the proposition that "lawsuits [are] not red flags[.]" (D.I. 89 at 15 n.15) But the case does not stand for such a blanket proposition either. Rather, the *Maurras* Court actually found that allegations regarding several Fair Debt Collection Practices Act ("FDCPA") lawsuits were inadequate to "allege that [d]efendants were or should have been aware that [the company] was committing FDCPA violations of such magnitude as to threaten the company's relationship with [its business partner] or its ability to do business in Minnesota." *Marvin H. Maurras Revocable Tr.*, 2013 WL 5348357, at *6-7. The cited portion of *Maurras* is directed at an analysis of what "*level of awareness* [the d]efendants had of the[] unlawful activities[,]" *id.* at *5 (emphasis added), not whether a lawsuit can ever be a "red flag" in the first instance.

[37]     *See also In re Capital One Derivative S'holder Litig.*, 952 F. Supp. 2d 770, 786 (E.D. Va. 2013) (explaining that "[i]nformation may constitute a red flag where there is a 'clear warning' that should put defendants on notice . . . [of] potential misconduct at the [c]ompany'") (quoting *Citigroup*, 964 A.2d at 128); *Horman*, 2017 WL 242571, at *11 (explaining that "the red flag analogy depicts events or reports that serve as warning signs to the [b]oard of corporate wrongdoing after a system of reporting and compliance is in place[] . . . [and] put the board on notice that the system is not working properly").

another red flag"); *see also In re Intuitive Surgical Shareholder Derivative Litig.*, 146 F. Supp. 3d 1106, 1117 (N.D. Cal. 2015); *In re Capital One Derivative S'holder Litig.*, 979 F. Supp. 2d 682, 697 (E.D. Va. 2013).

Accordingly, the Court will not *per se* disregard an investigation or lawsuit referenced in the Amended Complaint merely because the allegations have not been definitively proven, because those allegations could still serve to alert at least half of the Chemed Board that potential misconduct was occurring at Vitas. (Tr. at 12 (Defendants' counsel acknowledging that in order to demonstrate that Board members knew that the corporation was engaging in wrongdoing, "[i]t's no[t] an absolute requirement that there be a finding of wrongdoing")) And in line with the cases cited above, the Court will not look at the various investigations and lawsuits in a vacuum. Instead, the Court will consider them as a whole. *See Johnson & Johnson*, 865 F. Supp. 2d at 562, 568 (noting that the court would look at all of plaintiff's allegations of corporate misconduct "as a whole"); *see also In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453, 465 (S.D.N.Y. 2009).

Having done so, the Court concludes that at least as of July 2013, the Amended Complaint indicates that the Audit Committee Defendants:

- <u>Had been repeatedly alerted to the existence of both the first OIG investigation (which began in 2005) and the later Texas OIG investigation, and had discussed the substance of those investigations at nine different Audit Committee meetings (from February 11, 2011 to July 18, 2013).</u> (D.I. 81 at ¶ 147) The exact details of what was discussed about these investigations is not available—in part because (through no fault of Mr. Kvint), the records of the meetings are heavily redacted. But the "Material Legal Matters" memos issued in advance of those meetings and the meeting minutes themselves suggest that these investigations were significant topics of discussion. Although there is no indication that outright fraud was alleged by these investigators, it is a fair

41

inference that the Audit Committee Defendants knew the
investigations related to Vitas' failure to appropriately bill Medicare
and Medicaid for hospice services. (*Id.* at ¶¶ 109, 165-66; *cf.* D.I.
46 at 36 (noting that the Chemed Board's knowledge of the 2005
OIG investigation allowed the inference that the Board was "aware
that the OIG had instituted what seems like a fairly wide-ranging
inquiry into Vitas' Medicare/Medicaid billing practices")) And it is
a fair inference that at least the general substance of those
investigations were discussed during some or all of these Audit
Committee meetings.

- Had received notice of and discussed the *Rehfeldt qui tam* action as
of the April 25, 2011 Audit Committee meeting. (D.I. 46 at 40 &
n.29; D.I. 75-2, ex. 11; D.I. 81 at ¶¶ 109, 147; D.I. 92 at 6-7; Tr. at
23) It can also be inferred that from those discussions or otherwise
the Audit Committee knew, as of April 2011, and certainly as of
mid-2013, that the *Rehfeldt* action had alleged "'admission and re-
certification of ineligible patients . . . backdating revocations, and
conspiring to admit inappropriate patients into hospice[.]'" (D.I. 81
at ¶ 109 (quoting Chemed Corp., Quarterly Report (Form 10-Q)
(Sept. 30, 2012)); Tr. at 25-26) The *Rehfeldt* action was dismissed
on May 1, 2013. (D.I. 90, ex. 5)

- Had significant information, as of 2012, regarding the allegations in
the securities fraud class action—allegations regarding fraudulent
practices occurring at far-flung Vitas locations. In the securities
fraud class action, it was alleged that Chemed defrauded its
investors "by concealing a [company-wide] scheme to 'admit and
recertify as many patients as possible, without regard to the
eligibility of those patients for Medicare's hospice reimbursement.'"
(D.I. 81 at ¶ 141 n.27) The securities fraud class action complaint
included content from 14 confidential witnesses, all of whom
alleged some version of the fraudulent Medicare billing scheme.
(*Id.*; *see also* Amended Complaint at ¶ 30, *In re Chemed Corp. Sec.
Litig.*, No. 1:12-cv-00028-MRB (S.D. Ohio June 18, 2012), D.I. 34)
Importantly, the confidential witnesses had worked at various Vitas
locations, including Hartford, Connecticut; Dublin, Ohio; the New
Jersey North office; Sacramento, California; Boynton Beach,
Florida; Naples, Florida; Coachella Valley, California; Pittsburgh,
Pennsylvania; Encino, California; Walnut Creek, California;
Cincinnati, Ohio; and San Bernardino, California. (Amended
Complaint at ¶ 30, *In re Chemed Corp. Sec. Litig.*, No. 1:12-cv-
00028-MRB (S.D. Ohio June 18, 2012), D.I. 34) Thus, the
allegations in that complaint related to purported misconduct

42

occurring in numerous Vitas location across the country. The Audit Committee meeting minutes and memos reference the securities fraud class action at least eight times between February 9, 2012 and October 28, 2013. (D.I. 81 at ¶ 147; D.I. 75-2, exs. 14, 18-22, 24 & 26) And so it is a fair inference that the Audit Committee knew well the substance of the allegations in the securities fraud class action as of 2012 and certainly by mid-2013.

- Had received notice of the *Urick* and *Spottiswood qui tam* actions in 2011 and 2012, and had at least some information about the allegations therein, via the list of "Legal Reviews" provided to the Audit Committee as part of the May 20, 2013 Audit Committee Report. (D.I. 81 at ¶¶ 151, 166; D.I. 75-2, ex. 27)[38] By this point, the Company had in its possession a partially unsealed *Urick* complaint since June 2011, and had described the contents of the complaint in public filings as of November 2012. (D.I. 46 at 40-41 & n.30) And the Company had received a partially unsealed version of the initial *Spottiswood* complaint in June 2011 and a more detailed, amended complaint in that case as of November 2012. (*Id.* at 41 & nn. 31-32)

- Had been alerted, as of a memo dated May 13, 2013, of the existence of the DOJ Action. (D.I. 81 at ¶ 147; D.I. 75-2, ex. 24) As noted above, the DOJ Action Complaint contained allegations of fraudulent billing originating from all over the country, which could indicate a company-wide fraudulent billing scheme. And it is a fair inference that when the Audit Committee Defendants were advised of the existence of the DOJ Action, they were provided with at least some details about the substance of the DOJ Action Complaint. Moreover, the fact of the DOJ Action was the first time that the United States government was alleging that this type of wrongdoing had occurred at Vitas, a fact that surely would have been significant to the Audit Committee Defendants. *Cf. Johnson & Johnson*, 865 F. Supp. 2d at 567-68 (noting that the federal government's intervention in certain *qui tam* complaints was "significant"). That said, it is not clear that the Audit Committee Defendants received a copy of the DOJ Action Complaint in May 2013.

---

[38]    The Court here refers to the collective knowledge of all five Audit Committee Defendants. It notes that Defendant McNamara is associated with numerous Chemed Form 10-Q submissions during the relevant time period described in the Amended Complaint. Many of those submissions make reference to various of the *qui tam* actions. (*See, e.g.*, D.I. 46 at 42)

- <u>Had been alerted to the existence of the Missouri DOJ Investigation, as well as OIG investigations in other states (including California and Florida), via the Audit Committee Report dated May 20, 2013</u>. (D.I. 81 at ¶ 151; D.I. 75-2, ex. 27)  The report provided some details about these investigations.  At times, as in the description of the Missouri DOJ Investigation, the description noted that allegedly "false" claims were at issue; as to other investigations, reference is made only to an investigatory focus on "long stay[s]" or "CC level of care[.]"  (D.I. 75-2, ex. 27 at CHEKV00000127-28)

Taken together, then, by mid-2013, the above allegations show that the Audit Committee Defendants had been repeatedly told that over a number of years, a large number of different regulators and former Vitas employees had alleged that Vitas had engaged in fraudulent conduct in its hospice and crisis care admissions—conduct that was said to have occurred in various Vitas offices throughout the country.  (D.I. 92 at 13 ("[The Audit Committee Defendants] were informed year after year, meeting after meeting, of the multiple governmental investigations and *qui tam* complaints alleging wrongful conduct in connection with Vitas'[] hospice and crisis care billing and enrollment."))  To be sure, these were all simply allegations—Vitas had not then been found (and has not ever been found) to have actually committed civil or criminal misconduct by a court, regulator or other fact finder.  (D.I. 89 at 4, 7 n.6 & 14 n.14; D.I. 96 at 1-2, 4 & n.3; Tr. at 10)  But the breadth and depth of the allegations (and the Audit Committee Defendants' knowledge of them), as set out in the Amended Complaint, suffices for the Court to find that Plaintiff has plausibly alleged "that the directors knew or should have known that the corporation was violating the law[.]"  *Melbourne*, 2016 WL 4076369, at *8; *see also In re Capital One Derivative S'holder Litig.*, 979 F. Supp. 2d at 697 (finding that red flags, including a series of class actions and an investigation concerning the conduct at issue in the derivative litigation, "plausibly could have alerted defendants to wrongdoing").  That is, Plaintiff has met his burden

44

to demonstrate that, as of mid-2013, at least half of the Board was aware of enough "red flags" to sufficiently to put them on notice of corporate misconduct—here, the allegedly fraudulent Medicare billing scheme.

> **2.    Are Sufficient Facts Pleaded to Plausibly Demonstrate that the Audit Committee Defendants Acted In Bad Faith By Failing to Prevent or Remedy the Above-Referenced Legal Violations?**

The Court next turns to the question of whether Mr. Kvint has sufficiently pleaded (with particularity) that the Audit Committee Defendants "acted in bad faith by failing to prevent or remedy [the above-referenced] violations"—that is, "consciously disregard[ed their] duty to address that misconduct." *Melbourne*, 2016 WL 4076369, at *8.

### a.    Legal Standard for Bad Faith Inaction

In the *Caremark* context, "[i]n order to plead successfully that the Board's inaction amounted to bad faith, [p]laintiff must plead particularized facts from which it is reasonably inferable that the [b]oard consciously disregarded its duties by 'intentionally fail[ing] to act in the face of a known duty to act.'" *Id.* at *9 (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)). "'Conscious disregard' involves an 'intentional dereliction of duty' which is 'more culpable than simple inattention or failure to be informed of all facts material to the decision.'" *Id.* (quoting *In re Goldman Sachs Grp., Inc. S'holder Litig.*, Civil Action No. 5215-VCG, 2011 WL 4826104, at *13 (Del. Ch. Oct. 12, 2011)); *see also Stone*, 911 A.2d at 370 ("[I]mposition of liability [under *Caremark*] requires a showing that the directors knew that they were not discharging their fiduciary obligations."); *Oklahoma Firefighters Pension & Ret. Sys. v. Corbat*, C.A. No. 12151-VCG, 2017 WL 6452240, at *1 (Del. Ch. Dec. 18, 2017) (explaining that bad faith inaction "must suggest, not merely inattention, but actual scienter" and "must imply

that the directors are knowingly acting for reasons other than the best interest of the corporation").

### b.    Analysis of Mr. Kvint's Allegations

Mr. Kvint argues that the Chemed Board faces a substantial likelihood of liability because, "faced with the knowledge of mounting government investigations, *qui tam* lawsuits, and other related legal matters, the Audit Committee and the Board took no action." (D.I. 92 at 14) He asserts that "nowhere in the [Section] 220 Documents is there *any* mention of the Audit Committee or the Board initiating any proceedings or investigations to learn more about the allegations in the government investigations or the *qui tam* complaints, or even inquiring about Vitas's alleged fraudulent billing generally." (*Id.* at 14-15 (emphasis in original) (citing D.I. 81 at ¶ 150)) Mr. Kvint concludes that, "[p]ut simply, the Audit Committee and Board were apprised of Vitas'[] fraudulent activity, and egregiously failed to investigate to remedy the problems or take any action at all in response to this knowledge." (*Id.* at 15))

The Court, however, finds that in light of Rule 23.1's particularity requirements, the high bar inherent in a *Caremark* claim and the nature of the Amended Complaint's allegations, Mr. Kvint has not met his pleading burden here. It comes to this conclusion for five primary reasons.

First, Mr. Kvint points to no portion of the record indicating that the Audit Committee Defendants, having learned of one or more of the previously-referenced allegations/investigations/lawsuits, made an affirmative decision to do nothing about the underlying issues or to sweep the allegations under the rug. The Court is not suggesting that this kind of "smoking gun" evidence is required to plead demand futility in this context. It simply notes that nothing like that is a part of the record here.

Second, the record demonstrates that in the relevant time period, the Audit Committee Defendants were aware that the Company was: (1) complying with the various governmental or regulatory investigations; (2) responding to and/or litigating the *qui tam* and securities lawsuits; and (3) in many cases, conducting a review and audit of the files that were at issue in those investigations/lawsuits. For example, in the "Legal Reviews" list included in the May 20, 2013 Audit Committee Report, the Audit Committee Defendants were advised that the unsealed *Urick* complaint had been received and that the charts of the relevant patients were with the "audit team for medical review[.]" (D.I. 75-2, ex. 27 at CHEKV00000127) Similarly, that list explained that as to the other Texas *qui tam* action (likely the *Rehfeldt* action), Chemed/Vitas' physicians were "re[-]review[ing] and clarif[ying] Corridor/Govn't comments" (*Id.*)[39] The list also references the *Spottiswood* action, and explains that charts regarding the patients referenced in that complaint were "received and in review by [an] audit team[.]" (*Id.* at CHEKV00000128) As for the Missouri DOJ action, the list indicates that Chemed/Vitas had "retained local counsel, and based on medical review [felt] confident that the[] records [were] defendable[.]" (*Id.* at CHEKV00000127) The entries regarding other OIG investigations on that list (from California and Florida regional offices) show that the requested records had been reviewed and submitted to the government through counsel and that, as to at least one of those inquiries, "[a]udit team physicians" were reviewing and summarizing the relevant records. (*Id.* at CHEKV00000127-28) This all indicates that, with regard to these "Legal Reviews," the Audit Committee Defendants were aware that the Company was taking action—i.e., taking action to investigate the allegations

---

[39]    The "Legal Reviews" list is dated April 23, 2013. Again, note that the *Rehfeldt* action was dismissed on May 1, 2013, just over one week later. (D.I. 89 at 7 n.6; D.I. 90, ex. 5)

or, in some cases, to challenge them (when the Company felt it had enough evidence to suggest

that the allegations were wrongly made).  (*See* Tr. at 34-36 (Defendants' counsel arguing that the

references to the *qui tam* actions in this "Legal Reviews" section of the Audit Committee Report

"shows that there was a process underway and that the Audit Committee [was] being advised of

what that process is. . . . and it shows action by the company looking at these patient files"); *see*

*also id.* at 76-77 (Mr. Kvint's counsel stating that the "Legal Reviews" section's references to the

Texas *qui tam* actions shows that Chemed was "providing their defense in connection with"

those actions and "put people on th[o]se particular [actions] to respond to these requests and then

put forth the company's defense"); *id.* at 106)  And Mr. Kvint has provided no authority standing

for the proposition that the Audit Committee Defendants are guilty of bad faith inactivity if they

relied on other company personnel to respond to regulators' requests or to investigate and

evaluate claims of fraud.  *Cf. Melbourne*, 2016 WL 4076369, at *12 (noting that the plaintiff

failed to allege that the board acted in bad faith because, *inter alia*, the complaint "concedes that

the Board . . . . consistently expressed . . . its view that its business practices [were lawful]" and

pursued appeals of regulatory findings and penalties); (Tr. at 74-75).

　　　Third, the record contains additional evidence showing that the Audit Committee

Defendants were aware that the Company had taken various remedial actions during this time

period in order to strengthen compliance procedures.  The Audit Committee Report explains, for

example, how the Vitas "Compliance Committee has been reconstituted with an eye toward . . .

having more robust conversation at an appropriate policy level."  (D.I. 75, ex. 27 at

CHEKV00000119)  The report notes that a new Compliance Officer was appointed in "early

2012" who would report to former Defendant O'Toole and who would "provide more day-to-day

48

oversight of the compliance functions within the organization[.]" (*Id.*) In detailing the
compliance "Plan for 2013[,]" the report notes that Vitas intends to "[c]ontinue to refine
Compliance Committee processes[,]" institute ongoing educational efforts "including annual
compliance training and new-hire compliance training as part of the on-boarding process" and
"continu[e to] monitor[ the] regulatory environment and plan[] for anticipated changes[.]" (D.I.
75, ex. 27 at CHEKV00000121; *see also* D.I. 96 at 9 & n.4) It is a fair inference that some or all
of these plans were made in response to the reality that the company's crisis care billing practices
were under serious challenge. Indeed, even Mr. Kvint acknowledges that this document is one
that "actually deals with the Audit Committee remedying the wrongdoing alleged in the DOJ
Action and the *qui tam* complaints[.]" (D.I. 92 at 17); *cf. In re Qualcomm Inc. FCPA
Stockholder Deriv. Litig.*, C.A. No. 11152-VCMR, 2017 WL 2608723, at *3-4 (Del. Ch. June 16,
2017) (noting that where the record demonstrated that the company attempted "planned remedial
actions" in response to red flags regarding FCPA compliance issues, those actions showed that
the board did not act in bad faith); *Horman*, 2017 WL 242571, at *13-14 (same).

Moreover, Mr. Kvint's main argument as to why these portions of the Audit Committee
Report are irrelevant is off-point. Mr. Kvint argues that the above-referenced remedial measures
are immaterial to the *Caremark* bad faith inaction prong because the Audit Committee Report is
"dated May 23, 2013, ***after the DOJ Action was already filed***." (D.I. 92 at 17 (emphasis in
original)) This shows, he argues, that "the remedial actions of 'refin[ing] Compliance
Committee processes' and 'annual compliance training and new-hire compliance training' . . . are
all listed as 'compliance related activities for 2013' and, thus, were implemented only after the
DOJ took action to stop years of systematic wrongdoing by [Vitas]." (*Id.*) There are two

problems with this assessment.  For one thing, as Defendants point out, the Audit Committee

Report explains that these remedial processes began in *2012*, not mid-2013.  (*See* Tr. at 17

(Defendants' counsel stating that the Audit Committee Report "refers to a review process that

started in at least 2012, and the documents refer to a start date which is earlier than 2013"); *id.* at

106)  Indeed, as noted above, the report explains that in 2013 the Company was going to

"*[c]ontinue* to refine Compliance Committee processes" and engage in "*[o]ngoing* educational

efforts, including annual compliance training and new-hire compliance training[.]"  (D.I. 75-2,

ex. 27 at CHEKV00000121; *see also id.* at CHEKV00000119 (detailing how other compliance-

related initiatives described in the report dated from 2012))  Additionally, since even Mr. Kvint

acknowledges that he has only pleaded that the Audit Committee Defendants were aware of

illegal activity at Vitas *as of 2012, see infra* at 37-38, it does not seem out of the ordinary that the

Company would be undertaking responsive remedial actions *in 2012*.

   In light of the above, it appears that Mr. Kvint's real argument here is that the Audit

Committee Defendants should have realized that these 2012-13 remedial actions were

*insufficient*, given the nature of the red flags.  (*Cf.* Tr. at 118-19 (Mr. Kvint' counsel arguing that,

should Mr. Kvint satisfy the first *Caremark* prong and also show that "the response to the OIG

requests [were] insufficient, then [Mr. Kvint] should get [demand futility]"))  However, showing

that a board took insufficient remedial action—or remedial action that, in hindsight, could have

been better or more robust—is not the standard for this portion of a *Caremark* claim.  *See, e.g.*,

*Reiter ex rel. Capital One Fin. Corp. v. Fairbank*, C.A. No. 11693-CB, 2016 WL 6081823, at

\*14 (Del. Ch. Oct. 18, 2016) (finding that demand was not excused even though the allegations

in the complaint and incorporated documents "would allow reasonable minds to argue either side

of a debate over whether the directors' oversight of the [company's] compliance program was

sufficiently robust or flawed" and explaining that "'there is a vast difference between an

inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those

duties'") (quoting *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009)); *see also*

*Oklahoma Firefighters Pension & Ret. Sys.*, 2017 WL 6452240, at *16 (explaining that a board

making a wrong decision in response to red flags is insufficient to plead bad faith, and that the

question was "whether 'the board chose to do *nothing* about the control deficiencies that it knew

existed'") (emphasis in original, citation omitted).

    Fourth, an examination of the most relevant case on point also suggests that Mr. Kvint

has not met his burden here. In that case, *Melbourne Mun. Firefighters' Pension Tr. Fund ex rel.*

*Qualcomm, Inc. v. Jacobs*, C.A. No. 10872-VCMR, 2016 WL 4076369 (Del. Ch. Aug. 1, 2016),

the Delaware Court of Chancery ("Chancery Court") found that demand was not excused

regarding a *Caremark* claim, because plaintiff had failed to plead particularized facts indicating

that the company's board consciously disregarded alleged red flags. *Melbourne*, 2016 WL

4076369, at *12-13. In the case, plaintiff's complaint contained allegations that the company:

(1) had settled antitrust claims made by a competitor for $891 million; (2) had a decision entered

against it by the Korea Fair Trade Commission ("KFTC"), in which the company was to take

corrective action and pay a $208 million fine for having abused its dominant position in the

relevant Korean market (a decision that was on appeal to the Korea Supreme Court); (3) had a

cease and desist order entered against it by the Japan Fair Trade Commission ("JFTC") for

certain antitrust-related abusive business practices (which the company was disputing via

administrative procedures); and (4) had a penalty entered against it by an agency of the People's

Republic of China for $975 million for violation of the Chinese Anti-Monopoly Law (which the

company chose not to contest). *Id.* at *3-4. The complaint, relying on documents obtained

through a Section 220 request, alleged that at least half of the board had been made aware of

these various events. *Id.* at *8, *10.

The plaintiff argued that the company's board consciously failed to act in the face of three

"red flags" (the antitrust settlement, the KFTC decision and the JFTC order), which then resulted

in the $975 million Chinese governmental penalty against the company. *Id.* at *8-10. The

plaintiff asserted that the board's conscious inaction was "demonstrated by the fact that [the

board] failed to alter its business practices to avoid further antitrust violations." *Id.* at *11. The

Chancery Court disagreed, however, finding that it was "unreasonable to infer that the Board

consciously disregarded its fiduciary duties in response to those red flags" because the board not

only "continuously monitored each of the three alleged red flags" but also consistently expressed

"its view that its business practices were not violative of international antitrust laws[.]" *Id.* at

*12. Instead, the board "elected to address the relevant legal actions by focusing on educating

industry participants and government officials as to why its practices were legal and by pursuing

appeals." *Id.* Particularly relevant to the instant matter, the Chancery Court also explained that

"[p]laintiff's argument is not that the Board completely failed to act in response to [the] red flags,

but instead that the Board's response was insufficient." *Id.* And while the *Melbourne* Court

explained that certain red flags may give rise to "an immediate duty to alter a company's culture

and business practices"—such as a situation where "the company pled guilty to criminal charges"

or "was advised by its general counsel that its business plan included potentially illegal

conduct"—it concluded that this was not the situation before it. *Id.* (citing *In re Massey Energy*

*Co.*, C.A. No. 5430-VCS, 2011 WL 2176479, at *6 (Del. Ch. May 31, 2011) and *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 320 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013)).

Here, it may be that the Audit Committee Defendants and the Company chose to respond to the red flags at issue by: (1) complying with investigatory demands, assessing governmental allegations and asserting the Company's innocence and (2) otherwise taking steps to strengthen general compliance procedures, but not (3) launching a vast internal investigation or dramatically altering Vitas' business practices. Yet as *Melbourne* demonstrates, even if that response is in hindsight now argued to be *insufficient*, it does not follow that it is plausible that the Audit Committee Defendants *consciously disregarded* their fiduciary duty in bad faith. *See Okla. Firefighters Pension & Ret. Sys.*, 2017 WL 6452240, at *16-17.

Fifth, the two cases that Mr. Kvint cites as most beneficial to his position are distinguishable. They do not change the Court's analysis. (Tr. at 65-66, 116-19)

The first is *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313 (Del. Ch. 2012) ("*Pyott*"), a case Mr. Kvint cites as being relevant to the bad faith inaction *Caremark* prong. (Tr. at 116-19) In *Pyott*, the Chancery Court found that demand on the board was excused under *Caremark* because "the particularized allegations [in the complaint] support[ed] a reasonable inference that the Board consciously approved a business plan predicated on violating the federal statutory prohibition against off-label marketing." *Pyott*, 46 A.3d at 323. The illegal conduct at issue was the off-label marketing of a drug (that is, the marketing of the drug for a use that was not approved by the United States Food and Drug Administration)—conduct for which the company pleaded guilty to a criminal misdemeanor and paid $600 million in criminal and civil

penalties. *Id.* at 316-18, 320. Specifically, the allegations in the complaint demonstrated that the board "discussed and approved a series of annual strategic plans that contemplated expanding Botox sales dramatically within geographic areas that encompassed the United States[ and those] plans contemplated new markets for Botox that involved applications that were off-label uses in the United States." *Id.* at 352. As was succinctly stated in *Melbourne*, *Pyott* is distinguishable because there the board's alleged bad faith "was not based on its conscious disregard for its duty to *prevent* the company from engaging in illegal conduct[, but rather] it was based on the board's alleged decision to *cause* the company to engage in [adjudicated] illegal conduct." *Melbourne*, 2016 WL 4076369, at *12 (emphasis in original). And as in *Melbourne*, here Plaintiff has pointed to no particularized allegations indicating that the Audit Committee Defendants *caused* Vitas to adopt any illegal practices. *See id.*

The second case put forward by Plaintiff was *Shaev v. Baker*, Case No. 16-cv-05541-JST, 2017 WL 1735573 (N.D. Cal. May 4, 2017),[40] which Plaintiff's counsel argued was the "best comparison on the facts" and the case "most on point" to the instant action. (Tr. at 65-66) In *Shaev*, the United States District Court for the Northern District of California found that demand was excused on the board under *Caremark* because the particularized allegations in the complaint supported an inference that the Wells Fargo board "knew about widespread illegal activity and consciously disregarded their fiduciary duties to oversee and monitor the company." *Shaev*, 2017 WL 1735573, at *15. Specifically, the plaintiff alleged that the board "knew or consciously disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card accounts for their customers, without those customers' knowledge or consent."

---

[40]     Plaintiff's counsel referred to this case as "*Wells Fargo*." (Tr. at 65-66, 116)

*Id.* at *1. The reason the employees created those accounts was because "Wells Fargo's financial condition and prospects were dependent upon cross-selling—i.e., the sale of new products and services to existing customers." *Id.* at *2. Wells Fargo allegedly imposed "strict quotas regulating the number of products Wells Fargo bankers must sell." *Id.* (internal quotation marks and citation omitted). These quotas "translated into unrelenting pressure on bankers to open numerous accounts per customer" and served to foster and perpetuate the illegal account openings. *Id.* at *3 (internal quotation marks and citation omitted).

The plaintiff alleged that the Wells Fargo board had knowledge of the alleged illegal account activities based on the presence of numerous red flags:

> (1) A director's admission to the Senate Banking Committee and the House Financial Services Committee "regarding the Board's monitoring of sales integrity issues.";
>
> (2) Direct communications from a former employee to the board advising the board of unethical sales practices.;
>
> (3) Several lawsuits filed between 2008 and 2013, which involved allegations of unauthorized account-creation practices at the company, including a whistleblower lawsuit (in which the plaintiff prevailed), six wrongful termination suits, two discrimination lawsuits, one retaliation lawsuit, and a consumer class action.;
>
> (4) An article published in the *Los Angeles Times* that "described in detail how the intense pressure to meet cross-selling quotas drove employees to open unauthorized customer accounts[,]" which was discussed by the board.;
>
> (5) "[S]ignificant regulatory interventions" over a four-year period between 2012 and 2016, in the form of letters from the Office of the Comptroller of the Currency ("OCC") that identified the need for corrective action as to such practices.;
>
> (6) Widespread employee terminations due to unauthorized account creation.; and

55

(7) The allegation that due to the importance of cross-selling, the board "knew about the illicit account-creation scheme."

*Id.* at *3-5, 10-13 (internal quotations and citations omitted).  The plaintiff further alleged that despite those red flags, "[t]he only response [of the board] was to include a new entry code on its EthicsLine ethics complaint forms for 'gaming' and 'sales incentives,' to track those specific types of complaints." *Id.* at *15 (alterations in original, certain internal quotation marks and citation omitted).  The *Shaev* Court agreed with plaintiff that those "allegations plausibly suggest[ed] that the [board] knowingly failed to stop further problems from occurring, thus breaching their fiduciary duties to the company." *Id.* (internal quotation marks and citation omitted).

While some of the underlying factual allegations in *Shaev* are similar to those in the instant action, the case is distinguishable on numerous grounds.  For example, the Wells Fargo Board received letters from a regulator (the OCC) that, *inter alia*, "specifically identified the need [for Wells Fargo] to assess cross-selling and sales practices as part of its upcoming examination of the [b]ank's governance processes" and "identified that Wells Fargo "lack[ed] a formalized governance process to oversee sales practices and effectively oversee and test branch sales practices[.]" *Id.* at *12 (internal quotation marks and citations omitted).  In response to those letters, the Wells Fargo board did not appear to have taken any action to remedy the noted deficiencies.  Even more glaring is the fact that:  (1) a member of the Wells Fargo board actually testified before the Senate Banking Committee that the board received reports of the actual opening of fraudulent accounts by Wells Fargo employees; and (2) a former employee repeatedly advised the board directly of the unethical sales practices occurring at the company. *Id.* at *10-11.  Yet even in the face of these extremely direct indications of wrongdoing, the board's only

56

response was the inclusion of the new entry code in the EthicsLine ethics complaint forms. *Id.* at *15. As the *Shaev* Court noted, "implementation of a reporting system is not sufficient on its own to preclude director oversight liability." *Id.*

In contrast, in this case, not only is there less robust evidence of the Audit Committee Defendants' knowledge of unlawful activity, but additionally, the record reflects more fulsome actions by those Defendants/the Company in response to what was known. Rather than merely implementing new ways to monitor alleged fraudulent Medicare billing, the Audit Committee Defendants/the Company: (1) continued to refine the Company's compliance procedures and training; (2) complied with investigative demands; (3) analyzed and audited the records at issue and (4) otherwise aggressively litigated the cases brought against them.

For these five reasons, the Court concludes that Mr. Kvint has not met his burden to sufficiently plead the *Caremark* bad faith inaction prong, and thus, has not established demand futility.

## IV.    CONCLUSION

The Court recommends that Defendants' Motion be GRANTED pursuant to Rule 23.1. For the reasons set out above, Plaintiff has failed to meet Rule 23.1's requirements that he plead particularized facts indicating that at least half of the Board faced a substantial likelihood of liability with regard to such a claim. *Intel*, 621 F. Supp. 2d at 174. As a result, Plaintiff has failed to sufficiently allege that any demand as to that claim would have been futile. In light of this recommendation, the Court need not reach Defendants' alternative argument for dismissal of this claim premised upon Rule 12(b)(6). (D.I. 89 at 20); *see New Jersey Bldg. Laborers Pension Fund v. Ball*, Civil Action No. 11-1153-LPS-SRF, 2014 WL 1018210, at *2 n.3 (D. Del. Mar.

13, 2014).

Mr. Kvint, in a footnote, requests further leave to amend should the Court grant Defendants' Motion. (D.I. 92 at 20 n.21; Tr. at 86)  He notes that although this is now the second time the Court has ruled that allegations of demand futility are insufficient, his request is appropriate because "this is Plaintiff Kvint's first complaint before the Court[.]"  (D.I. 92 at 20 n.21)  Defendants oppose this request.  (D.I. 89 at 20; D.I. 96 at 10; Tr. at 115-16)

Mr. Kvint's argument is unavailing.  Mr. Kvint had access to the KBC Complaint and the Court's First MTD R&R, which extensively detailed the KBC Complaint's deficiencies.  Thus, Mr. Kvint was in a strong position to address those issues before filing his Amended Complaint. He has been given every fair opportunity to do so.  The fact that his Amended Complaint is still wanting after many years of litigation indicates that providing further opportunity to amend would be futile.  Therefore, the Court recommends that Defendants' Motion, (D.I. 88), be GRANTED with prejudice, and that the above-captioned matter be dismissed as to all Defendants.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).  The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at

http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **March 1, 2019** for review by the Court, along with a motion for redaction that includes a clear, factually-detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated: February 26, 2019

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

59